**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| **DAVELL ARTIS,** | \| |
| **DONTRA ARTIS,** | \| |
| **MICHAEL BLUNT,** | \| |
| **RONNELL BROTHERS,** | \| |
| **BRANDON CAMPBELL,** | \| |
| **JERRY COOK,** | \| |
| **BOBBY HARDY,** | \| |
| **HUSAMIDDIN MUBASHIR,** | \| |
| **GABRIEL JIMINEZ,** | \| |
| **ALFREDO LEBRON DIAZ,** | \| |
| **WILFREDO LEBRON-DIAZ,** | |
| **RAMELL MCDONALD,** | |
| **ROBERT THOMAS, SR.,** | **Case No. 2:17cv595** |
| **ROBERT THOMAS, JR.,** | |
| **TAVARIS TILLERY,** | |
| **EDWARD WASHINGTON, and** | |
| **JAMES WILLIAMS** | |

   **Plaintiffs,**

**v.**

**LYON SHIPYARD, INC.**

   **Defendant.**

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**AND COMPEL MEDIATION AND ARBITRATION OF FIVE PLAINTIFFS' CLAIMS**

  Plaintiffs Michael Blunt, Ronnell Brothers, Gabriel Jimenez, Edward Washington and

Husamiddin Mubashir oppose Defendant Lyon Shipyard, Inc.'s motion to compel mediation and

arbitration. Although styled as a motion to dismiss for lack of subject matter jurisdiction, dismissal for

want of jurisdiction is inappropriate. If the Court were to determine that a valid mediation and

arbitration agreement existed – which Plaintiffs deny – staying those claims pending arbitration would

be the appropriate outcome.

1

The agreements on which Defendant relies to support its motion are not enforceable. The agreements are procedurally unconscionable, having been provided in a 'take it or leave it' setting: "if you don't sign it, you can't work here"; " You have two choices, sign it, and stay working or don't sign it, and pack up your tools and go"; during which employees were misinformed about their rights: "once you sign the paper you cannot talk to anybody, including your lawyer," Lyon's true purpose was explained: "this agreement is to keep whatever goes on in Lyon Shipyard in Lyon Shipyard and not let it get to the news or media" and that Lyon wanted to ensure that employees did not speak about the materials employees worked with and were exposed to at Lyon - [which included asbestos and lead] - with others outside of Lyon or with family members. They were told that they should "report the issue to Human Resources. Human Resources would evaluate whether there was a claim. If they decided there was a claim, the claim would be referred to Lyon Shipyard's attorneys." When asked to take the document home to read, Lyon stated that the "document could not leave the front gates."

The terms were not negotiable, some were not even provided with an opportunity to read the agreement, and they were not permitted to keep copies of the purported Agreements. In addition, the majority of the claims at issue predate the written agreements, and are not covered by them: the agreements are not retroactive. Further, the agreements are not enforceable because the language allows for the *employees* to pay not only the costs of the arbitration but defendant's attorneys' fees and costs as well, either or both of which would be prohibitively expensive. Finally, the agreements impermissibly purport to shorten the statute of limitations for civil rights claims in a manner that does not even provide a known time-frame for filing, and could result in employees being left with no forum for redress at all.  Defendant's motion to dismiss should be denied.

## I.      FACTUAL BACKGROUND

Plaintiffs filed the instant action to redress longstanding harassment and discrimination, and retaliation, at Lyon Shipyard. Complaint, dkt. 1. Defendant was previously sued by twenty three

individuals, for harassment and discrimination, Acosta et al. v. Lyon Shipyard, 2:14 CV 592.  Rather than address  the rampant discrimination in the yard and institute appropriate remedial measures, it apparently sought to cloak the misconduct under a veil of secrecy by holding meetings with multiple employees, informing them they could not speak about their employment with anyone – whether in connection with racial harassment, or unsafe working conditions involving asbestos – and could not speak with an attorney; it forced them, upon pain of discharge, to sign "Employment and Arbitration Agreements" that purported to waive their right to a jury trial,  shorten the statute of limitations pertaining to civil rights claims, and permit an award of legal fees *against them*  for Lyon's enforcement of the Agreement. Some were not allowed to read the forms before signing, or take a copy; none were allowed to negotiate terms. It was sign or be fired. Lyon explicitly told them the goal was to keep claims out of the media, and it was interpreted as a gag order.

     A.     **The Circumstances  of Signing the "Employment and Arbitration Agreements" Render Them Unenforceable**

<u>Gabriel Jimenez</u>

Plaintiff Jimenez began working at Lyon shipyard as a pipefitter through Tidewater Staffing in March 2012 and was hired as a permanent worker at Lyon in or around July 2014. Jimenez Decl., ex. A, par. 2. On June 3, 2016, years after he had been working at Lyon Shipyard, Nick Worley, the superintendent, informed the workers in the pipefitting shop that they would be asked to sign a document that day. Jimenez Decl., ex. A, par. 3. The document would prohibit them from speaking about the work they did at Lyon Shipyard. *Id.*.

Jimenez' co-worker, James Brown, asked, "what about if I don't want to sign?" Bobby Holden, a supervisor, responded, " You have two choices, sign it, and stay working or don't sign it, and pack up your tools and go." *Id.*, par. 4. At lunchtime, Superintendent Worley told him to go to a meeting in the machine shop, at which approximately 30-40 workers were gathered.  *Id.*, par. 5.

Nicole Dunkley, the head of Human Resources, led the meeting. *Id.*, par. 6. She covered various topics, including changes to the company handbook and the document we would have to sign later in the day. *Id.* Dunkley held the document in her hand and she summarized that the purpose of the document was to ensure that employees did not speak about the materials we worked with and were exposed to at Lyon - [which included asbestos and lead] - with others outside of Lyon or with our family members. *Id.*, par. 7.

She told them that they could not speak to an attorney if they had an issue at Lyon. *Id.*, par. 8. Instead, they  would have to report the issue to Human Resources. Human Resources would evaluate whether there was a claim. *Id.* If they decided there was a claim, the claim would be referred to Lyon Shipyard's attorneys. *Id.* Workers were upset at her explanation. *Id.*, par. 9. They said it was unfair that Lyon was forcing them to sign a document or lose our job. *Id.*  Dunkley implied that it was no big deal to sign the document, saying that it was meant to ensure that Lyon workers did not talk about their jobs to others. *Id.*, par. 10.

James Brown asked to take the document home to read. *Id.*, par. 11. Dunkley responded that the document could not leave the front gates. *Id.* At no point during this meeting did he receive the document to read or review. *Id.*, par. 12. When he returned to the pipe shop, Nick Worley asked Jimenez to come into his office. *Id.*, par. 14. Worley held the document in his hands and pointed to the signature line. Jimenez signed the document. *Id.*, par. 15.

He had no choice but to sign the document. *Id.*, par. 16. He had two babies, a one-year old and a two-year old, and a wife to support. *Id.* He knew that if he left Lyon, it could take months to find another job. *Id.* He had previously been unemployed for months, which is common in the shipyard industry, and could not afford to be without a job for that long again. *Id.*, par. 17. He never received a copy of the document before or after he signed it. *Id.*, par. 18. He was never given the opportunity to read the document. *Id.*, par. 19. If he had to pay the arbitrator's fees and defendant's legal fees, he

would not be able to afford to proceed in his lawsuit against Lyon. *Id.*, par. 20.

Edward Washington

  Washington started at Lyon Shipyard through Tidewater Staffing in May 2014 as a laborer. Washington Decl., ex. B, par. 2. In September 2014 he became a permanent Lyon Shipyard rigger. *Id.* .On or around June 3, 2016, at the start of night-shift, Bobby Daniels, supervisor, told him to attend a meeting in the Rose Avenue building. *Id.*, par. 3.The majority of the night shift were gathered in the building's conference room. *Id.*

  Nicole Dunkley, the head of Human Resources, was also present. *Id.*, par. 4. She led the meeting discussing Lyon Shipyard's arbitration agreement. *Id.* She explained, "this agreement is to keep whatever goes on in Lyon Shipyard in Lyon Shipyard and not let it get to the news or media." *Id.*, par. 5. Referring to the agreement, Dunkley stated that "once you sign the paper you cannot talk to anybody, including your lawyer." *Id.*, par. 6. She further stated, "You have to go through arbitration and someone will mediate between the company and you." *Id*

  As Dunkley discussed the terms of the agreement, Washington commented, "this is bullshit." She responded, "this is really not bullshit." *Id.*, par. 7. Someone asked, "what happens if we don't sign it." Dunkley answered, " if you don't sign it, you can't work here." *Id.*, par. 8. Most of the workers did not want to sign the agreement. *Id.*, par. 9. They felt it was unfair. *Id.* But they  did sign the agreement because they needed the job. *Id.*

  Washington also signed the agreement because he needed the job. *Id.*, par. 10. He had six children to support, ranging in age from one year to thirteen years, and, in the past, had had a difficult time finding employment based on a variety of factors.  *Id.* He could not afford to be without a job. *Id.*

  He never received a copy of the agreement. *Id.*, par. 11. If he had to pay the arbitrator fees and defendant's legal fees, he would not be able to afford to proceed in a lawsuit against Lyon. *Id.*, par. 12.

Husamaddin Mubashshir

Plaintiff Mubashshir worked at Lyon Shipyard for one day on December 15, 2016 through Tidewater Staffing. Mubashshir Decl., Ex. C, par. 2. He had previously worked there through March 2014. Complaint, dkt. 1, par. 244. Lyon Shipyard was aware that Mubashshir had a ninth grade education. Ex. C, par. 4. Plaintiff Mubashshir does not have specific knowledge of signing a "Temporary Worker Arbitration Agreement." *Id.*, par. 5.

On December 15, 2016, in the morning, he went into the Human Resources office at Lyon, having been told to go by his staffing company. *Id.*, par. 6. As is customary in the industry, he was handed a packet of documents to sign to receive access to the shipyard. *Id.*, par. 7. He did not read through these documents. *Id.*, par. 8.  Since I had worked at Lyon Shipyard previously, and had signed similar paperwork before at Lyon Shipyard, he believed assumed these documents were similar to others he had signed in the past. *Id.* No one went over the documentation given to him to sign. *Id.*, par. 9. No one gave an orientation to discuss the arbitration agreement. *Id.*, par. 10. He was not given a copy of the documents he signed. *Id.*, par. 11.

Plaintiff Mubashshir does not know if the "Temporary Worker Arbitration Agreement" was part of the packet of documents he signed. *Id.*, par. 12. He then worked eight hours on December 15, 2016. *Id.*, par. 13.  Approximately, one to two hours after he arrived home, he received a phone call from a Tidewater Staffing representative. *Id.*, par. 14. The representative said that Lyon Shipyard no longer wanted his services.  *Id.*

Immediately, he telephoned his supervisor at Lyon Shipyard, Benjamin Brinkley and asked why Lyon was letting him go. *Id.*, par. 15. Brinkley initially responded, "I don't know." *Id.* He asked, "Are you associated with the lawsuit against Lyon shipyard." *Id.*, par. 16. Mubashshir responded, "yes." *Id.* Benjamin Brinkley confirmed, "that's why." *Id.*, par. 17. If Mubashshir had to pay the arbitrator's fees and defendant's legal fees, he would not be able to afford to proceed in his lawsuit against Lyon.  *Id.*,

par. 18.

<u>Ronnell Brothers</u>

Plaintiff Ronnell Brothers started at Lyon Shipyard in 2013 through Tidewater Staffing. Brothers Decl., ex. D, par. 2. He became a permanent worker at Lyon Shipyard in early 2014. *Id.* In June 2016, he reported to his supervisor, Bobby Daniels, at the beginning of night shift. *Id.*, par. 3. That shift, Daniels directed Plaintiff Brothers to attend a meeting in the Rose Ave building. *Id.* Plaintiff Brothers walked over to the building. *Id.*, par. 4. Workers from the night shift were gathered in the building's conference room. *Id.*

Nicole Dunkley, the head of Human Resources, led the meeting. *Id.*, par. 5. She said that Lyon Shipyard wanted to avoid lawsuits. *Id.* For that reason, Lyon Shipyard workers would be required to sign an agreement to keep their complaints about Lyon Shipyard's illegal activities within the company. *Id.*

Dunkley said, if Lyon Shipyard workers did not sign the agreement, they would be fired. *Id.*, par. 6. She explained that under the agreement, if a worker had a complaint, he had to report it to Human Resources and Lyon Shipyard would handle the complaint. *Id.*, par. 7. If anyone spoke about the conditions at Lyon Shipyard to anyone else, they would be fired. *Id.*

Someone commented that the agreement was unfair. *Id.*, par. 8. Another person asked, "what if I don't want to sign it." *Id.*, par. 9. Bobby Daniels responded, "you can sign it, or you can turn your ID in and I will personally escort you out of this gate in my cart." *Id.* At the end of the meeting, Dunkley directed Daniels to make sure that the workers had signed the paperwork. *Id.*, par. 10

Plaintiff Brothers returned to work. *Id.*, par. 11. While he was working, Daniels called Brian Bass, the leadman on Plaintiff Brothers' job, over the radio and asked that Bass send over Plaintiff Brothers to Daniels. *Id.* Plaintiff Brothers walked to Daniels' office and Daniels gave him the agreement to sign. *Id.*, par. 12.

Plaintiff Brothers signed the document because he did not have a choice. *Id.*, par. 13. He had to support his wife and three children. *Id.* He had had difficulties getting work in the past for a variety of reasons and could not afford to be without a job. *Id.*

Plaintiff Brothers asked for a copy of the agreement but Daniels refused to give it to him. *Id.*, par. 14. His coworker Ruby also asked for a copy of the agreement, and Daniels responded that Ruby could sign the agreement or be fired. *Id.*, par. 15. He never received a copy of the agreement. *Id.*, par. 16. If Plaintiff Brothers had to pay the arbitrator fees and defendant's legal fees, he would not be able to afford to proceed in his lawsuit against Lyon. *Id.*, par. 17.

<u>Michael Blunt</u>

Plaintiff Michael Blunt started working at Lyon Shipyard through Tidewater Staffing in September 2014 as a firewatch. Blunt Decl., ex. E, par. 2. In August 2015, he became permanent at Lyon Shipyard. *Id.* Sometime at the end of May 2016 or beginning of June 2016, Nicole Dunkley, and a second representative from Human Resources came into the Dock Shop/Carpentry Shop. *Id.*, par. 3. Dunkley explained that we would have to sign an arbitration agreement or be fired. She stated that the agreement was to protect Lyon Shipyard so that it wouldn't be liable for "anything that goes on." *Id.*, par. 4. Dunkley and the representative were in the shop for less than fifteen minutes. *Id.*, par. 5. Before Dunkley and the representative left, they handed out the agreement for the workers to sign. *Id.*, par. 7.

After Human Resources Representatives left, the workers expressed to each other, "that's a whole bunch of bullcrap." *Id.*, par. 8. Many of the workers said that they were not going to sign the paper. *Id.* Approximately two weeks passed. Plaintiff Blunt was working at Lyon Shipyard's south yard. *Id.*, par. 9. Kurt, Plaintiff Blunt's assistant foreman, drove over from the main yard to the south yard. He came over to tell Plaintiff Blunt that if he did not sign the agreement, he would be fired. *Id.*, par. 10.

Prior to working at Lyon Shipyard, Plaintiff Blunt had been homeless. *Id.*, par. 11. He had had problems finding work in the past for various reasons. *Id.* He knew he could once again be homeless if he did not have a job. *Id.* He could not afford to be without a job. *Id.*, par. 12. He did not have a choice but to sign the agreement. *Id.*, par. 13. He signed it and gave it to Human Resources. *Id.*

Plaintiff Blunt never received a copy of the signed agreement. *Id.*, par. 14. If he had to pay the arbitrator fees and defendant's legal fees, he would not be able to afford to proceed in his lawsuit against Lyon. *Id.*, par. 15.

B.      **The Majority of the Conduct At Issue Occurred Prior to Execution of the Agreements, Which are Not Retroactive**

The majority of the conduct comprising Plaintiffs' claims arose before the "Employment Agreements" were executed.

Husamiddin Mubashshir worked at Lyon from January 2006 until July 2008; from July 2009 until July 2011; and from November 2013 until March 2014. Complaint, dkt. 1, par. 244. Lyon asserts that he executed a Temporary Worker Arbitration Agreement on December 15, 2016, see Dkt. 5-5, more than two years after his last stint at Lyon. Lyon was aware, at the time Mubashshir was provided with the Arbitration Agreement to sign that he was represented by counsel with regard to the instant claims.[1]

---

1  Counsel for Ms. Mubashshir, along with several other plaintiffs, were in discussions with counsel for Lyon Shipyard in June 2016, to determine whether claims could be resolved without litigation. Lyon's attorneys failed to inform Plaintiffs' counsel before the Complaint was filed that any of their claims were alleged to be subject to an arbitration agreement. Moreover, after Lyon already knew that Mubashshir was represented, Lyon had him sign an arbitration agreement. Although Plaintiffs' have asked counsel for Lyon whether obtaining the Temporary Worker and Arbitration Agreement was done at the instruction of counsel, potentially violating Va. RPC 4.2, so far counsel have not responded.

Lyon re-called Mubashshir to work for <u>one day</u> on December 15[2], but then claimed there was no work for him, and he did not work further. Dkt. 1, par. 244; Declaration of Husamiddin Mubashshir.

Michael Blunt worked at Lyon Shipyard from September 2014 through August 2015 on Fire watch. Dkt. 1, par. 78. In August 2015, Blunt became a permanent Lyon employee where he worked in the Dockshop/Carpentry Shop until he was fired in July 2016. Id., par. 79. Lyon asserts that he signed an Employment and Arbitration Agreement on June 7, 2016, Dkt. 5-1, approximately one month before he was fired.

Ronnell Brothers worked for Lyon Shipyard from July 2013 until July 21, 2016, as a welder's helper. Dkt. 1, par. 92. Initially he worked through Tidewater Staffing, but later became a permanent Lyon employee in or around July 2014.  Id.

Lyon asserts he signed an Employment and Arbitration Agreement on June 1, 2016, Dkt. 5-2, approximately six weeks before he was fired.

Gabriel Jimenez worked at Lyon as a pipefitter in the Pipeshop from March 2012 until October 20, 2016. Dkt. 1- par. 295.  Lyon asserts he signed an Employment and Arbitration Agreement on June 3, 2016, Dkt. 5-3, less than five months before he was constructively discharged.

Edward Washington worked for Lyon  in the Labor Shop from May of 2014 through March 2017, when he was effectively fired. Dkt. 1, par. 447. Lyon asserts he signed an Employment and Arbitration Agreement on June 3, 2016.  Dkt. 5-4. Consequently, more than two years of employment, and claims arising in those two years, precede the arbitration agreement.

## II.    ARGUMENT

Dismissal is inappropriate. Even if the Court were to find that Plaintiff's agreed to arbitrate all their claims, this Court maintains subject matter jurisdiction, and the court should stay Plaintiffs'

---

2  The date he was recalled was listed incorrectly in the Complaint as January 2017; it was December 15, 2016. It will be corrected in an amended complaint.

claims. However, the Court should not compel arbitration considering the circumstances under which Plaintiffs were forced to sign, and the terms of the agreements, render then unconscionable.

A. **Stay, not dismissal, is appropriate in the event the Court finds any claims arbitrable**

Defendant's motion to dismiss for lack of subject matter jurisdiction, brought pursuant to FRCP 12(b)(1), should be denied. *See Bayer CropScience AG v. Dow AgroSciences LLC*, 2012 U.S. Dist Lexis 97850 (E.D.Va. 2012) (Jackson, J.). In *Bayer,* defendant, like Lyon here, moved for dismissal based on a purported lack of subject matter jurisdiction. As the court explained, a party moving for dismissal for lack of subject matter jurisdiction should prevail only if material jurisdictional facts are not in dispute and the moving party is entitled to prevail as matter of law. *Id.,* at *13. *citations omitted.* Here, Lyon does not contend that the allegations in the Complaint do not otherwise support subject matter jurisdiction, and Lyon has not moved pursuant to 12(b)(1) in connection with the 14 plaintiffs for whom there is no purported arbitration agreement, effectively conceding subject matter jurisdiction is present. Because the Court clearly has subject matter jurisdiction over Plaintiffs' civil rights claims brought pursuant to 41 U.S.C. 1981, dismissal is inappropriate. *See* Complaint, dkt. 1, par. 5 alleging jurisdiction; 28 U.S.C.1343.

An arbitration agreement, if otherwise valid, does not divest the court of subject matter jurisdiction. In fact, the Federal Arbitration Act specifically calls for a stay: Sections 3 and 4 of the Federal Arbitration Act "provide[] two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). Under § 3 of the FAA, a district court must grant a party's motion to stay further proceedings if (1) the court is "satisfied that the issue . . . is referable to arbitration" pursuant to "an agreement in writing for such arbitration," and (2) the "applicant for the stay is not in default in proceeding with such

arbitration." *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 713 (4th Cir. 2015) quoting 9 U.S.C. § 3. Thus, the provisions of the FAA confer upon the court the authority to retain jurisdiction over a matter that is subject to arbitration. *Bayer,* at *16.

In *Bayer,* the court rejected Defendant's motion to dismiss for lack of subject matter jurisdiction, after evaluating the caselaw discussing stays compared with dismissal: "By contrast, the Federal Circuit has reasoned that an arbitration agreement does not divest the court of jurisdiction to hear a matter: '. . . [W]hile older case law suggests that an arbitration clause 'ousts a court of jurisdiction, that view has lost much, if not all, of the legitimacy it once may have had.' Arbitration agreements are properly viewed as contractual arrangements for resolving disputes, not as documents divesting a court of jurisdiction.'" *Id.,* at 21-21, *quoting Hardie v. United States,* 19 Fed. Appx. 899, 906 (Fed. Cir. 2001) (*quoting DiMercurio v. Sphere Drake Ins.*, 202 F.3d 71, 76 (1st Cir. 2000) (citing to several cases indicating that arbitration agreements are on the same footing as other contracts and holding that such agreements are not destructive of jurisdiction.); *see also Forbes v. SeaWorld Parks & Entm't*, 2017 U.S. Dist. Lexis 86926, fn.5 (E.D. Va. 2017) (Davis, J.) (*noting* "It is unclear to the Court whether Defendant's alternate basis for dismissal, the lack of subject matter jurisdiction under Federal Rule 12(b)(1), is appropriate under the facts of this case, *citing Bayer*, but declining to resolve because the parties did not brief the issue and there were other bases to dismiss.) This Court retains subject matter jurisdiction over Plaintiffs' claims regardless of the validity of any arbitration agreement. Having provided no other basis to dismiss,[3] and because the Court maintains subject matter jurisdiction,

---

3   The sole case Lyon cites for the proposition that subject matter jurisdiction is lacking where there is a binding arbitration agreement emanates from the Fifth Circuit, *Gilbert v. Donahoe,* 751 F.3d 303 5th Cir). Dkt. 6, p. 4. A subsequent Fifth Circuit panel expressly rejected the language used by *Gilbert* in connection with subject matter jurisdiction. *Ruiz v. Donahoe,* 784 F.3d 247 (5th Cir. 2015):
    Although in Gilbert we spoke in terms of subject-matter jurisdiction, **we used the term imprecisely**.  "Because the consequences that attach to the jurisdictional label may be so drastic," the Supreme Court has cautioned courts to use the term "jurisdictional" only when discussing subject-matter or personal jurisdiction. The Supreme Court has explained that "[s]ubject-matter jurisdiction properly comprehended . . . refers to a tribunal's 'power to hear a

dismissal is inappropriate, and Defendant's motion should be denied in full.

If the Court nevertheless considers Defendant's motion as one to dismiss for improper forum, it should decline to dismiss even if the claims are to be arbitrated, because dismissal could result in claims becoming stale/extinguished[4], and because the claims of fourteen plaintiffs remain, an arbitration award must be confirmed by a court, and there is no prejudice to Lyon if the matter is stayed. *See Tarpley v. Brookdale Senior Livings,* 2016 U.S. Dist. LEXIS 116126, at *13 (W.D. Va. Aug. 30, 2016). "Although courts within the Fourth Circuit have noted that, when all the issues presented in a lawsuit are arbitrable, dismissal may be the proper remedy, this approach is unpersuasive." *Id.,*

---

case,' a matter that 'can never be forfeited or waived.'" Conversely, mandatory grievance and arbitration procedures in contracts, such as the CBA in Gilbert, are waivable and **do not affect this court's subject-matter jurisdiction**. If a dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration. However, a dismissal may be appropriate "when all of the issues raised in the district court must be submitted to arbitration." **In any event, agreements to arbitrate implicate forum selection and claims-processing rules not subject matter jurisdiction.**

*Id.*, 249-50 (emphasis supplied).

4  The arbitration agreements purport to shorten the statute of limitations for civil rights claims from four years to (a maximum of) one year. Plaintiffs' Complaint was filed in November 2017; if the Court dismisses, Lyon is expected to argue that the one year limitations period runs from no later than the date of termination. If the claims are stayed pending arbitration, any claim that was timely as of the date of filing the instant Complaint remain timely.

internal quotations omitted.[5] If the Agreements are enforceable, the claims should be stayed.[6]

### B.  The Agreements are Procedurally and Substantively Unconscionable

Arbitration agreements will not be enforceable where grounds exist at law or equity for the revocation of any contract. 9 U.S.C. § 3 (2006). The validity of an arbitration agreement is determined under state contract formation law. *AT&T Mobility, Inc. v. Concepcion*, 131 S. Ct. 1740, 1745-46 (2011); *Hill v. PeopleSoft USA, Inc*., 412 F.3d 540 (4th Cir. 2005). Defendant's assertion that the scope of the arbitration agreements is a matter for an arbitrator fails to recognize that whether a contract exists at all is a matter for this court. "To be enforceable, a contract cannot be unconscionable." *U. S. ex rel TBI Invs v. BrooAlexa LLC,* 119 F. Supp 3d. 512 (S.D.W.V. 2015) quoting *Montgomery v. Applied*

---

5   The court acknowledged the Fourth Circuit's statement that, "[n]otwithstanding the terms of § 3 . . . dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable," [quoting *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.* ("Choice Hotels"), 252 F.3d 707, 709-10 (4th Cir. 2001)], but noted that the language is dicta; the Court in *Choice Hotels* actually stayed the litigation and the language concerning dismissal was extraneous. *Id.*, at *13-15 n.14. *See also, Christian v. TravelCenters of Am., LLC,* 2014 U.S. Dist. LEXIS 100266, at *11-12 (D.S.C. June 30, 2014) (staying case where plaintiff had noted that if the case were sent to arbitration and dismissed, defendants would argue that his claims were time-barred under the agreement's shortened limitations period and finding that if defendants were successful in that argument, plaintiff would be left without a forum to pursue his claims, making a stay rather than dismissal appropriate)(*quoting McNamara v. Yellow Transp., Inc*., 570 F.3d 950, 957 (8th Cir. 2009) ("To prevent the complete loss of a forum, however, we direct the district court on remand to enter a stay thus retaining jurisdiction to ensure a forum for McNamara's claims in the event the arbitrators hold a contractual or procedural limit bars arbitration."); *see also Lloyd v. HOVENSA, LLC*., 369 F.3d 263, 269 (3d Cir. 2004) (holding that the plain language of the FAA affords district court no discretion to dismiss case where one of parties applies for stay pending arbitration); 9 U.S.C. § 10 (setting forth circumstances under which the district court may vacate an arbitration award); *United States ex rel. Beauchamp & Shepherd v. Academi Training Ctr.,* 2013 U.S. Dist. LEXIS 46433, at *9 (E.D. Va. Mar. 29, 2013) ("Thus, if parties have entered "into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA requires federal courts to stay judicial proceedings . . . and compel arbitration in accordance with the agreement's terms[.]") (*quoting Murray v. United Food & Comm'l Workers Int'l Union*, 289 F.3d 297, 301 (4th Cir. 2002) (internal citations omitted)).

6   In *Choice Hotels*, while the court noted that dismissal is a proper remedy where all the issues are arbitrable, the Court also recognized that "the FAA requires a district court, upon motion by any party, to stay judicial proceedings involving issues covered by written arbitration agreements." *Choice Hotels*, 252 F.3d at 709-10 (emphasis added).

*Bank*, 848 F. Supp. 2d 609, 614 (S.D. W. Va. 2012); *Sanders v. Certified Car Ctr., Inc*., 93 Va. Cir. 404, 405-07 (Cir. Ct. 2016).

"The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness, or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written." *Brown ex rel. Brown v. Genesis Healthcare Corp. (Brown I)*, 228 W. Va. 646, 724 S.E.2d 250, 283 (W. Va. 2011), vacated on other grounds. "Unconscionability is concerned with the intrinsic fairness of the terms of the agreement in relation to all attendant circumstances." *Sanders, supra, quoting Philyaw v. Platinum Enters*., 54 Va. Cir. 364, 367 (2001). A court will not enforce a contract or contract provision if it is both procedurally and substantively unconscionable. *Sanders, citing* e.g., *Boatright v. Aegis Def. Servs*., LLC, 938 F. Supp. 2d 602, 608 (E. D. Va. 2013) (applying Delaware law); *Dan Ryan Builders, Inc. v. Nelson et al*., 230 W. Va. 281, 289, 737 S.E.2d 550 (2012). "Procedural unconscionability arises from inequities, improprieties, or unfairness in the bargaining process and the formation of the contract . . . . Substantive unconscionability involves unfairness in the terms of the contract itself . . . ." *Sanders, supra* (declining to find arbitration agreement unconscionable because while plaintiff was unable to negotiate terms [implicating procedural unconscionability], it was not substantively unconscionable for lack of mutuality where although it did not impose identical obligations, it was not so one-sided as to be unconscionable).

Further, no public policy weighs in favor of finding a valid agreement to arbitrate here.

Public policy in Virginia is by no means against arbitration, but the cases both in Virginia and in other jurisdictions that discuss the presumption in favor of arbitration do so in terms of the scope of arbitration agreements, not the existence of such agreements. The presumption is applied when a court is trying to determine whether the conflict at issue is within the scope of an already established agreement to arbitrate. The presumption in favor of arbitrability arises only after a determination has been made that the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945-46, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995); *Bell Atlantic Corporation v. CTC Communications Corp.*, 1998 U.S. App. LEXIS 20160 (2nd Cir. 1998); Bonnot, 331 F.2d at 359. The present case calls upon this Court to determine whether there is an agreement to arbitrate, not whether an issue falls within the scope of that agreement. Therefore, the presumption in favor of arbitrability does not apply.

*Tm Delmarva Power v. Ncp of Va.*, 263 Va. 116, 126, 557 S.E.2d 199, 204-05 (2002)(dissenting opinion). Here, the agreements are both procedurally and substantively unconscionable and should not be enforced.

### 1.     The take-it-or-leave it terms were procedurally unconscionable

Where an agreement is unconsionable, it will not be enforced. *See Fransmart, LLC v. Freshii Dev., LLC,* 768 F. Supp. 2d 851 (E.D.Va. 2011). Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.. *U.S. ex rel TBI Invs v. BrooAlexa LLC,* 119 F. Supp 3d. 512 (S.D.W.V. 2015), citing *Brown, supra. "*[C]ourts are more likely to find unconscionability in consumer transactions and employment agreements than in contracts arising in purely commercial settings involving experienced parties." *Id.* (quoting Brown I, 724 S.E.2d at 285).

In *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 256-57 (D. Md. 2011), the court analyzed the enforceability of an arbitration agreement. Plaintiffs had argued the agreement was procedurally unconscionable because the agreements  were presented to them on a take-it-or-leave-it basis in which they would lose their jobs if they did not sign, had no chance to negotiate the terms, received it in final form, did not participate in drafting it, and were told the documents had to be signed "as is, without any cross outs." *Id.*, at 257. The court found that "a reasonable fact finder could conclude that the

16

arbitration agreements are procedurally unconscionable contracts of adhesion."[7] *Id.*, *citing Shaffer*, 321 F. Supp. 2d at 683-84, 684 n.1.

Similarly, in *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594-96 (D. Md. 2013), the plaintiff argued an arbitration policy was unconsionable, which (under Maryland law) required "a showing of procedural unconscionability—'one party's lack of meaningful choice' in making the contract—and substantive unconscionability —contract terms that 'unreasonably favor' the more powerful party." *Id.,* at 594-95, quoting *Rose*, 816 F. Supp. 2d at 256 (quoting *Walther*, 872 A.2d at 744). Plaintiff was hired, but his offer letter did not mention arbitration; when he received the manual with the arbitration policy, he was not allowed time to read before signing. Where there was a lack of opportunity to read or negotiate the arbitration policy, the court found "It would be patently unfair to bind an employee with little or no bargaining power to a contract he was not allowed time to read because he failed to attempt to bargain for a change to the very terms he had not been able to read. There is evidence that this was a contract of adhesion that was entered into in a procedurally unconscionable manner." *Id,* at 595.

Here, the circumstances under which Plaintiffs were required to sign or be fired have all the markings of procedural unconscionability. *U.S. ex rel TBI Invs v. BrooAlexa LLC, supra*. Plaintiffs were required to sign the employment and arbitration agreements under circumstances that were patently unfair. First, they had clearly unequal bargaining power. They were brought in to a conference room, told by the HR manager and supervisors that they had to sign or be escorted out. They could not negotiate terms – or even read it before signing. Unlike sophisticated corporate entities negotiating a

---

7  Under Virginia law, "[a] contract of adhesion is a standard form contract, prepared by one party and presented to a weaker party -- usually, a consumer -- who has no bargaining power and little or no choice about the terms." *Schwam v. XO Communs., Inc*., 2006 U.S. App. LEXIS 7428, at *5-6 (4th Cir. Mar. 24, 2006), *quoting Philyaw v. Platinum Enters*., 54 Va. Cir. 364 (2001); see also Black's Law Dictionary 342 (8th ed. 2004)(defining contract of adhesion as the same) (declining to find a contract of adhesion in employment agreement where plaintiff admitted he had other employment options, had bargained for a different position and had the freedom to leave).

contract, plaintiffs are individuals who were told by their employer – often their employer of many years – that they had to sign the agreement or lose their job. *See* Section I(A). They were not permitted to take the agreement to a lawyer, or even trusted family member to review. Plaintiff Mubashshir, who had a ninth grade education, was not told what he was signing at all, and only worked one day.  In response to a question from a co-worker, Lyon's HR Manager told them the terms were not negotiable and they could leave their tools and go, if they did not sign.  Plaintiffs did not have other job opportunities waiting for them, and could not afford to simply quit on the spot, with families and responsibilities. Lyon lied to them, telling them they could not talk to anyone – even a lawyer – about their claims, and that Lyon wanted to keep unlawful conduct out of the media.  None of them could keep a signed copy of the Agreement. Under these circumstances, the agreements are unconscionable contracts of adhesion and should not be enforced. *See Rose, Caire, supra.*

## 2.    **The Agreements may be prohibitively expensive**

Fee provisions in the arbitration agreement are probitively expensive. This renders the agreements substantively unconscionable for two reasons. Arbitration agreements that are prohibitively expensive for the employee will not be enforced. *Gadson v. Supershuttle Int'l,* 2011 U.S. Dist. LEXIS 33824, at *15 (D. Md. Mar. 30, 2011) ("Fee splitting can render an arbitration agreement unenforceable where fees and costs are so prohibitively expensive as to deter arbitration.") (citing *Green Tree Fin. Corporation-Alabama v. Randolph,* 531 U.S. 79, 90-91 (2000); *Bradford v. Rockwell Semiconductor Systems, Inc.* 238 F.3d 549, 553-54 (4th Cir. 2001)). The arbitration agreement, at Section 7 (and at Section 5 with respect to Mushshabir), purports to require the employee to indemnify Lyon for all costs, including attorneys' fees, incurred by Lyon with respect to "enforcement of its rights under this Agreement." Dkt. 5-1(7), 5-2(7), 5-3(7), 5-4(7), 5-5(5).  Although Section 8(m) of the agreements indicates that Lyon will pay the costs and fees associated with the arbitration, it also states that the arbitrator may award the prevailing party their fees and costs, and Section 7 (and dkt. 5-5(5)), in

18

contravention of the caselaw and Section 8(m), could be read to require (among other things) that the employee pay Lyon for the costs of the arbitrator, along with Lyon's attorneys' fees in defending a civil rights claim, which would otherwise be unrecoverable by Lyon.  Plaintiffs cannot afford to pay the costs associated with arbitration, or to pay Lyon's attorneys' fees, which will be in the tens of thousands of dollars (if not more). See Declarations of Plaintiffs. If the AAA rules are used (*see infra*), arbitration and arbitration expenses – which are normally born in an employer-promulgated plan by the employer – will run in the many thousands of dollars. See

https://www.adr.org/sites/default/files/Employment_Arbitration_Fee_Schedule.pdf (listing administrative fees, filing fees, and indicating that arbitrator fees are charged by individual arbitrator[8]). Having to bear the cost of arbitration, including administrator and arbitrator fees, would be prohibitively expensive and deter arbitration. The uncertainty of knowing whether Lyon would proceed under AAA rules, whether an arbitrator would enforce Section 7 to impose on plaintiffs' the costs associated with the arbitration, renders the agreement unconscionable.

Further, the indemnification language itself could allow for imposition on Plaintiffs of Lyon's fees and costs, regardless of whether it is the prevailing party – as it simply states that it is entitled to indemnification "incurred with respect to the enforcement of its rights under this Agreement." Dkt. 5-1 – 5-5. While Lyon might have intended that language to mean that in the event it is successful in enforcing its rights under the Agreement, it is entitled to indemnification, it does not even specifically refer to prevailing in its enforcement. Such language would deter Plaintiffs from proceeding. *See* Declarations.

The agreements are also unconscionable because there is no clarity – and Lyon appears to retain for itself to decide – as to what arbitration rules are in place. In *Caire,* plaintiff argued that an

---

8  Because no arbitrator has been selected, it is impossible to state the specific hourly rate of the arbitrator. However, AAA arbitrators typically charge several hundred dollars an hour.

arbitration agreement was unconscionable because it denied him access to a neutral arbitral forum. *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582 (D. Md. 2013), citing *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 181 (4th Cir. 2013). "In addition to a lack of mutual consideration and InforMed's sole discretion to alter the agreement's terms, the Arbitration Policy is unconscionable because there is no mechanism for selecting a neutral arbitrator and it states no rules by which the arbitration will proceed." *Id.,* at 595, quoting *Raglani*, – F. Supp. 2d ---, 2013 U.S. Dist. LEXIS 53962, 2013 WL 1633053, at *6-7 (holding that an arbitration agreement that allowed employer to choose arbitrator and insufficiently defined rules by which arbitration would be conducted denied employee neutral arbitral forum). The court found that these disparities, including the "take it or leave it" requirement, unreasonably favored defendants. *Id.,* at 595-596. Here, the agreements state that the parties will proceed under the Employment Dispute Resolution Rules of the American Arbitration Association "or equivalent state law." Dkt. 5-1 – 5-4(8); 5-5(6). Thus, it is unclear as to what rules are in place, and how they would benefit Lyon compared with Plaintiffs.

### 3.    The Agreements are not Retroactive

The agreements do not apply retroactively, and the majority of Defendant's unlawful conduct predated the agreements. *Hendrick v. Brown & Root, Inc*., 50 F. Supp. 2d 527, 537-38 (E.D. Va. 1999) ("[A]n arbitration agreement 'may not be used to reach back to cover disputes arising before the agreement was executed. . . .'") (quoting *Peerless Importers, Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 928 (2nd Cir. 1990)). The parties in *Hendrick* had entered into various contracts over the course of several years. A 1988 contract did not include an arbitration agreement. Conduct giving rise to the dispute occurred in 1992 and 1993, at a time when a dispute resolution program had not yet been created. The 1988 contract between the parties ended before a dispute resolution program went into effect. *Id*. at 533. "Hence, at the time Hendrick's claims accrued, it can be said with certainty that it was not the intent of the parties to resolve those claims by arbitration." *Id*.

20

Hendrick signed a new contract in 1993, requiring arbitration. It contained no specific language that provides for arbitration of claims pre-dating execution of the 1993 contract. *Id*. The court held that:

> absent a contractual manifestation of intent to arbitrate them, arbitration agreements do not reach pre-existing disputes. That, of course, is nothing more than an application of the rule that parties are bound to arbitrate only those kinds of disputes which they have agreed to arbitrate. And, consent must be manifest, not implied by silence.

*Hendrick*, 50 F. Supp.2d at 538.[9]

The plaintiffs whom Lyon contends are subject to mediation and arbitration requirements worked at Lyon for years prior to the date of the alleged arbitration agreements. Similar to Hendricks there is no language in the arbitration agreements Lyon provided that indicates any intent to bind the parties retroactively. Indeed, Lyon ignores the issue in its moving papers, despite knowing that Plaintiffs' position is that the arbitration agreements would not apply retroactively to the bulk of Plaintiffs' employment.[10]

42 USC 1981 governs the relationship between the parties. It states in full:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

> (b) "Make and enforce contracts" defined
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> (c) Protection against impairment

---

9 Compare *Goetsch v. Shell Oil Co*., 197 F.R.D. 574, 577 (W.D.N.C. 2000) (rejecting argument that arbitration clause including class actions was retroactive where language of agreement clearly indicated that defendant could change the terms of the agreement at any time and would apply to outstanding unpaid indebtedness as well as new transactions, thus "clearly provid[ing] for retroactive effect."

10 The parties corresponded prior to Defendant filing the instant motion; Plaintiffs indicated their position with respect to the agreements not applying retroactively. Defendant never responded, but filed this motion.

> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 USC 1981 ("Section 1981"). All five of the Plaintiffs were protected by "Section 1981" during the entirety of their employment. Lyon's efforts to limit the enforcement of Plaintiffs' rights under Section 1981, by virtue of the arbitration agreement, was not explicit in reaching backwards into the prior relationships.

Specifically, the <u>entirety</u> of Mr. Mubashshir's employment/claims pre-existed the agreement save for **one day** in 2017. He had last worked in **March 2014**, before his staffing agency let him know he was going to be placed with Lyon in December 2016, at which time he worked for one day before being told there was no work for him, *because of his claims against Lyon*. *See* Mubashshir Decl. Thus, while a retaliation claim accrued when he learned that he was being let go because of his protected activity, in December 2016, his hostile work environment, discrimination and retaliation claims as of March 2014 are not subject to arbitration, even if the agreement were otherwise enforceable.

Mr. Brothers worked at Lyon for nearly two years before the date of the agreement Lyon provided.  All but one month of Mr. Blunt's employment preceded the agreement.  Mr. Jimenez worked from 2012 to October 2016; only the last four months were post-agreement.  Similarly, Mr. Washington worked from 2014 to March 2017; the arbitration agreement is dated June 2016. Even if the arbitration agreements were otherwise effective, they do not apply to the bulk of these five plaintiffs' claims, which arise out of 42 USC 1981, barring discrimination in contracts, including barring a hostile work environment based on race, disparate treatment and retaliation.

### 4.      The purported limitations period, if applied, would be substantively unconsionable

Arbitration agreements that unreasonably limit the statute of limitations for civil rights claims are substantively unconscionable. *Gadson v. Supershuttle Int'l*, 2011 U.S. Dist. LEXIS 33824, at *20-22 (D. Md. Mar. 30, 2011). There, plaintiffs brought claims under the Fair Labor Standards Act

("FSLA"). 29 U.S.C. § 255 (a). Citing Ninth Circuit precedent that forcing employees to comply with a strict one-year limitation period for employment-related statutory claims is oppressive in a mandatory arbitration context, especially where continuing violation theories were involved, a one year limitations period was "substantively unconscionable because it imposes an unreasonably strict limitations period on an employee to arbitrate employment-related statutory claims." *Gadson*, at \*21-22 (D. Md. Mar. 30, 2011).[11]

Here, the arbitration agreements are substantively unconscionable because they could result in employees' claims being extinguished totally before arbitration even is initiated and therefore, provides for a maximum one year limitations period that is likely to be much shorter. Specifically, the arbitration agreements provide that "Except as otherwise provided under applicable law, any Claim governed by this Agreement shall be filed no later than one (1) year from the date on which an alleged incident last occurred or one year from the last date of employment, whichever comes first. Any dispute not resolved through mediation, must be submitted to arbitration within one (1) year from the completion of the mediation or termination of employment, whichever comes first. Dkt. 5-1 – 5-4(8h); 5-6(6h). Thus, while Plaintiffs assert that 42 USC 1981 provides a four year limitations period, and therefore is "otherwise provided under applicable law,"[12] if the four year statute of limitations were held not to apply, the arbitration agreement impermissibly shortens the limitations period. For example, the arbitration agreement compels mediation before an arbitration can be filed. See e.g. dkt. 5-1(8a, 8i). However, the agreement provides no time limits on the mediation process. Plaintiff could initiate mediation, but the process could take three months, during which time, his claims are expiring under

---

11 Gadson was vacated on grounds not applicable here: *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 184 (4th Cir. 2013)  ("Accordingly, we hold that because Muriithi's challenge to the one-year imitations provision does not rely on any aspect of the Arbitration Clause, but relates only to the general contract defense itself, the district court erred in holding the one-year limitations period unconscionable as part of the court's resolution of the motion to compel.")

12 In other words, the one year (or shorter) limitations period does not come in to play for claims brought under 42 USC 1981, because it "otherwise provides" for a longer limitations period.

the terms of the agreement, because, assuming he no longer works at Lyon, his claims must be arbitrated within one year of his separation, if that is sooner than the mediation ends. The result is an unknown statute of limitations period, which has the potential to expire before mediation ends. Moreover, even if it were simply one year from the date of termination, or last event, whichever were earlier, shortening a limitations period from four years to one is impermissible. *Gadson, supra.*

## III.    CONCLUSION

The arbitration agreements at issue are not enforceable. They are procedurally and substantively unconscionable. They were created, in Defendant's words, to keep claims of discrimination and harassment out of the media because – apparently – it is simpler to shield unlawful conduct from the public's prying eyes than to address the underlying racial harassment and discrimination. The agreements were provided to Plaintiffs in take it or leave it fashion. When employees complained or asked whether they could not sign, they were clearly told they would be fired that day. They were unable to even read the agreements, let alone keep a signed copy. Plaintiffs are individuals without bargaining power in their relationship with Defendant Lyon Shipyard, and could not afford to simply leave their jobs – all of them had worked for Lyon for years, except Mubashshir, whom Lyon may have brought back knowing he had claims simply to attempt to bring him under the umbrella of the arbitration clause.

The agreements, if enforced, could result in an order compelling plaintiffs to pay not only the administrative and arbitrator costs, which would be many thousands of dollars, but could also include all of Lyon's attorneys' fees and costs. This would be patently unfair and prohibitively expensive. Moreover, depending on the interpretation of the agreement, it could result in Plaintiffs losing any forum to redress their claims at all, given the language purporting to shorten the limitations period to one year from termination or the unlawful conduct, whichever were earlier, which is also contingent on the expiration of the mandatory mediation process over which plaintiffs have no control. The end result

could be the expiration of all or many of their claims. Under federal law, the claims brought in the instant suit are timely, having been brought within four years of the unlawful conduct, pursuant to 42 USC 1981. For all the foregoing reasons, the arbitration agreements are both procedurally and substantively unconscionable, and therefore void. Defendant's motion should be denied.

Even if the Court were to find the agreements enforceable, the Court should deny Defendant's motion to dismiss. There is subject matter jurisdiction over Plaintiffs' claims, and the Federal Arbitration Act compels staying the instant litigation, rather than dismissing it. Staying it, in addition to being required under the FAA, would be least prejudicial to plaintiffs as dismissal could lead to some or all Plaintiffs' claims being precluded by statutes of limitation.

Wherefore, Plaintiffs respectfully request the Court deny Defendant's motion.

Dated: January 24, 2018
      Newport News, VA

                    Respectfully submitted,

                    Davell Artis, Dontra Artis, Michael Blunt, Ronnell Brothers, Brandon Campbell, Jerry Cook, Bobby Hardy, Husamiddin Mubashir, Gabriel Jiminez, Alfredo Lebron-Diaz, Wilfredo Lebron-Diaz, Ramell McDonald, Robert Thomas, Sr., Robert Thomas, Jr., Tavaris Tillery, Edward Washington, and James Williams

                    By:   */s/ James H. Shoemaker, Jr.*
                         Of Counsel

James H. Shoemaker, Jr., VSB No. 33148
Andrew J. Dean VSB No. 88192
**PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.**
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: 757.223.4500
Facsimile: 757.223.4518
jshoemaker@pwhd.com
adean@pwhd.com

Cindra M. Dowd, Esq., VSB No. 33819
**LAW OFFICES OF RICHARD J. SERPE, P.C.**
580 East Main Street, Suite 310
Norfolk, VA 23510
Telephone: 757.233.0009
Facsimile: 757.233.0455
cdowd@serpefirm.com

Joshua Friedman
Rebecca Houlding
Jesse Centrella
**FRIEDMAN & HOULDING LLP**
1050 Seven Oaks Lane
Mamaroneck, NY 10543
888-369-1119 x5
Fax: 866-731-5553
josh@friedmanhouldingllp.com
rebecca@friedmanhouldingllp.com
jesse@friedmanhouldingllp.com
*To Be Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2018 I will electronically file the foregoing Opposition to Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By: _____/s/ James H. Shoemaker Jr. _____
      James H. Shoemaker, Jr.
Virginia State Bar No. 33148
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone:  (757) 223-4500
Fax:  (757) 223-4518
jshoemaker@phwd.com

*Local Counsel for Plaintiffs*