UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
┌──────────────────────────────┐
│           FILED              │
│  ┌────────────────────────┐  │
│  │      SEP 3 0 2019       │  │
│  └────────────────────────┘  │
│  CLERK, U.S. DISTRICT COURT  │
│         NORFOLK, VA          │
└──────────────────────────────┘
```

DAVELL ARTIS et al.,

        Plaintiffs,

v.

                                    Civil No. 2:17cv595

LYON SHIPYARD, INC.,

        Defendant.

## OPINION AND ORDER

This matter is before the Court on eleven motions for summary judgment filed by defendant Lyon Shipyard, Inc. ("Defendant" or "Lyon"), against the following plaintiffs: Davell Artis, ECF No. 71, Brandon Campbell, ECF No. 75, Jerry Cook, ECF No. 77, Bobby Hardy, ECF No. 79, Alfredo Lebron-Diaz, ECF No. 81, Wilfredo Lebron-Diaz, ECF No. 83, Ramell McDonald, ECF No. 85, Robert Thomas, Jr., ECF No. 87, Robert Thomas, Sr., ECF No. 89, Tavaris Tillery, ECF No. 91, and James Williams, ECF No. 94. After examining the briefs and record, the Court finds that oral argument is unnecessary because the facts and legal contentions are adequately presented, and oral argument would not aid in the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J). For the reasons set forth below, Defendant's motions are **GRANTED** in part and **DENIED** in part.

## I. Background

The Plaintiffs' amended complaint includes four grounds for relief: Count One – Hostile Work Environment; Count Two – Racially Disparate Treatment; Count Three – Retaliation; and Count Four – Wrongful Discharge, with all counts alleged to be violations of 42 U.S.C. § 1981.   ECF No. 20.   Counts One and Two are advanced by all eleven plaintiffs, and Counts Three and Four are advanced by six plaintiffs: Robert Thomas, Sr., James Williams, Jerry Cook, Tavaris Tillery, Bobby Hardy, and Ramell McDonald.[1]

Plaintiffs all contend that they were harassed by supervisors and/or co-workers at Lyon's workplace based on their race (nine Plaintiffs are African-American, two are Hispanic).   As emphasized by Lyon, this Court must individually assess the merits of each summary judgment motion because, although the overall environment at Lyon's workplace is relevant to all Plaintiffs, different Plaintiffs worked in different departments at Lyon at different times.   However, for the purpose of providing a general background, the Court notes that the relevant allegations include assertions that multiple Lyon supervisors, over the course of multiple years,

---

[1] There were additional plaintiffs in this case that were required by written agreements to pursue arbitration, rather than litigation.   On February 22, 2019, Defendant and the "Arbitration Plaintiffs" filed a stipulation of dismissal of the Arbitration Plaintiffs' claims.   ECF No. 157.   Additionally, prior to the dismissal of the Arbitration Plaintiffs, the parties jointly filed a stipulation of dismissal as to plaintiff Dontra Artis.   ECF No. 115. Accordingly, all references to "Plaintiffs" refer to the eleven plaintiffs remaining in this case after February 22, 2019.

engaged in the following conduct: (1) using the "n-word" to refer to, and degrade, African-American employees; (2) using numerous other racial slurs (including "boy," "black-ass," "monkey," "wetbacks," "lazy spics," etc.); (3) telling racist jokes and making statements connecting a non-white employees' race to a lack of intelligence and/or inability to perform workplace duties; (4) instructing black employees to "kiss [their] white ass"; (5) displaying the confederate flag in various forms, including a necklace, scarf, office decorations, toolbox stickers, etc.; (6) providing white workers with desirable work assignments and the ability to refuse undesirable work, with the converse being true for non-white workers (who were sent home without pay, or were threatened to be sent home, if they complained about unfavorable assignments); (7) terminating non-white employees that complained about discrimination; and (8) refusing to hire African-American temporary employees due to their race, and/or wrongfully terminating African-American permanent employees under the guise of a workload-driven "reduction in force" ("RIF"). Additionally, the environment at Lyon's workplace is alleged to have included: (1) nooses hung on the job site on more than one occasion; (2) pervasive racist graffiti in bathrooms denigrating African-Americans and/or Hispanics; (3) the failure of Lyon's "personnel office," to perform effective investigations into race-based complaints, and the failure of the subsequently created Human

Resources ("H.R.") Department to effectively change the culture at Lyon's workplace in 2015 and 2016; and (4) managerial employees that witnessed or were informed of racist conduct, yet failed to investigate such conduct, failed to report the conduct up the managerial chain, and/or failed to prevent such conduct from reoccurring.

**II. Standard of Review**

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986).

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving

party." <u>Dulaney v. Packaging Corp. of Am.</u>, 673 F.3d 323, 330 (4th Cir. 2012) (citation omitted). "Because 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "'sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law.'" <u>McAirlaids, Inc. v. Kimberly-Clark Corp.</u>, 756 F.3d 307, 310 (4th Cir. 2014) (quoting <u>Anderson</u>, 477 U.S. at 255, 251–52). In making its determination, "the district court must 'view the evidence in the light most favorable to the' nonmoving party." <u>Jacobs v. N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 568 (4th Cir. 2015) (quoting <u>Tolan v. Cotton</u>, 572 U.S. 650, 657 (2014)).

### III.  Discussion – Legal Standard for § 1981 Claims

#### A. Hostile Work Environment

"[T]o prevail on a [§ 1981] claim that a workplace is racially hostile, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." <u>Boyer-Liberto v. Fontainebleau Corp.</u>, 786 F.3d 264, 277 (4th Cir. 2015) (en banc)

(quotation marks and citation omitted).[2] Here, Defendant's summary judgment motions focus on the third and fourth elements.

### 1. Severe or Pervasive Harassment

"The third element of a hostile environment claim . . . has both a subjective and objective component, i.e., the employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment." Strothers v. City of Laurel, Maryland, 895 F.3d 317, 331 (4th Cir. 2018).  In the Fourth Circuit's en banc Boyer-Liberto opinion, the Court explained the third element as follows:

> Element three of a hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"; the plaintiff may, but is not required to, establish that the environment is "psychologically injurious." See Harris [v. Forklift Sys., Inc.], 510 U.S. 17, 22 (1993)).  Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).  That determination is made "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. It "is not, and by its nature cannot be, a mathematically precise test." Id. at 22.

---

[2] Boyer-Liberto involved a hostile work environment claim under Title VII, not § 1981.  However, the "same test applies" to a claim brought under either statute, although § 1981 is limited to discrimination claims based on race, whereas Title VII covers claims predicated on additional protected categories, including "religion" and "sex." Boyer-Liberto, 786 F.3d at 276-77.

> To be sure, viable hostile work environment claims often
> involve repeated conduct. See Nat'l R.R. Passenger
> Corp. v. Morgan, 536 U.S. 101, 115–17 (2002). That is
> because, "in direct contrast to discrete acts, a single
> act of harassment may not be actionable on its own."
> Id. at 115. For example, "'mere utterance of an . . .
> epithet which engenders offensive feelings in an
> employee' does not sufficiently affect the conditions of
> employment to implicate Title VII." Harris, 510 U.S. at
> 21 (alteration in original) (quoting Meritor [Sav. Bank,
> FSB v. Vinson], 477 U.S. 57, 67 (1986)). The same goes
> for "simple teasing [and] offhand comments." See
> Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).
> Importantly, however, an "isolated incident[ ]" of
> harassment can "amount to discriminatory changes in the
> terms and conditions of employment," if that incident is
> "extremely serious." Id. (internal quotation marks
> omitted).
>
> In measuring the severity of harassing conduct, the
> status of the harasser may be a significant factor—e.g.,
> "a supervisor's use of [a racial epithet] impacts the
> work environment far more severely than use by co-
> equals." Rodgers v. W.–S. Life Ins. Co., 12 F.3d 668,
> 675 (7th Cir. 1993). Simply put, "a supervisor's power
> and authority invests his or her harassing conduct with
> a particular threatening character." Burlington Indus.,
> Inc. v. Ellerth, 524 U.S. 742, 763 (1998).

Boyer-Liberto, 786 F.3d at 277-78. In seeking to differentiate

between actionable conduct and the "mere utterance" of an epithet,

the en banc Fourth Circuit went on to quote from the following

discussion from Spriggs v. Diamond Auto Glass:

> Far more than a "mere offensive utterance," the word
> "nigger" is pure anathema to African-Americans. Perhaps
> no single act can more quickly alter the conditions of
> employment and create an abusive working environment
> than the use of an unambiguously racial epithet such as
> 'nigger' by a supervisor in the presence of his
> subordinates.[3]

---

[3] The Court includes an unredacted quote using this viscerally offensive
term in order to assist those performing future legal research, including

Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)
(internal quotation marks and citation omitted); Pryor v. United
Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015) (labeling the
n-word "pure anathema . . . to all of us" and noting that "the use
of that word is the kind of insult that can create an abusive
working environment in an instant, and is degrading and humiliating
in the extreme") (internal quotation marks and citations omitted).

    In Springs, the Fourth Circuit reviewed the evidence
supporting the plaintiff's claims that his white supervisor
repeatedly used "highly repugnant" insults in the workplace,
directed at not only the plaintiff and other African-American
employees and customers, but also the supervisor's own African-
American wife, including "n**ger," "monkey," "dumb monkey," and
"black bitch." Spriggs, 242 F.3d at 182. In reversing the
district court's grant of summary judgment to the defendant, the
Fourth Circuit concluded that: (1) "the degree of hostility or
abuse to which [the plaintiff] was exposed can only be determined
by examining the totality of the circumstances"; (2) the totality
inquiry considers "conduct targeted at persons other than [the
plaintiff]" because the operative issue is "the 'environment' of
workplace hostility"; and (3) the supervisor's "frequent and
highly repugnant insults were sufficiently severe or pervasive (or

---

victims of harassment considering filing suit. Hereinafter, this word will
be presented in a redacted or alternative form.

both) to cause a person of ordinary sensibilities [and the plaintiff himself] to perceive that the work atmosphere . . . was racially hostile." Id. at 184-85; see Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 226 (4th Cir. 2016) (indicating that both Title VII and § 1981 are violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment") (citation and quotation marks omitted); Pryor, 791 F.3d at 496-97 (finding that a reasonable juror could conclude that two anonymous notes making racist death threats were sufficiently "severe" to create a hostile work environment, especially when considered in conjunction with other less severe, but overtly racist, "notes" and circulating "rumors").

In defining the contours of what constitutes an objectively "severe or pervasive" environment, it is necessary to consider the "social context" where the claimed harassment occurs. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (contrasting a professional sports team with an office). This Court thus acknowledges the existence of case law suggesting that certain industries, such as the construction industry, may be less refined than an office environment. See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1537 (10th Cir. 1995); EEOC v. E & H Elec. Serv., Inc., No. 3:05cv269, 2007 WL 841942, at *4 (W.D.N.C. Mar.

19, 2007). However, the "constellation of surrounding circumstances, expectations, and relationships" that govern the appropriate inquiry, Oncale, 523 U.S. at 82, include not only the industry, but the time-frame of the alleged conduct. While this Court looks to existing precedent to assist in determining whether a reasonable juror could conclude that the record satisfies the objective component of the hostile work environment test, the Court is careful not to place undue emphasis on the fact patterns of "historical" cases, as doing so would ignore evolving social norms and could have the effect of sanctioning an established culture of "blue-collar" racism under the faulty justification that "it's always been that way" in such industry. Accordingly, applying the "common sense" approach called for by the Court in Oncale, both courts and juries act reasonably in considering both the setting of the disputed conduct and the timeframe of such conduct (with this Court, on summary judgment, considering such fact only within the context of determining how a reasonable juror could rule on this record). Here, the contours of the relevant industry are also informed by case-specific evidence, as multiple plaintiffs testified that they worked in more than one local shipyard during the several years immediately preceding this suit, but that the racism alleged in this case was experienced only at Lyon's workplace.

10

## 2. Harassment Imputable to the Employer

Because the fourth element of a hostile work environment claim requires a plaintiff to prove that the harassment is imputable to the employer, the employer's liability "may depend on the status of the harasser." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). As explained by the Supreme Court in Vance:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Faragher v. Boca Raton, 524 U.S. 775, 807 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Id. The Supreme Court further explained in Vance that: (1) "Under this framework, therefore, it matters whether a harasser is a 'supervisor' or simply a co-worker"; and (2) that an employee is only a "supervisor" if the "employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 424, 431 (emphasis added) (quoting Ellerth, 524 U.S. at 761). This affirmative defense available to

11

Vance supervisors, referred to as the "Ellerth/Faragher defense"
based on the two Supreme Court cases cited in Vance, "in essence,
imposes a duty on the victim to report her supervisor's harassing
behavior to the employer." Boyer-Liberto, 786 F.3d at 278.

In contrast to the standard governing harassment by Vance
supervisors, a plaintiff "seeking to impute liability to her
employer for harassment" by a coworker, or by a manager/superior
that does not qualify as a "Vance supervisor," is required to
demonstrate the employer's negligence.   Id.   Similar to Vance
supervisor harassment claims, a plaintiff often cannot carry her
burden to prove negligence if the victim "did not report the
harassment" to her employer.   Id.   That said, the utilization of
an established grievance procedure is not always a pre-requisite
to demonstrating an employer's negligence; rather, a negligence
claim ultimately turns on whether the employer "knew or should
have known about the harassment and failed to take effective action
to stop it."   Strothers, 895 F.3d at 332, 335 (emphasis added)
(quotation marks and citation omitted) (acknowledging that the
employer "had reason to suspect" that the alleged harasser was
"motivated by racial bias" based, in part, on having received
"other complaints from black employees about" the harasser that
put the employer "on notice of a possible pattern of race-based
harassment").     When  addressing  an  employer's  constructive
knowledge, the Fourth Circuit has expressly held that an employer

cannot avoid liability for "coworker harassment by adopting a 'see no evil, hear no evil' strategy"; rather, "[k]nowledge of harassment can be imputed to an employer <u>if a reasonable person, intent on complying with [antidiscrimination laws] would have known about the harassment</u>." <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 334 (4th Cir. 2003) (en banc) (emphasis added) (internal quotation marks and citations omitted). "Under this rule an employer may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." <u>Id.</u> (citations omitted).

## B.   Disparate Treatment

The precise elements that must be proven to establish a prima facie "disparate treatment" claim vary depending on the type of disparate treatment alleged by a plaintiff (<u>i.e.</u>, failure to hire, failure to promote, disparate discipline, failure to train, etc.). <u>Tabor v. Freightliner of Cleveland, LLC</u>, 388 F. App'x 321, 322 (4th Cir. 2010).   Here, the amended complaint broadly alleges disparate treatment in "all salient benefits of employment," but the majority of the Plaintiffs' claims are predicated on unequal job assignments.

As accurately highlighted by Defendant, a disparate treatment claim predicated on unequal job assignments requires more than proof that the contested assignment was less appealing to a plaintiff, instead requiring that the challenged assignment(s)

13

rose to the level of an "adverse employment action." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007).

>    As explained by the Fourth Circuit in Holland:

>    An adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks omitted). "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action." Id. at 376. There must be some significant detrimental effect and "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." Boone v. Goldin, 178 F.3d 253, 256–57 (4th Cir. 1999).

Id. While being less appealing is insufficient, unfavorable assignments can constitute an adverse employment action if there is evidence that the unfavorable position subjected the employee to "appreciably more dangerous conditions," such as "greater exposure to potentially harmful radiation," or "increased exposure to dangerous pathogens." Sherman v. Westinghouse Savannah River Co., 263 F. App'x 357, 370 (4th Cir. 2008) (emphasis added) (internal quotation marks and citations omitted).

## C. Retaliation

"A plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the burden-shifting framework of McDonnell Douglas Corp. v. Green [411 U.S. 792, 802 (1973)]." Strothers, 895 F.3d at 327

14

(citation omitted).  Under the McDonnel Douglas burden shifting framework, a plaintiff can establish "a prima facie case of retaliation in contravention of [§ 1981]," by proving "'(1) that she engaged in a protected activity,' . . . '(2) that her employer took an adverse employment action against her,' and '(3) that there was a causal link between the two events.'"  Boyer-Liberto, 786 F.3d at 281 (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005)).  If a prima facie case is established, the McDonnell Douglas framework applies to shift the burden of production "to the employer to articulate a . . . non-retaliatory reason for the adverse action;" and if the employer does so, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is . . . retaliatory."  Guessous, 828 F.3d at 216 (citations omitted) (emphasis added).

The "adverse employment action" necessary to prove a retaliation claim does not require the same species of "adverse employment action" necessary to establish a disparate treatment claim.  Rather, a retaliation claim requires proof that an employer undertook "a materially adverse action . . . [by doing] something that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Smith v. Clark/Smoot/

Russell, 796 F.3d 424, 434 (4th Cir. 2015) (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006)).

Additionally, for a plaintiff to prove "pretext," and demonstrate that the real reason for the materially adverse action was retaliatory, the plaintiff must effectively demonstrate that the protected activity was a "but-for cause of a challenged adverse employment action." Guessous, 828 F.3d at 216-17 (emphasis added). This showing at the pretext stage effectively mirrors the "but-for" showing necessary to prove retaliation through direct evidence (rather than through the McDonnell Douglas framework). Id.; Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015). Such causation standard is more onerous than that applicable to a "status-based" discrimination claim (such as wrongful discharge), which only requires that the discriminatory motive was "one of" the motives that influenced the employer's action. Guessous, 828 F.3d at 216-17.[4] While the ultimate causation standard for a retaliation claim presents a higher hurdle, "a cause need not work in isolation to be a but-for cause." Id. at 217 (citing Burrage v. United States, 571 U.S. 204, 211 (2014)).

---

[4] Plaintiffs do not dispute the applicability of the "but-for" standard to § 1981 retaliation claims, and in fact, cite such standard in their filings.

## D. Wrongful Discharge

As explained in detail by the Fourth Circuit:

A plaintiff generally may defeat summary judgment and establish a claim for race discrimination through one of two avenues of proof. First, a plaintiff may establish a claim of race discrimination by demonstrating through direct or circumstantial evidence that <u>his race was a motivating factor in the employer's adverse employment action. See, e.g., Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). "The second method of averting summary judgment is to proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." <u>Id.</u> at 285.

. . . Under the <u>McDonnell Douglas</u> pretext framework, an employee demonstrates a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. <u>See, e.g., McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

<u>Holland</u>, 487 F.3d at 213-14 (emphasis added). The fourth prong of a § 1981 wrongful termination claim can alternatively be satisfied by demonstrating that "other employees who are not members of the protected class were retained under apparently similar circumstances." <u>Honor v. Booz-Allen & Hamilton, Inc.</u>, 383 F.3d 180, 188 (4th Cir. 2004) (citations omitted).

17

## IV.   Discussion - Individualized Summary Judgement Analysis

As noted above, the Court must separately address Defendant's summary judgment motion as to each of the eleven Plaintiffs because each Plaintiff faced varying work environments at Lyon due to his or her assignments to different "yards" or "shops," as well as the fact that different Plaintiffs worked for Lyon at different times. However, because many of the facts still overlap, and because Defendant's summary judgment arguments are similar, the Court offers a preliminary summary of some of the broadly applicable record facts, interpreted, as required at the summary judgment stage of the case, in a light most favorable to the Plaintiffs:

- Multiple high-level managers, and even the company president (George Lyon), were aware of ongoing racial harassment at Lyon's workplace during the ten years preceding the filing of this civil action. For example, sometime in 2006, Plaintiff Robert Thomas, Sr. complained directly to the company president about racial harassment at Lyon.  ECF No. 126-1, at 148-50.

- Prior to April of 2015, Lyon did not have an H.R. Department, but rather had a "personnel office" headed by Holly Noack.   Noack's highest level of general education was tenth grade, with no formal training in H.R. issues or equal opportunity laws other than "seminars" or "webinars" she completed during her employment.   In April of 2015, Nikole Dunkley was hired as the director of Lyon's newly established H.R. Department.   ECF Nos. 119-6, at 13, 60; 119-8, at 10-11.

- Lyon's written anti-discrimination policy has changed several times, but the record suggests that, prior to 2016, supervisors at Lyon were not effectively trained on how to handle, investigate, or report complaints of race discrimination.   Moreover, prior to Dunkley's hiring in 2015, Noack did not always adequately document

allegations of racial harassment, did not maintain a central file of complaints, and did not always investigate race-based harassment. As reflected in her 2015 deposition, Noack believed that the Lyon anti-discrimination policy <u>did not prohibit the use of the n-word</u> in the workplace, although it was her view that such word was inappropriate/offensive, and if she heard that epithet, Noack would simply tell the employee that he or she "shouldn't be saying that." Additionally, Noack testified that she: (1) was not aware that it was likely that African-Americans would find a confederate flag offensive; and (2) did not "intend any discrimination" when she used the word "boy" to address an African-American employee. ECF Nos. 119-11, at 5; 119-9, at 19-20; 119-8, at 25-26; 119-12.

- Even after Lyon updated its anti-discrimination policy in late 2015, such policy did not require, or even encourage, an employee to report harassment to H.R., but instead "encourages" a victim to promptly advise the offender that the conduct is unwelcome, which the policy indicates will often "resolve the problem." If a formal complaint is desired, the policy states that the victim "should discuss their concerns with their immediate supervisor" (or a higher level manager), but the policy appears to put the onus on the victim to re-report the complaint to a higher level manager if the immediate supervisor provides an inadequate response. Unlike the 2013 policy, which indicates that complaints can be made to the "Personnel Manager," it does <u>not</u> appear from the language of the 2015 policy that an employee is even expressly informed that H.R. is available to receive complaints directly from a victim. ECF No. 76-2; ECF No. 78-3, at 10.

- Lyon's 2015 policy, which is the document that Lyon relies on in support of most of its summary judgment motions,[5] does not appear to include a written procedure requiring foreman/supervisors to report complaints up the chain to a more senior supervisor, or to H.R. Holly Noack testified in 2015 that foremen/supervisors did

---

[5] It appears that multiple Plaintiffs signed a document indicating that they were provided with a copy of the new employee handbook (to include the new anti-discrimination policy) in November or December of 2015; however: (1) some of the Plaintiffs were no longer working at Lyon as of such date; and (2) many of the events relevant to this litigation occurred prior to November/December of 2015.

receive some live training on investigating complaints, which included the instruction that they inform H.R., but there was no written policy that H.R. be informed, and the live training dealt with workplace complaints in general, <u>not discrimination complaints</u>. ECF No. 119-8, at 29-36.

- Lyon did not provide its employee handbook or a stand-alone anti-discrimination policy to its temporary employees that worked for Lyon through staffing companies. Rather, such individuals were provided with a short document that included a statement indicating that <u>sexual</u> harassment would not be tolerated at Lyon. There is no evidence, prior to 2016, of a training program for temporary workers, employees, or managers that was specifically directed at racial harassment in the workplace. ECF No. 119-6, at 34; ECF No. 119-8, at 29-30, 33-36.[6]  Most of the Plaintiffs in this case worked for Lyon as a temporary employee during at least part of the timeframe relevant to this case.

- All of the male Plaintiffs report seeing racist graffiti in the bathrooms at Lyon's workplace, with some indicating that it was present almost every day. The graffiti included racist jokes, "white hoods," swastikas, racist epithets including the n-word, and various writings/pictures critical of both African-Americans and Hispanics, including depictions of lynchings. Based on directions from Nikole Dunkley in

---

[6] The "joint employer doctrine" recognizes the reality that many workers "are employed by temporary staffing companies that exercise little control over their day-to-day activities" and it "prevents those who effectively employ a worker from evading liability by hiding behind another entity, such as a staffing agency." <u>Butler v. Drive Auto. Indus. of Am., Inc.</u>, 793 F.3d 404, 410 (4th Cir. 2015). Here, "Tidewater Staffing" and other local agencies technically "employed" many of the Plaintiffs, for at least a time, but had virtually no role in their day-to-day activities at Lyon. To the extent Lyon attempts to rely on Tidewater Staffing's rules and procedures regarding workplace harassment: (1) Lyon fails to cite any precedent suggesting that the Court should evaluate the reasonableness of Lyon's conduct, committed at its facility by its employees, through cross-reference to a third-party staffing company's policies; and (2) the "post-offer" Tidewater Staffing document cited by Lyon in support of at least some of its summary judgment claims is an outdated document, and some of the key language in such document does not appear in the "post-offer" documents signed by many of the Plaintiffs in, or after, 2012. <u>Compare</u> ECF Nos. 72-4, 92-8 (prior version of this document), <u>with</u> ECF Nos. 78-2, 92-4 (later version of this document).

H.R. and Johnny Gaskins,[7] the graffiti was painted over at various times, but <u>no investigation was ever performed by Lyon</u>, and the graffiti reappeared after it was covered, including as late as 2018. The bathrooms with the graffiti were used by supervisors/managers as well as temporary and permanent Lyon employees. Gaskins had used these bathrooms as well. <u>See</u> ECF No. 120-1, at 36-37; ECF No. 86; ECF No. 120-15, at 81-86.

With the above background, the Court turns to the consideration of the individual merit of each summary judgment motion.

## A. Brandon Campbell

### 1. Facts

- Brandon Campbell is an African-American man who worked for Lyon through an outside staffing company from 2009 to 2011, was a full-time employee in Lyon's paint shop from 2011 to 2013, and again worked as a temporary worker through "Tidewater Staffing" from July 2014 to July 2015. During these timeframes, Campbell reported to three different "foremen": David Kerner, Tommy Hill, and David Dragon.

- "Production Manager" Lonnie Jones called Campbell "boy" or "big boy" all the time. Campbell complained to Jones and told him that "boy" was not his name, asking Jones to call him "Brandon." Campbell also complained about Jones' comments to "lead man" Bobby Hardy, who is African-American (and is himself a Plaintiff in this case). Hardy made his own complaints to Jones about Jones' racist comments, but they were returned with other racist statements, including the assertion that Jones' father was rich and bought Jones an African-American "to play with" when Jones was a baby. ECF No. 119-1, at 41-44; ECF No. 119-24, at 142-43.

- Campbell heard Jones describe Bobby Hardy's skin as so black that it was "blue," and heard Jones tell foreman Michael Ahart that he should "fire all their black asses." ECF No. 119-1, at 111.

---

[7] It appears that Gaskins was the "Vice-president of production" and/or the "Production Manager" at Lyon for some of the relevant timeframe. <u>See, e.g.</u>, ECF No. 126-1, at 49.

- Campbell saw confederate flags all around Lyon's workplace every day, including on tool boxes, paint caps, and on foreman Ahart's bandanna, vehicle, and screen saver. Campbell saw other racist symbols, including nooses on three separate occasions. He was also racially harassed by Henry Miller, a foreman, and witnessed Miller harassing other African-American workers, including an incident where Miller tried to throw a noose around Quinton Miller's neck, and another where Henry Miller threatened Quinton, saying that he would "'run your black ass over' while he was in a Lyon Shipyard truck." On another occasion, Henry Miller pulled his pants down exposing his rear-end to Campbell and Quinton Miller and telling them that they could "kiss his white ass." Id. at 36-37, 67-75.

- David Kerner, another foreman, also made racist comments as frequently as twice a week, including use of the n-word, referring to an African-American employee as a "thug," and commenting that his old neighborhood, which used to be predominately white, turned "into the ghetto" when "the black people" moved in. Id. at 112-14.

- Foreman Ahart made racist comments on "about a weekly basis," including inappropriate race-related statements to Campbell associating race with penis size, and noting that Ahart didn't allow black people in his house. At one point, Ahart told Campbell that because he wasn't allowed to call African-American employees "n**gers no more" he would just "have to call you-all ninjas." Id. at 39, 112.

- Campbell testified that the worst job assignments at Lyon were virtually always given to African-Americans while the white workers would just "sit there." Campbell understood that "dirty work" was part of his job, but the responsibility for performing such work almost never rotated to white workers. Work that had to be done at night was also unfairly assigned to Campbell rather than rotated to white workers. Campbell complained to "lead-man" Bobby Hardy, but Hardy told him that Ahart wanted Campbell to do the dirty work, and because Ahart was Hardy's superior, there was nothing Hardy could do about it. Id. at 21, 26-29, 32.

- Campbell did not report all of the above racist statements because: (1) he used to report similar conduct to Bobby Hardy and Quinton Miller, but they said "there was nothing they could do," with Hardy further explaining that "it's a white man's world," id. at 39-42; (2) high-level management participated in racist jokes and other improper racial comments, including Production Manager Lonnie Jones referring to Campbell as "boy" after Campbell confronted Jones and asked to be called "Brandon", id. at 39-41;[8] and (3) he was scared of retaliation, in part because Holly Noack, the head of personnel, was friends with the people committing the racial harassment, id. at 39-40, 42, 115, 119, and in part because he complained to personnel in 2013 about mistreatment by foreman David Dragon, and was "sent home" without pay for a few days by Holly Noack. Id. at 31-32, 117.[9]

---

[8] According to Campbell's evidence, Lonnie Jones is the only person at Lyon that was ever formally reprimanded for racial harassment, as Jones received a written warning after Lyon was named as a defendant in a race discrimination suit that predated the instant action. ECF No. 119-23. The written warning indicated that an internal investigation revealed that Jones had not directed racist language toward the six plaintiffs in that case, but had used inflammatory and/or racist language in the workplace. Id. Jones was warned not to do it again, but the reprimand did not end Jones' practice of calling certain African-American employees "boy" and others the n-word. ECF No. 119-18, at 158-59. Although Plaintiffs have been precluded from referencing the earlier-in-time litigation at the trial in this case, ECF No. 165, reference is made herein to provide context for such reprimand, because the Court views such context as important to the evaluation of the effectiveness of Lyon's discrimination policy and personnel/H.R. department, matters that Lyon has placed at issue through its affirmative defense. To the extent Lyon advances such defense at trial, the Court will have to determine whether such defense opens the door to the need for some explanatory statement providing context for the reprimand of Jones.

[9] To the extent an employer has an effective anti-discrimination policy in place with established reporting channels that are actually conveyed to its workers, an employee is generally unable to avoid his or her obligation to report harassment based solely on a nebulous fear of retaliation. Cf. Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 270 (4th Cir. 2001) (explaining the importance of the "reporting requirement" to the law of workplace harassment and explaining that "[t]he bringing of a retaliation claim, rather than failing to report . . . harassment, is the proper method" to address retaliatory acts) (internal citation omitted).

### 2. Hostile Work Environment - Campbell

#### a. Severe or Pervasive

Lyon first seeks summary judgment as to Campbell's hostile work environment claim, but it does not, at least at this time, challenge whether the claimed harassment was "severe or pervasive," instead challenging only whether such conduct is imputable to Lyon.

#### b. Imputable to Lyon

Lyon seeks summary judgment based on the application of the Ellerth/Faragher affirmative defense, asserting that Lyon both had an effective anti-discrimination policy and that Campbell failed to avail himself of remedies under such policy (by failing to report the harassment to H.R. or to a supervisor). Campbell correctly asserts that because Defendant seeks to invoke an affirmative defense, it is Defendant's burden to prove that such defense applies based on the undisputed facts in the record. As described below, the Court largely agrees with Campbell's arguments that Defendant fails to carry its burden at the summary judgment stage to establish: (1) that such affirmative defense is available; and (2) that even if available, there is sufficient undisputed evidence to satisfy the first prong of the defense.

First, Defendant fails to advance facts demonstrating that the harassment at issue came from individuals that qualify as "Vance supervisors." As described above, the Ellerth/Faragher

affirmative defense only applies to "Vance supervisors," with the authority to hire/fire or modify a plaintiff's conditions of employment, and therefore, "it matters whether a harasser" is a supervisor as defined in Vance. Vance, 570 U.S. at 424 (emphasis added). Notably, Defendant both: (1) fails to point to evidence, or provide argument, in its initial brief outlining the job responsibilities/authority of the respective "foremen," "lead men," the "Production Manager," or other individuals purportedly committing harassment; and (2) fails to offer any response in its reply brief to Campbell's express contention that such evidence is lacking in the record.

Second, even accepting Defendant's premise that the Ellerth/Faragher affirmative defense is "available," which requires the further assumption that Campbell did not suffer a tangible employment action based on his race,[10] Defendant fails to demonstrate an absence of disputed material facts as to whether Lyon's anti-discrimination policy was sufficiently "effective" such that Lyon can be said to have exercised "reasonable care" to prevent/correct harassing behavior (the first prong of the

---

[10] The Ellerth/Faragher affirmative defense is unavailable to Lyon if a "tangible employment action" resulted from the discriminatory conduct. See McKinney v. G4S Gov't Sols., Inc., 179 F. Supp. 3d 609, 621 (W.D. Va. 2016) (explaining that to succeed on summary judgment when the harasser is a Vance supervisor, the defendant "must first show that no tangible employment action was taken . . . and then must establish there are no disputed facts as to each of the two prongs of the [affirmative] defense").

25

Ellerth/Faragher affirmative defense). Rather, Campbell points to numerous facts that call into question the effectiveness of the policy, to include Lyon's failure to provide the Court a copy of its anti-discrimination policy in force prior to November of 2015, as all of the harassment asserted by Campbell occurred prior to such date. If the Court is limited to the summary judgment filings specific to Campbell,[11] it would clearly be "debatable whether the company actually ha[d] a [racial] harassment policy" during the relevant timeframe, as Defendant has provided "[n]o company document" in effect prior to November of 2015 that mentions racial harassment and Defendant fails to highlight any evidence that the company conducted effective "training to prevent [racial] harassment" prior to 2016. Ocheltree, 335 F.3d at 334.

Alternatively, even if this Court considers the text of Lyon's 2013 written anti-discrimination policy that was introduced against other named Plaintiffs, and even if such policy were deemed effective on its face, because Mr. Campbell was a temporary employee from July of 2014 until July of 2015, he was not provided

---

[11] Campbell stopped working at Lyon before the circulation of Lyon's updated 2015 employee handbook, yet the 2015 handbook is the only policy submitted by Defendant as a summary judgment exhibit as to Campbell. Lyon does provide a document that Campbell signed in 2011 indicating that he received a copy of the employee handbook in force at that time; however, Defendant does not provide a copy of such handbook. ECF No. 76-2, 76-3. The Court notes that the broader case-file does includes earlier versions of the Lyon anti-discrimination policy submitted by Lyon in support of summary judgment as to Plaintiffs other than Campbell. See ECF No. 78-3 (documenting the anti-harassment policies in place during 2008 and 2013).

a copy of such policy.  ECF No. 119-8, at 29-30.  Accordingly, Campbell has clearly pointed to disputed material facts as to whether Lyon maintained an effective anti-discrimination policy during the relevant timeframe.  See Scott v. Ameritex Yarn, 72 F. Supp. 2d 587, 593 (D.S.C. 1999) (finding the existence of a "genuine issue[] of material fact" as to whether an anti-harassment policy had been communicated to the plaintiff, explaining that the employer cannot demonstrate its reasonableness "if it entirely fails to disseminate the policy").

Additionally, even if the policy had been circulated, the current record presents material factual disputes as to whether: (1) supervisors that heard complaints about harassment had a duty (and/or followed any such duty) "to report incidents of [racial] harassment to their superiors," Ocheltree, 335 F.3d at 334; (2) a victim of harassment had "reasonable avenues for voicing [his or] her [racial] harassment complaints," id. at 335; and (3) "the employer's actions as a whole," including its failure to adequately investigate complaints and reprimand the offenders, "established a reasonable mechanism for prevention and correction" of racial harassment, Holly D. v. California Inst. of Tech., 339 F.3d 1158, 1177 (9th Cir. 2003) (citing Ellerth, 524 U.S. at 765).  Here, the evidence on such issue is clearly not "so one-sided that [Defendant] must prevail as a matter of law," McAirlaids, 756 F.3d at 310 (citation omitted), in light of the fact that: (1) Lyon's

27

written policies did not provide personnel/H.R., or Lyon
supervisors/managers, with "any guidance regarding how to
investigate, document, and resolve harassment complaints once they
were reported," E.E.O.C. v. Boh Bros. Const. Co., 731 F.3d 444,
464 (5th Cir. 2013) (en banc); (2) complaints of racial harassment
that were discovered by the Lyon personnel office/H.R. were not
always investigated, and if an investigation was conducted, the
racial component of the complaint was not always explored; and (3)
the head of the Lyon personnel department through April of 2015
had limited, if any, training on racial harassment, may have
herself used the term "boy" to refer to African-American workers,
and did not believe that use of the n-word at Lyon was a violation
of the anti-discrimination policy as it was written, ECF No. 119,
at 19-20; cf. Boyer-Liberto, 786 F.3d at 280 ("In my view, being
called the n-word by a supervisor—as [the plaintiff] alleges
happened to him—suffices by itself to establish a racially hostile
work environment." (quoting Ayissi-Etoh v. Fannie Mae, 712 F.3d
572, 580 (D.C. Cir. 2013) (Kavenaugh, J., concurring))).

Lyon therefore fails to carry its burden to establish the
applicability of the Ellerth/Faragher affirmative defense in light
of material factual disputes regarding whether Lyon adopted,
distributed, and enforced an effective anti-harassment policy that

was actually aimed at preventing/rectifying racial harassment.[12]
See Howard v. Semco Duct & Acoustical Prod., Inc., No. 7:12cv452,
2013 WL 4451117, at *4 (W.D. Va. Aug. 16, 2013) (denying summary
judgment on the Ellerth/Faragher defense after describing the
record as "rife with questions of fact" as to "whether [the
plaintiff's] supervisor was a 'supervisor' as Vance defines that
term" and whether the defendant "exercised reasonable care to
prevent and promptly correct any harassing behavior"); Smith v.
First Union Nat. Bank, 202 F.3d 234, 244 (4th Cir. 2000) ("[T]he
first element of [the Ellerth/Faragher] affirmative defense is
showing that [the employer] exercised reasonable care to prevent
and correct promptly any . . . harassing behavior."); cf. Vance,
570 U.S. at 446 ("As an initial matter, an employer will always be
liable when its negligence leads to the creation or continuation
of a hostile work environment."). Notwithstanding Defendant's
efforts to rely on its written anti-discrimination policy,
Campbell, and other Plaintiffs, have pointed to multiple facts on
which a reasonable juror could conclude that Lyon's policy was not

---

[12] Defendant correctly argues that "[d]istribution of an anti-harassment
policy provides 'compelling proof' that the company exercised reasonable
care in preventing and promptly correcting sexual harassment." Barrett v.
Applied Radiant Energy Corp., 240 F.3d 262, 266 (4th Cir. 2001) (citation
omitted). However, "[t]he mere presence of an anti-discrimination policy"
does not end the summary judgment inquiry, particularly where the plaintiff
points to evidence suggesting that the policy was "defective or
dysfunctional," which Plaintiffs have done here. Williams v. Silver Spring
Volunteer Fire Dep't, 86 F. Supp. 3d 398, 414-15 (D. Md. 2015) (citations
omitted). Stated another way, the existence of "such a policy only insulates
an employer if it effectively was enforcing its policy," and on this record,
such a question can only be answered by the factfinder. Id.

effectively implemented and/or was "defective or dysfunctional." Smith, 202 F.3d at 244-45.

The Court recognizes that it may be an atypical fact pattern for an employer to have a written anti-discrimination policy that fails to satisfy the first prong of the Ellerth/Faragher defense, but the facts here suggest multiple deficiencies in Lyon's efforts to bar, police, and curtail racial harassment at its workplace, particularly prior to mid-2015. These deficiencies include failure to distribute its policy to temporary employees (some of which held a "temporary" status for years), failure to maintain an effective H.R. office during the bulk of the relevant timeframe, failure to adequately train its workers and supervisors, and failure to effectively implement a policy whereby managers that received a complaint, or witnessed racial harassment, would conduct an adequate investigation and/or report the matter to H.R.[13]   See Ocheltree, 335 F.3d at 334 ("The first problem with

---

[13] The 2015 policy language relied on by Lyon, which is not relevant to Campbell, but is relevant to the Plaintiffs working at Lyon beyond November of 2015, could be interpreted as only requiring that the victim: (1) ask the harasser to stop the harassment (an action Campbell asserts that he performed on multiple occasions); and/or (2) tell his or her immediate supervisor of the harassment (a requirement that Campbell may have satisfied by his reports to "lead man" Bobby Hardy). ECF No. 78-3. It also does not appear that there is a written requirement that supervisors who receive a complaint forward it to H.R., or anyone else (Dunkley testified that reporting up the chain was the standard practice at Lyon, but Plaintiffs' evidence suggests the contrary). The jury could also consider the fact that the 2015 policy arguably puts the onus on the employee to report the same harassment twice if his or her immediate supervisor fails to follow through on a complaint. Cf. Ocheltree, 335 F.3d at 334-35 (suggesting an approach that requires the employee to report the harassment twice if a supervisor

[the defendant's] complaint procedure is that . . . it fails to place any duty on supervisors to report incidents of sexual harassment to their superiors.").

In light of all of these facts suggesting that Defendant failed to exercise "reasonable care" to promptly prevent/correct supervisor harassment, a reasonable juror could plainly find that Lyon's policy was inadequate and/or not effectively implemented. See Spriggs, 242 F.3d at 187 (explaining that "no matter how well-conceived" a policy is, an employer fails "to show the requisite level of care" if it "has rendered [the policy] ineffectual by acting unreasonably"). The above analysis, of course, is "not to say that [Lyon] cannot establish . . . the affirmative defense" at trial; however, Lyon "has failed to establish [such defense] as a matter of law" based on the summary judgment submissions. Harris v. Mayor & City Council of Baltimore, 797 F. Supp. 2d 671, 684 (D. Md. 2011).

### c. Negligence

The Court separately finds, for the reasons argued in detail in Campbell's brief in opposition to summary judgment, ECF No. 110, at 27-31, that Defendant fails to point to undisputed facts demonstrating that it was not negligent in its handling of "anonymous" harassment and/or harassment committed by individuals

"cannot or does not adequately resolve an employee's complaint . . . seems ill designed to ensure that upper management learns of harassment").

31

that do not qualify as "Vance supervisors." See Vance, 570 U.S. at 424 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."); see also Pryor, 791 F.3d at 497 ("The anonymous nature of severe threats or acts of harassment may, in fact, heighten what is required of an employer."). For reasons similar to those discussed above, disputed material facts, regarding whether Lyon "knew or should have known about [any co-worker] harassment and failed to take effective action to stop it," preclude summary judgment. Strothers, 895 F.3d at 332 (citation omitted).[14]

For all of the above reasons, Defendant's summary judgment motion is **DENIED** as to Campbell's hostile work environment claim.

### 3. Disparate Treatment: Work Assignments - Campbell

Defendant's summary judgment motion next asserts that Campbell fails to advance sufficient evidence on which a reasonable

---

[14] When conducting such negligence inquiry, "[e]vidence that an employer did not monitor the workplace, failed to adequately respond to complaints of racial discrimination, failed to provide an effective system for registering complaints, or effectively discouraged complaints from being filed," are all relevant. Vance, 570 U.S. at 449. Highlighting just one form of the asserted discriminatory treatment in this case, a juror could easily find that repeatedly painting over racist graffiti without any investigation, or any other action aimed at curbing such practice, only to have such graffiti immediately reappear, ECF No. 76-1, at 66, was not "reasonably calculated to end the harassment." Freeman v. Dal-Tile Corp., 750 F.3d 413, 423 (4th Cir. 2014) (quotation marks and citation omitted); see also Pryor, 791 F.3d at 498 (explaining that an employer "is not subject to a lesser standard simply because an anonymous actor is responsible for the offensive conduct"; rather, anonymity is just one circumstance that informs the "determination of whether a company's response was reasonably calculated to end the harassment at issue") (citations omitted).

juror could conclude that he suffered an "adverse employment action" based on his race, a prerequisite for a valid disparate treatment claim. Holland, 487 F.3d at 219. The amended complaint broadly alleges that Campbell and other "African-Americans and Hispanics," were "made to perform the least desirable jobs, sometimes in dangerous conditions," and that "African-Americans and Hispanics, including Campbell, might be made to work in dangerous conditions or work by themselves with no one watching to ensure that they were not injured, or if they were injured, to provide assistance." Am. Compl. ¶¶ 189-90 (emphasis added). Not only are such allegations equivocal on their face, but Plaintiff cannot rely on mere allegations at the summary judgment stage; rather, the evidence in the record must control.

In response to Defendant's summary judgment motion, Campbell's opposition memorandum cites a single record fact in support of the assertion that "he and other African-American workers were forced to work in worse conditions than white workers, and made to work in more dangerous conditions or work alone with no back up for safety compared to white workers." ECF No. 119, at 30. The cited evidentiary paragraph, however, offers no evidence of any "dangers" faced by Campbell on even a single occasion, instead broadly asserting, without providing a factual predicate, that Campbell's foreman would "unfairly assign Campbell the more dirty tasks," and would give Campbell the "dirty jobs," and "night

jobs." Accordingly, even when this limited evidence (which does not include evidence of denied training or promotions, lesser pay, or materially more dangerous work) is viewed in a light most favorable to Campbell, no reasonable juror could conclude that Campbell established a prima facie disparate treatment claim.[15] See Holland, 487 F.3d at 219 (explaining that "less appealing" job assignments do not constitute an "adverse employment action" absent a "significant detrimental effect") (quotation marks and citation omitted); Von Gunten v. Maryland, 243 F.3d 858, 868 (4th Cir. 2001), abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) (noting that, even in a case involving "exposure to dangerous pathogens," the plaintiff's disparate treatment claim failed based on her "fail[ure] to proffer any credible evidence that her exposure to these chemicals did in fact increase in the new assignment").

Because Campbell fails to point to evidence that could support his disparate treatment claim, Defendant's summary judgment motion is **GRANTED**. Campbell is correct, however, that the race-based

---

[15] Campbell does not directly argue in opposition to summary judgment that being "sent home" for a few days without pay in 2013 after a disagreement with his foreman (David Dragon) constituted an adverse employment action. Moreover, Campbell's own evidence would not support such a finding because he admits that he refused to follow his foreman's directions and "gave him a reason" to fire Campbell (though not a "big reason," because the direction Campbell refused to follow was about a trivial matter). ECF No. 119-1, at 31-33. Campbell's evidence also establishes that he was unaware why his foreman disliked him and that it was "personnel," and not Dragon, that sent him home for a few days after the argument. Such evidence, which is not even raised by Campbell in his argument in opposition to summary judgment, appears facially insufficient to support a disparate treatment claim.

34

assignments cited in support of his disparate treatment claim bolster his hostile work environment claim, as such facts are relevant to both the "severe or pervasive" mistreatment he alleges and, if proven to be a widespread practice as alleged, to Lyon's constructive knowledge of race-based harassment.

### B. Robert Thomas, Sr.

### 1. Facts

The facts previously summarized documenting the absence of an H.R. department prior to April of 2015, failure to train Lyon employees and supervisors on racial discrimination, failure to provide an anti-discrimination policy to temporary workers, etc., apply equally to Thomas, Sr. and all other Plaintiffs. Additionally, the following facts are relevant to Thomas, Sr.:

- Thomas, Sr. is an African-American man who performed work at Lyon's workplace periodically in the late 1990s through a subcontract company, and then worked as a Lyon employee in the position of "lead man" in the labor shop for a period of several months in 2006,[16] and again in 2015.

- Thomas, Sr. asserts that Tom Barnes (superintendent) used racial slurs in the late 1990s, including the epithet "black ass n**ger" whenever he got upset. Foreman Michael Ahart wore confederate clothing at work dating back to the late 1990s, and continuing through 2015. ECF No. 126-1, at 146-48.

---

[16] Thomas, Sr.'s deposition references his first permanent employment at Lyon as occurring in 2008, and such date repeats throughout the entire deposition. Thomas, Sr. clarifies on summary judgment, that as verified by Lyon's internal employee records, that he actually worked for Lyon in 2006, not 2008. As Defendant does not challenge such correction, which is predicated on Lyon's own company records, this Court will refer to such term of employment as occurring in 2006.

35

- In 2006, Tom Barnes told Thomas, Sr. to get his "black ass off that barge," and then said "[y]ou-all n\*\*gers make me sick." Thomas, Sr. challenged such epithet and warned Barnes not to talk to him like that. Immediately thereafter, Thomas, Sr. complained directly to the company president (George Lyon) about Barnes' racially derogatory language and asked Mr. Lyon to talk to Barnes. Mr. Lyon told Thomas, Sr. that he needed to stand up to the harassers himself or else they would continue to push him around. As far as Thomas, Sr. knows, Mr. Lyon took <u>no action</u> in response to the complaint. The racial slurs continued after that date. <u>Id.</u> at 49-51, 149-50.

- Production Manager Lonnie Jones, who reported directly to George Lyon, repeatedly made racist statements in the workplace (including "spook" and "blue"), and while Jones referred to most African-American employees as "boy," he repeatedly, and routinely, called Thomas, Sr. "Big N\*\*ger." Jones also told Thomas, Sr. that when he was young his family "had a maid and [his] dad bought him a n\*\*ger as a toy." Thomas, Sr., confronted Jones about some of his offensive comments, including the nickname "Big N\*\*ger," but Jones did not stop using said offensive moniker. When Thomas, Sr. returned to Lyon in 2015 after many years working elsewhere, Jones called him "Big N\*\*ger" again the first time Jones saw him. Jones then indicated that he knew he wasn't supposed to call Thomas, Sr. that name anymore based on Lyon's "new H.R.," but he still repeated the name on another occasion after that. <u>Id.</u> at 38-42, 151-52, 155-59.

- Thomas, Sr. did not work around David Kerner much in 2006, but got to know him more in 2015. Kerner routinely made racist statements to his subordinate African-American employees, including the slurs "n\*\*ger," "boy" and "blue." Kerner used the n-word "just about every week" as he used it whenever he got upset. He also told his employees to get their "black ass out there" on a job. On one occasion during 2015, Kerner asked Thomas, Sr. whether "n\*\*gers grow tails at night on a full moon." Thomas, Sr. confronted Kerner when he was back at Lyon in 2015 and told him that he couldn't talk to employees that way. <u>Id.</u> at 51-54, 172-173.

- Thomas, Sr. worked with "Sacco" in the late 1990s and in 2006. Sacco used terms such as "boy, n\*\*ger, black ass, [and] monkey-looking ass" while working at Lyon. On one

occasion in 2006, Sacco threatened to fire an African-American employee if he didn't "keep his black ass" at Lyon for additional work even though he had just worked for twelve hours and needed to go home to pick up his kids. Thomas, Sr. asserts that Sacco fired such employee about a week later. Sacco also said things like "them damn n**gers get on my damn nerves." Id. at 53-56, 160-163.

- In 2015, when Thomas, Sr. was rehired at Lyon, one of his African-American subordinates complained to Thomas, Sr. that Kerner was mistreating him, including telling him to "get [his] black ass" to work. Id. at 69. Thomas, Sr. assisted another employee (who was Italian or Puerto Rican) after David Kerner was "joking" with him regarding his race and physically assaulted him by picking him up. Thomas, Sr. made a written statement to H.R. (at H.R.'s request) about Kerner "putting his hands on that man" and Thomas, Sr. thinks that Kerner received a warning from H.R. Kerner then came back at Thomas, Sr. and called him "nothing but a damn snitch." Id. at 70-71.

- Thomas, Sr. was exposed to additional racist speech and symbols in both 2006 and 2015, as he saw numerous confederate flags at work (displayed primarily by Ahart, who wore the flag "faithfully" on bandanas, a jacket, wristbands, and his motorcycle) and saw racist graffiti, including the n-word and pictures of monkeys. He also saw nooses hanging on more than one occasion, including one hanging in the engine room on the "Lady D" tugboat in 2015. He saw a second "old" hidden noose hanging in the corner of a building being torn down in 2015. Id. at 100-110, 171-75.

- Thomas, Sr. personally witnessed other mistreatment based on race while working at Lyon in 2015 as he was in charge of several African-American employees that were mistreated by white supervisors. One incident involved Kerner forcing Thomas, Sr.'s son to shovel "shot" by hand on a very hot day even though a "bobcat" was available to complete the job far more efficiently. Thomas, Sr. confronted Kerner, who refused to sit down and talk with Thomas, Sr. about the way Kerner was treating his subordinate American-American employees. Kerner's view was that he was the "facility manager," and whatever orders he gave should be followed. Id. at

37

74-78. On other occasions, Thomas, Sr. heard Kerner indicating that he did not want to teach "[t]hese n\*\*gers" because they "ain't going to get it no way," that he "hate[d] them black ass n\*\*gers," and that he was going to "[g]et rid of these n\*\*gers and get [him] a new crew." Id. at 185.

- Sometime in September of 2015, Kerner confronted Thomas, Sr. and told him "[y]our black ass can't run my job." Id. at 85-86. Kerner then falsely reported to Johnny Gaskins that Thomas, Sr. had threatened to physically harm Kerner, and without even giving Thomas, Sr. a chance to explain what happened, Gaskins transferred Thomas, Sr. to "the main yard" in order to split up Thomas, Sr. and Kerner. Id. at 86-88.

- After being transferred to the main yard, and shortly prior to his termination from Lyon, Thomas, Sr. had an encounter with another white supervisor (Donna Douglas) who verbally and physically assaulted Thomas, Sr. in a manner that injected race into the confrontation. Douglas was insisting that Thomas, Sr. write a "ticket" authorizing "hot work" on a vessel, but Thomas, Sr. refused based on his judgment that such work would create a fire hazard until the recently applied paint was fully dry. After Thomas, Sr. refused to authorize the work in spite of Douglas' loud cussing, Douglas "straddle[d] her legs," took her right hand and "went down into her buttocks, walked over there to [Thomas, Sr.], and . . . said, 'Not only you kiss my ass, you kiss my white ass,' and she wiped it right across [his] . . . nose." Thomas, Sr. told his boss, who told him to go to personnel. He tried reporting the incident to H.R., but Dunkley was not available. Thomas, Sr. was then hospitalized for an unrelated medical issue, but at some point, he made a written complaint to H.R. indicating that Douglas had told him to "kiss my wite [sic] ass." Id. at 89-95; ECF No. 126-9.

- After an internal investigation, Douglas was suspended for five days, but such suspension was solely due to her aggressive behavior toward a subordinate during a "major verbal altercation" and was not tied in any way to her racist statement. In fact, H.R. had overlooked Thomas, Sr.'s written report indicating that Douglas made a racist statement until after an EEOC charge was filed, and when confronted with such matter during her 2018

38

deposition, Dunkley continued to believe that the race-based statement ("white-ass") was <u>fabricated by Thomas, Sr. and other eye-witnesses</u>, saying that she believed the statement of another Lyon employee who had not witnessed the event. Dunkley further stated that she heard the deposition testimony of several other Plaintiffs that claimed to have heard Douglas say "kiss my white ass," but she <u>disregarded such statements as fabrications</u>. Critically, however, Douglas <u>freely admitted</u> during her deposition that she told Thomas, Sr. to "kiss her <u>white</u> ass," further indicating that she never denied saying that, and that if Lyon's records state that she only said "kiss my ass," or that she ever denied saying "kiss my <u>white</u> ass," Lyon's records are wrong. ECF Nos. 126-7; 126-8; 126-11.

• Approximately two weeks after the incident with Douglas, Thomas, Sr. was terminated by Jevon Brooks, who told Thomas, Sr. that he had to let him go, but didn't know why. Noack told Thomas, Sr. that Lyon was "having a layoff," which Dunkley repeated when Thomas, Sr. called Lyon the following week. ECF No. 126-1, at 90-96.

### 2. Hostile Work Environment - Thomas, Sr.

#### a. Severe or Pervasive

In support of its motion seeking summary judgment on Thomas, Sr.'s hostile work environment claim, Defendant first summarily asserts, in a two sentence argument without citation to case law, that Thomas, Sr. cannot rely on any events occurring in 2006 as they fall far outside of the applicable limitations period. ECF No. 90, at 8. Defendant further asserts that the 2015 harassment, when considered in isolation, was not sufficiently "severe and pervasive."[17]   Id. at 8-9. Thomas, Sr. responds by arguing that:

---

[17] To clarify, the controlling legal standard requires the racial harassment to be sufficiently severe (a single <u>extreme</u> event) <u>or</u> sufficiently pervasive (<u>repeated</u> harassment over time). Accordingly, notwithstanding Defendant's use of the conjunctive term "and," which is also found in some case law,

(1) the "continuing violation approach applies to § 1981 hostile work environment claims," such that discrete acts committed outside the four-year limitations period remain actionable in conjunction with the numerous acts committed inside the limitations period, Guessous, 828 F.3d at 223; (2) the continuing harassment in this case was committed in the same manner, by the same actors, whenever they interacted with Thomas, Sr. (in the late 1990s, 2006, and 2015); (3) that even if the past conduct is not actionable, (a) the 2015 conduct alone is sufficiently severe or pervasive to survive summary judgment; and (b) the past conduct remains admissible to demonstrate Lyon's negligence for allowing widespread harassment by supervisors, and even a senior manager only one step below the company president (Jones), to occur over several decades.

Defendant's abbreviated limitations argument, which does not cite to any case law or address or respond to Thomas, Sr.'s invocation of the "continuing violation" theory, is insufficient to demonstrate that Thomas, Sr. is barred, as a matter of law, from presenting evidence regarding events preceding 2015. Guessous, 828 F.3d at 223-24; see Milligan-Grimstad v. Stanley, 877 F.3d 705, 712 (7th Cir. 2017) (noting that it may be possible to reach back "10, 15, or 20 years" if the violation was

---

the applicable legal test in the Fourth Circuit requires "severe or pervasive" harassment.

40

continuing); 7 Emp. Coord. Employment Practices § 84:90 (2019 update) (stating that a "continuing violation may also be established by evidence of a company-wide policy of discrimination," and observing that "[w]idespread harassment participated in by numerous individuals is usually sufficient to establish the existence of a company-wide policy of discrimination"); see also Fiorito v. Metro. Aviation, No. 1:17cv731, 2018 WL 3730071, at *6 (E.D. Va. Aug. 3, 2018) ("[C]ourts of appeals have uniformly found that intervening actions only sever continuing violations where the intervening actions are remedial efforts that bring an end to harassment.") (citations omitted); but see Felton v. Polles, 315 F.3d 470, 486 (5th Cir. 2002), overruled on other grounds by Burlington Northern, 548 U.S. 53 (finding that a "very distinct, three-year break [in harassment due to a transfer to another job position] defeats any attempt to establish a continuing violation").

While Defendant may retain an avenue to preclude consideration of the 2006 (or earlier) conduct as part of the "severe or pervasive" analysis (such as through a pre-trial motion in limine), Defendant's failure to even address the continuing violation legal standard, including in its reply brief, proves fatal to Defendant's argument on this issue at this time. Moreover, even if Defendant's limitations defense is assumed to be meritorious, Thomas, Sr. is correct that evidence of the 2006

conduct would still likely be admissible at trial (with a limiting instruction) as it appears squarely relevant to whether Defendant was negligent in permitting widespread racial discrimination, committed by numerous long-term supervisory employees, to occur unchecked for a period of at least a decade, extending into the limitations period.

Defendant's failure to prevail on its cursory limitations argument, however, has no bearing on the outcome of its summary judgment motion, as the Court finds that Thomas, Sr. has highlighted sufficient evidence to create a jury question as to whether the claimed hostile work environment experienced in 2015 (without reliance on events from 2006) was sufficiently "severe or pervasive" to support a valid claim. Such evidence includes the Production Manager's use of the grossly offensive nickname "Big N\*\*ger," the repeated racial mistreatment of minorities that Thomas, Sr. supervised, the presence of two nooses and racist graffiti, a white manager's routine use of the n-word in the workplace to refer to subordinate employees, and the encounter between Douglas and Thomas, Sr. shortly before his termination, which involved aggressive and abusive conduct by a white superior in front of numerous eyewitnesses whereby the white superior put her hand down her pants prior to putting the same hand in her

African-American subordinate's face while aggressively telling him
to "kiss her white ass."[18]

In reaching this conclusion, the Court has considered "all of
the circumstances," including the high frequency of the racist
comments/treatment/graffiti, the severity of such conduct—as
punctuated by the weekly use of the word recognized to be "pure
anathema to African-Americans," the statements linking the n-word
to threats of termination, the mistreatment of African-American
subordinate employees over the objection of Thomas, Sr., the race-
based element of the assault by Douglas, and the fact that the
"status" of the harasser was almost always a supervisor/superior
to Thomas, Sr., with the use of racial epithets by superiors a
fact that "impacts the work environment far more severely than
[harassment] by co-equals." Boyer-Liberto, 786 F.3d at 277-78
(citations omitted); Spriggs, 242 F.3d at 185 (citation omitted).

## b. Imputable to Lyon

Defendant next challenges whether Thomas, Sr.'s hostile work
environment claim is imputable to Lyon, arguing that the record
establishes as a matter of law that Lyon is shielded by the
Ellerth/Faragher affirmative defense. While this Court assesses

---

[18] To the extent Defendant contends that Thomas, Sr. fails to demonstrate
that he was subjectively offended by the racist conduct due to the fact that
he admitted that he tried to get along with everyone he worked with,
including his harassers, such claim fails at the summary judgment stage
based on the disgust revealed in Thomas, Sr.'s deposition testimony, as well
as his complaints directly to the harassers and/or other Lyon employees,
and his complaint to H.R. about Douglas.

43

such issue individually as to Thomas, Sr., the analysis and result tracks that for Plaintiff Campbell as Lyon: (1) fails to demonstrate that all the relevant harassers (including anonymous actors) were "Vance supervisors"; and (2) fails to demonstrate the absence of a tangible employment action and/or the absence of disputed facts as to whether Lyon had an effective anti-discrimination policy.

In addition to this Court's analysis above, which is reincorporated herein, Thomas, Sr. offers an example of an express race-based complaint he made to H.R. about Douglas that was not adequately investigated. See Smith, 202 F.3d at 245-46 (finding that an inadequate investigation that focused on complaints about "management style" and "ignored [the] allegations of sexual harassment" could support a jury in finding that the defendant "did not act with reasonable care to correct promptly [the alleged] harassing behavior").[19] Thomas, Sr. also testified that he complained to a "dockmaster" foreman during 2015 about Kerner, but

---

[19] When viewed in Thomas, Sr.'s favor, Dunkley's sworn 2018 testimony indicating that she still believed that Thomas, Sr. and other witnesses were fabricating a race-based element to the Douglas confrontation is evidence on which a reasonable juror could conclude that Lyon's H.R. department failed to perform an effective investigation into the racial harassment claim during 2015 because Douglas herself freely admits that she made the race-based comment. See Smith, 202 F.3d at 245 (noting the absence of "reasonable care" to promptly correct harassment when an investigation failed to even ask the purported offender whether he made the sexually harassing comments).

44

that H.R. never followed up with Thomas, Sr. on such complaint. ECF No. 126-1, at 176-77.

Because Lyon cannot establish the first element of its affirmative defense, Thomas, Sr.'s purported failure to report all of the offending conduct does not support entry of judgment in Lyon's favor. Cf. Ocheltree, 335 F.3d at 335 (holding that because the defendant "did not exercise reasonable care in setting out the channels by which it could receive reports of sexual harassment, it is therefore in no position to rely on those inadequate channels to claim that it did not receive notice") (quotation marks and citation omitted). Moreover, Defendant fails to establish that the undisputed facts demonstrate that it was not "negligent" in failing to investigate or take steps to curtail racist graffiti or other long-term and widespread racial harassment. While the Court's ruling in no way precludes Lyon from establishing its affirmative defense at trial, Lyon fails to make the requisite showing at the summary judgment stage, and its motion is therefore **DENIED**.

## 3. Disparate Treatment: Work Assignments - Thomas, Sr.

Defendant's summary judgment motion asserts that the basis for Thomas, Sr.'s disparate treatment claim is "obscure" and that he advances no evidence indicating that he was the victim of "selective treatment" that rose to the level of a "tangible employment action." ECF No. 90, at 14. Thomas, Sr. opposes

45

summary judgment, arguing that Defendant does not address facts associated with "dangerous" job assignments, to include working alone without backup. ECF No. 126, at 31.

Although neither party has presented a particularly robust argument on this claim, the record reveals that the only proper result is to grant Defendant's motion. Lyon accurately labels Thomas, Sr.'s disparate treatment claim as "obscure" as it is unclear what evidence he relies on in support of such claim. In contrast to Campbell, who responded in opposition to summary judgment by pointing to at least some limited facts broadly referencing assignments to "dirty" jobs, Thomas, Sr. defends against summary judgment without citation to any record evidence, and the Court is otherwise unaware of any facts that could support Thomas, Sr.'s disparate treatment claim. Defendant's summary judgment motion is therefore **GRANTED**.[20]

### 4. Retaliation - Thomas, Sr.

For summary judgment purposes, Defendant assumes that Thomas, Sr. can establish a prima facie case of retaliation, but argues that Lyon is entitled to summary judgment because it has effectively advanced evidence demonstrating a non-retaliatory reason for Thomas, Sr.'s termination—an asserted "Reduction in

---

[20] Although Thomas, Sr.'s hostile work environment evidence documents his transfer to another "yard" based on a fabricated threat, Thomas, Sr. does not offer evidence demonstrating that such internal transfer constituted an "adverse employment action," nor does he even raise such event in his opposition to summary judgment on his disparate treatment claim.

46

Force" ("RIF"). Defendant explains, based on testimony and affidavits rather than citation to company documents, that Thomas, Sr. was the last supervisory employee to be hired, and that was why he was selected for the RIF.

Thomas, Sr. counters by highlighting evidence on which a reasonable juror could conclude that Defendant's proffered reason is pretextual, including: (1) Thomas, Sr. was the only permanent employee laid off in the fall of 2015 even thought there was purportedly a RIF occurring; (2) such layoff occurred within two weeks after he complained about Douglas' racist statement, see Milligan-Grimstad, 877 F.3d at 711 ("In some circumstances, suspicious timing may reveal discriminatory intent."); (3) a Lyon company document indicates that Thomas, Sr. was terminated due to a violation of company policy, ECF No. 126-12, not the RIF, revealing that Lyon has presented shifting/conflicting justifications as to the reasons why Thomas, Sr. was terminated; (4) Lyon hired three new permanent workers into its labor department just months prior to asserting that Thomas, Sr. needed to be released due to a "lack of work," ECF No. 126-15; and (5) Thomas, Sr.'s termination notice did not reference the RIF, whereas three other employees terminated approximately two months after Thomas, Sr. all received termination notices that expressly referenced the RIF. ECF Nos. 126-1, at 94-97; 126-12; 126-13; 126-15; 126-33; 90-4, at 6-12. Because Thomas, Sr. highlights

47

sufficient evidence for a reasonable juror to find Lyon's proffered justification for selecting Thomas, Sr. for termination was pretextual (most notably, the conflicting justifications within Lyon's own records), Lyon's summary judgment motion is **DENIED** as to this claim.[21]

### 5. Wrongful Termination – Thomas, Sr.

Thomas, Sr. contends that his race was a motivating factor in his discharge, with his termination occurring shortly after he complained about Douglas' verbal/physical attack, which included a racial element ("kiss my wite [sic] ass"). Defendant's summary judgment motion does not challenge whether Thomas, Sr. can establish a prima facie wrongful termination claim, but instead offers the exact same argument offered with respect to Thomas, Sr.'s retaliation claim—that the RIF was "a legitimate non-discriminatory reason for discharging him." ECF No. 90, at 15. For the same reasons discussed in the preceding section, the Court finds that there are genuine disputes of material fact as to whether Lyon's justification is pretextual, and therefore, summary judgment is **DENIED** as to Count Four.

---

[21] Defendant asserts that Thomas, Sr. had been identified for termination weeks prior to the incident with Douglas; however, there are no company documents evidencing such fact. Rather, the only evidence in support is testimonial, the credibility of which only the jury can weigh against other relevant facts. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 569 (4th Cir. 2015). Additionally, Defendant's argument that Donna Douglas' suspension proves how seriously Lyon's H.R. office viewed Thomas, Sr's race-based complaint falls flat at the summary judgment stage in light of H.R.'s apparent false rejection of the racial component of his complaint.

### C. Robert Thomas, Jr.

#### 1. Hostile Work Environment - Thomas, Jr.

Defendant does not seek summary judgment as to Robert Thomas, Jr.'s, hostile work environment claim.  Such claim will therefore proceed, and there is no need to produce a detailed factual statement specific to Thomas, Jr., who is an African-American man that worked for Lyon as a temporary employee during 2015.

#### 2. Disparate Treatment: Assignments/Training - Thomas, Jr.

Defendant seeks summary judgment as to Thomas, Jr.'s disparate treatment claim, arguing that Thomas, Jr. failed to identify an "adverse employment action," and correctly noting that "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action."  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004).  Thomas, Jr. responds by stating that his claim is not predicated solely on allegations that he was forced to work in unpleasant conditions, but rather, he advances direct evidence that he was denied the opportunity for training because of his race.  See, e.g., Melendez v. Bd. of Educ. for Montgomery Cty., No. DKC 14-3636, 2017 WL 121769, at *10 (D. Md. Jan. 12, 2017) ("Indirect actions that affect present and future employment such as . . . limited access to training programs, or reduced

49

opportunities for promotion also qualify as adverse employment
actions.") (emphasis added) (citations omitted).

Thomas, Jr. highlights evidence indicating that while he was
employed at Lyon as a temporary worker with the title "painter's
helper," two different supervisors refused his request to be
trained on and/or to use a "spray gun" so that he could actually
paint while on the job at Lyon.   ECF No. 116-1, at 58-59, 62-64.
Specifically, Thomas, Jr. asserts that:

> There was another incident where the guys was learning
> how to spray the boat, learning different things of how
> to spray with the spray gun. I was asking [foreman
> Kerner] him if he can teach me. He was like, "Why teach
> you? You n**gers wouldn't get it anyway." You know what
> I'm saying?

Id. at 58.   Thomas, Jr. asserts that foreman David Dragon made a
similar statement on the same topic, saying that "n**gers [are]
late to the punch," meaning that they do not learn quickly enough.
Id. at 62-63.   It is unclear whether Dragon's statement occurred
on the same day as Kerner's race-based refusal to provide training,
as Thomas, Jr. indicates that Dragon made the statement when
Thomas, Jr. "was talking to him about the situation with the
spraying," and had asked Dragon why "the other guys [are] able to
spray" and he could not.   Id.

Providing further context for the above incidents, Thomas,
Jr. asserts that Kerner allowed white temporary workers with the
same title as Thomas, Jr. ("painter's helper") to "actually

paint[]" and to pressure wash, whereas he was required to do "grunt work," such as "[s]hoveling muck, like dirt, out of the barges." Id. at 82-87.  Thomas, Jr. argues that the failure to train him on a spray gun is sufficient to support his disparate treatment claim because it negatively impacted his pay and/or had an impact on his ability for promotion.   See ECF No. 116-3 (indicating that permanent "helpers," and "laborers" at Lyon received a significantly lower hourly pay rate than permanent "painters").

Although Thomas, Jr.'s evidence documenting a pay disparity between "helpers" and "painters" only reflects the disparity for permanent workers at Lyon, such evidence, coupled with Thomas, Jr.'s failure to train evidence and evidence that he was not allowed to perform job functions within his assigned "trade" due to his race, is sufficient to overcome summary judgment, particularly because Defendant fails to demonstrate that a refusal to provide on-the-job training based on race requires the same "materiality" showing as other "adverse employment actions." Cf. Pafford v. Herman, 148 F.3d 658, 667 (7th Cir. 1998) (concluding that whether the training at issue "is material to [the plaintiff's] further promotion is irrelevant to whether the [defendant] denied [the plaintiff] training for a discriminatory reason").

As explained by the Fourth Circuit, the "adverse employment action" prerequisite "is derived from [Title VII's] requirement

51

that the employer's practice relate to 'compensation, terms, conditions, or privileges of employment' or that the practice 'deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.'" Ali v. Alamo Rent-A-Car, Inc., 8 F. App'x 156, 158 (4th Cir. 2001) (quoting 42 U.S.C. § 2000e-2(a)(1) & (2)). However, unlike most other allegations of disparate treatment, a failure to train claim is not grounded in the statutory language set forth in § 2000e-2(a)(1) & (2), rather, there is an independent statutory provision making it an "unlawful employment practice" for any employer to "discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training," to include "on-the-job training programs." 42 U.S.C § 2000e-2(d). Stated another way, "training is a benefit of employment that receives protection under Title VII." Stewart v. Morgan State Univ., No. DKC 11-3605, 2013 WL 425081, at *3 n.3 (D. Md. Feb. 1, 2013) (quoting LaGrande v. DeCrescente Distrib. Co., Inc., 370 F. App'x 206, 211 (2d Cir. 2010)).

Although Thomas, Jr.'s disparate treatment claim is advanced under § 1981, not Title VII, because training is a benefit of employment (if provided by the employer to other similarly situated employees), and because § 1981 governs "all benefits" of a contractual relationship, including an at-will contract of

52

employment, the test for a failure to train claim is the same under § 1981. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 n.1 (4th Cir. 2002) (finding that the legal standard for a "discriminatory denial of training" claim is the same under Title VII and § 1981). The Fourth Circuit has defined the elements of a prima facie failure to train claim without any reference to the generally applicable "adverse employment action" standard, instead requiring only that: "(1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination." Id. at 649-50 (citing Pafford, 148 F.3d at 667)).

Here, in light of Defendant's failure to address § 2000e-2(d) and/or the elements of a failure to train claim as outlined in Thompson v. Potomac, Defendant's summary judgment motion is **DENIED** at this time. See Thompson v. Town of Front Royal, 117 F. Supp. 2d 522, 528 (W.D. Va. 2000) (denying the defendant's summary judgment motion based on the plaintiff's claim that he was assigned to menial tasks and denied training based on his race, noting that the Fourth Circuit "has never adopted a specific test to determine what constitutes an actionable adverse employment decision," and finding it "relevant" that "§ 2000e-2(d) makes it an unlawful

employment practice to discriminate on the basis of race for entry
into any training, retraining, or on-the-job training programs").[22]

### D. James Williams

### 1. Hostile Work Environment - Williams

Defendant does not seek summary judgment as to James Williams'
hostile work environment claim.  Such claim will therefore proceed
in this case, and there is no need to produce a detailed factual
statement specific to Williams, who is an African-American man
that worked for Lyon as a temporary employee from 2013 until 2015.

### 2. Disparate Treatment: Work Assignments - Williams

Defendant seeks summary judgment as to Count Two, disparate
treatment, arguing that Williams fails to demonstrate that he
suffered an "adverse employment action" grounded in his assertion
that he was purportedly assigned unpleasant, more difficult, and
even "ridiculous" work due to his race.   Williams responds by
arguing that he was unfairly assigned to work alone on jobs that
were impossible for one person to complete, and that his supervisor

---

[22] Defendant's reply brief offers no response to Thomas, Jr.'s <u>direct</u>
<u>evidence</u> of failure to train based on race, or the case law cited by Thomas,
Jr. in support of his contention that he highlighted sufficient facts to
demonstrate that the lack of training impacted his ability to secure future
pay raises and/or promotions.   <u>Cf.</u> <u>Warch v. Ohio Cas. Ins. Co.</u>, 435 F.3d
510, 520 (4th Cir. 2006) ("Direct evidence must be evidence of conduct or
statements that both reflect directly the alleged discriminatory attitude
and that bear directly on the contested employment decision.") (internal
quotation marks  and citation omitted); <u>Thompson</u>, 117 F. Supp. 2d at 528
(finding that the failure to train the plaintiff based on his race "affected
the ultimate employment conditions of the plaintiff or created a significant
change in his status, and such issues are questions of fact, best suited
for a jury").

always gave him and other African-American employees the least desirable jobs, while white employees received preferential job assignments.  ECF No. 117-1, at 74.

Although work assignments can constitute an adverse employment action if there is evidence that the employee was subject to "appreciably more dangerous conditions," such as "greater exposure to potentially harmful radiation," Sherman, 263 F. App'x at 370, Williams does not offer any evidence demonstrating any "danger" that he faced at Lyon, including the solo work assignments he claims were unfairly assigned.  To the contrary, Williams' own testimony reveals that he did not have any problems doing the assigned work, that the work was within his trade as a pipefitter, and that on some occasions after he was unfairly assigned to work alone on a very large job, he later asked for and was granted a helper to complete the task.  While performing any manual task alone may incrementally increase the "danger" faced by a worker, Williams acknowledged that all pipefitters at Lyon performed certain assignments alone, and he did not provide any examples of "danger" that he personally faced, instead focusing on the perceived inequity of the work assignments.  See Von Gunten, 243 F.3d at 868 (affirming the grant of summary judgment to the employer as to a Title VII retaliation claim, noting that the

plaintiff failed to "proffer any credible evidence" that her reassignment increased her exposure to dangerous pathogens).[23]

On this record, even accepting that Williams was given facially "unfair" work assignments within his trade based on his race, no reasonable juror could conclude that he suffered an "adverse employment action." See Mohammed v. Cent. Driving Mini Storage, Inc., 128 F. Supp. 3d 932, 944 (E.D. Va. 2015) (explaining that "[n]ot everything that makes an employee unhappy is an actionable adverse action," and that "reassignment" is only actionable if it "presents some significant detrimental effect" to compensation, level of responsibility, or some other condition/benefit of employment) (internal quotation marks and citations omitted). Defendant's summary judgment motion is therefore **GRANTED** as to this claim.

---

[23] Williams stated during his deposition, shortly after acknowledging that white workers were also assigned to work by themselves, that "It's not a problem with doing the jobs by yourself, but it seemed like that most of the black people that was there was doing the jobs that other white people weren't doing at all. They was doing a lot better jobs than me. I really wouldn't have been complaining if I was doing a bad job and a white person was doing a bad job sometimes, but it wasn't like that at all." ECF No. 117-1 at 110. Williams provided an example of the unfair "ridiculous" work he was assigned, presumably occurring during the winter:

> I was outside and it was cold. God, it was cold. I was outside by myself and I was outside throwing out gas pipes. That was fine that you put me outside throwing out gas pipes, but why you got all the white people on the inside of the shop with a broom sweeping and cleaning up inside the shop and you got me outside in the snow or you got me doing other jobs, putting pipe in by myself?

Id. at 109-10.

### 3. Retaliation - Williams

Defendant seeks summary judgment as to Count Three, arguing that Williams' retaliation claim (which is based on a complaint Williams made to H.R. about his supervisor using a racial slur) fails for the same reason as his disparate treatment claim – failure to advance facts demonstrating that he suffered an "adverse employment action." In response, Williams correctly highlights that the legal standard for a retaliation claim requires a less onerous "adverse action" showing than is necessary to establish a disparate treatment claim, requiring only a "materially adverse action" that may have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Smith, 796 F.3d at 434 (citation omitted). While such standard presents a lower hurdle, a retaliation claim ultimately requires a plaintiff to prove that the protected activity be a "but-for cause" of the materially adverse treatment. Guessous, 828 F.3d at 216-17.

As noted above, Williams describes long-term unfair treatment in job assignments based on his race occurring long before he complained to H.R. about his supervisor's use of a racial slur. However, he contends that he was treated "a lot more different" after he reported his supervisor's racial slur, with his supervisor being suspended for five days in mid-2015 after admitting to using profane (but not racially charged) language. ECF No. 117-3. Williams explained that after his supervisor returned to work, the

57

jobs he was assigned "got a little harder," and he got "worser work" and "harder work" than before he made the report to H.R. ECF No. 117-1, 76-78. Williams described the work he was assigned after his H.R. complaint as "more than pipefitter work" because he was being assigned "ridiculous work to do by [him]self" and at times he was given jobs that he tried to complete alone, but after failing, he needed (and was assigned) a helper to finish the unfairly assigned job. Id.

Williams' vague claims of "worser" work in retaliation for his complaint to H.R. are insufficient, standing alone, to create a jury question as to whether Williams suffered a "materially adverse action" that would dissuade a reasonable person from reporting his employer's misconduct due to the lack of factual detail documenting the increase in severity of the "worser" work.[24] See Evans v. Int'l Paper Co., 936 F.3d 183, No. 18-1448, 2019 WL 4018287, at *7-8 (4th Cir. Aug. 27, 2019) ("The Supreme Court emphasized [in Burlington Northern] that the 'materiality' requirement was necessary to ensure that only significant harms would be actionable," noting that allegations that the plaintiff "generally was treated worse than white employees" and was "ignored and left out of meetings" are "not enough to create a genuine issue

---

[24] The one concrete example that Williams provided for the "ridiculous" work he was assigned after he complained about his boss is the example discussed in the preceding footnote regarding work he performed "in the snow," yet the claimed retaliation occurred in June of 2015 during a season in which snow does not fall in Virginia.

58

of material fact"; rather, the plaintiff must "offer evidence of an actual retaliatory act that meets the 'materially adverse' standard.") (emphasis added); Ugbo v. The All. Legal Grp., No. 2:15cv151, 2016 WL 7411134, at *8 (E.D. Va. Dec. 22, 2016) ("[N]ot all unfavorable workplace events rise to the level of a materially adverse action.") (citation omitted); Cherry v. Elizabeth City State Univ., 147 F. Supp. 3d 414, 426 (E.D.N.C. 2015) (noting the lack of evidence establishing that being reassigned to the midnight shift, which "may have been annoying[,] . . . would dissuade a reasonable worker from engaging in protected activity").

However, in addition to such vague accounts, Williams offers a document reflecting a specific complaint of retaliation he made to Tidewater Staffing's H.R. representative in June of 2015, a complaint that was forwarded to Lyon's H.R. manager. ECF No. 117-4. Such complaint documents Williams' contemporaneous assertion that he was "reaping retaliation from supervisors" at Lyon because they "believe that he is the reason" that Williams' manager (Bobby Holden) was suspended for five days. Id. Mr. Williams asserted that, following his complaint about Bobby Holden, different supervisors at Lyon: (1) falsely accused him of attempting to "steal time" in order to get paid for 30 minutes that he didn't work; (2) singled him out and threatened to "write him up" in front of multiple other workers for using the incorrect sink to "wash up," even though multiple other people did the same thing without

any reprimand; (3) gave him a verbal warning for improper cell phone use in front of other employees actively using their cell phones; and (4) "jokingly" told Williams that he better listen carefully to his job assignment because the manager assigning the work "didn't want Mr. Williams to do him like he did Bobby." When Williams was asked by Tidewater's H.R. what resolution he was trying to achieve, he said that "he only wanted to work in peace," that he "does not want anyone to get in trouble but he also wants the rumor to go away about him being responsible for Bobby being suspended," and that his decision to tell the truth about Bobby's behavior "should not cause him to be harassed by anyone at the worksite." Id.

Considering all of the allegations collectively, in the light most favorable to Williams, the Court finds that it cannot resolve this issue without "weighing" the evidence, as a reasonable juror construing all reasonable inferences in Williams' favor could conclude that the collective targeting of Williams by multiple managers "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Smith, 796 F.3d at 434 (citation omitted). This is because a juror could find that a reasonable worker in Williams' position would be dissuaded from reporting a manager's misconduct to H.R. if he knew that the result would be: (1) harder daily work assignments, including solo work assignments that were so difficult that they could not be completed

alone; (2) being threatened with discipline by managers on multiple occasions for conduct that other employees were permitted to engage in; (3) being falsely accused of trying to falsify a timecard, a serious accusation that could likely lead to termination if formally pursued; and (4) being the subject of a rumor, thrown back in his face by other managers, that it was his fault that his supervisor was suspended. While clearly a close question, the Court finds that the proper course is for the jury to conduct the necessary fact-intensive balancing, as the "claimed" retaliation included threatened "write-ups" from multiple managers which could be interpreted as reasonably putting Williams in fear that he would lose his job. Defendant's summary judgment motion is therefore **DENIED** with respect to Count Three.

### 4. Failure to Hire - Williams

Williams' final claim, which is similar to a wrongful discharge claim, is that because of his race he was not hired by Defendant as a full time employee. Defendant's sole argument in support of summary judgment relies on the fact that Williams never formally applied for a permanent pipefitter job at Lyon. See Brown v. McLean, 159 F.3d 898, 902 (4th Cir. 1998) (listing elements of a failure to hire claim, to include the requirement that the plaintiff submitted an application for the position).

As explained by the Fourth Circuit in Brown, when a plaintiff that never formally applies for a job meets all other prongs of the applicable legal test, he "may still carry his burden of proof" by establishing either that he did not apply because he (accurately) knew that his application would be "discriminatorily rejected," or that "he was deterred from applying for a job by his employer's discriminatory practices . . . [and] would have applied for the job had it not been for those practices." Id. at 902-03 (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 368 (1977)). Similarly, federal and state courts have recognized that filing a formal application is unnecessary in scenarios in which an employer does not accept formal applications (and is aware of the plaintiff's interest in a job opening), or in which an employer thwarts the plaintiff's efforts to formally apply. See Van Slyke v. Northrop Grumman Corp., 115 F. Supp. 2d 587, 594 (D. Md. 2000) (informal section process); Hawkins v. Rockville Printing & Graphics, Inc., 189 Md. App. 1, 18, 983 A.2d 531, 540 (2009) (denial of opportunity to obtain job application); see also Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996) (listing elements of a failure to promote claim as requiring that the plaintiff "applied or sought to apply").

Here, the record reveals that Williams was a "shipfitter"/ "pipefitter" working at Lyon for several years as a "temporary worker" through Tidewater Staffing. Williams' evidence indicates

that he always wanted a full-time job at Lyon, and that Lyon's
personnel department not only knew of his interest in a full-time
position, but had received his express request to apply sometime
in 2014. ECF No. 117-1, at 62-68. Moreover, Williams has
presented evidence that personnel, in conjunction with the
department manager in charge of hiring pipefitters, gave Williams
the "runaround" regarding the necessary application process. Id.
Record evidence further indicates that Lyon was advertising for a
full-time pipefitter position in 2014 when Williams made multiple
inquiries asking how he could apply, and that Williams had informed
the proper Lyon manager "every year" that he worked for Lyon that
he wanted to be hired as a full-time employee. Id. Williams,
however, was never allowed to apply for a permanent position, and
on more than one occasion, Lyon hired a white employee with less
experience than Williams, including individuals that Williams
trained. Id. Additionally, Williams' evidence indicates that the
Lyon manager responsible for hiring pipefitters used some racial
slurs and told racist jokes at Lyon's workplace. ECF No. 117-1,
at 44, 56-57.

On these facts, Defendant's abbreviated argument in support
of summary judgment predicated solely on a failure to submit a
formal application is insufficient to demonstrate that Williams'
failure to hire claim fails as a matter of law. Defendant's
summary judgment motion is therefore **DENIED** as to Count Four.

63

### E. Jerry Cook

### 1. Hostile Work Environment - Cook

#### a. Severe or Pervasive

Defendant does not challenge the existence of "severe or pervasive harassment," but instead seeks summary judgment based on the Ellerth/Faragher affirmative defense. A detailed recitation of the facts is therefore unnecessary as to Cook, who is an African-American man that worked for Lyon as a temporary employee from 2011 until early 2012, and again in later 2012 until mid-2013.

#### b. Imputable to Lyon

For reasons similar to those previously explained herein, Defendant fails to carry its burden to establish the applicability of the Ellerth/Faragher affirmative defense. First, Defendant fails to advance facts demonstrating that the actionable harassment, including the pervasive racial harassment from the individual known to Cook as "Sponge Bob," came from "Vance supervisors."[25] Second, factual disputes exist as to whether such affirmative defense is available in light of Cook's contention that he suffered a tangible employment action (failure to hire and/or constructive discharge) based on his race. Third, even accepting Defendant's unsupported premise that the

---

[25] Defendant also fails to address whether it was negligent for allowing co-worker harassment to occur and/or for allowing the racist graffiti to continue without an investigation of any kind.

64

Ellerth/Faragher affirmative defense is "available," Defendant fails to demonstrate an absence of disputed facts as to whether the Lyon anti-discrimination policy in place during the relevant times was effective, such that Lyon can be said to have exercised "reasonable care" to prevent/correct harassing behavior (the first prong of the Ellerth/Faragher affirmative defense).  Illustrating this third point, Cook's evidence indicates that there was long-term and pervasive racial harassment from multiple supervisors/managers at Lyon, including repeated use of racial epithets, yet: (1) the personnel manager did not believe that use of the n-word violated Lyon's anti-discrimination policy; and (2) temporary employees were not provided with a copy of Lyon's anti-discrimination policy, and the lone relevant policy document that they were provided did not include details as to how to report workplace harassment, and appears to only reference a policy against sexual harassment.  ECF Nos. 122-2, at 34; 122-3 at 29-30; 122-9, at 19-20.  Defendant's summary judgment motion is therefore **DENIED** as to Count One.

### 2. Disparate Treatment: Failure to Hire - Cook

Defendant's summary judgment motion asserts that Cook cannot establish a disparate treatment claim predicated on failure to hire because: (1) he did not apply for a position until January of 2013; and (2) he was offered a full-time job by Lyon in 2014. Cook, however, effectively highlights material factual disputes

regarding the delayed job offer, as he points to evidence indicating: (1) he submitted applications for a full time "rigger" position in 2011 and/or early 2012, but he was not hired, and instead was "laid off" as a temporary worker for a period of several months while his two white temporary co-workers were both hired as permanent employees; (2) Cook was rehired as a temporary worker into Lyon's "labor shop" in October of 2012 and filled out another application to be a "rigger" no later than January of 2013, having consistently communicated his desire to the appropriate managers to be hired as a permanent "rigger"; and (3) that Cook agreed to return to Lyon as a temporary worker in the labor shop at a greatly reduced hourly wage only because he was promised that he would be offered a full-time "rigger" position when it became available, but he was thereafter passed over for hire when Lyon instead hired white full-time riggers. ECF No. 122-1, at 33-37, 42-47, 51-54. By the time Cook was offered a rigger position in 2014, he had already quit his temporary assignment to Lyon and found another job with a different employer. Id. at 79-82. Having failed to address all of the material evidence favorable to Cook that, if accepted by a jury, could support a disparate treatment claim based on failure to hire, Defendant's summary judgment motion is **DENIED** as to Count Two.

### 3. Retaliation - Cook

Defendant next challenges Cook's retaliation claim, arguing that Cook fails to adduce any evidence suggesting that he engaged in "protected activity" for which he suffered retaliation. Cook does not even respond to such contention in his brief in opposition, and a review of the record reveals an absence of evidence of "protected activity" or retaliatory conduct. Defendant's summary judgment motion is therefore **GRANTED** as to Count Three.

### 4. Wrongful Discharge - Cook

Defendant seeks summary judgment as to Cook's wrongful discharge claim, arguing only that such claim "fails as a matter of law" because Cook admits that he "quit" his temporary position at Lyon. However, as highlighted by Cook in his responsive brief, Cook's wrongful discharge claim has always been predicated on a theory of constructive discharge. Am. Compl., at 37 ¶ 237, 109 ¶ 11. Such theory of relief does not require an employee to be fired or demoted, but rather, relies on the assertion that the working environment at Lyon was so objectively intolerable "that a reasonable person would resign." United States E.E.O.C. v. Consol Energy, Inc., 860 F.3d 131, 144 (4th Cir. 2017) (quoting Green v. Brennan, 136 S. Ct. 1769, 1779 (2016)); see also Nnadozie v. Genesis HealthCare Corp., 730 F. App'x 151, 162 (4th Cir. 2018) (explaining that the objective intolerability standard "governing

constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims") (citation omitted).

Defendant offers no evidence or argument in its opening brief addressing  whether the quantum of evidence before the Court, when considered in Cook's favor, can clear the "objective intolerability" hurdle. More tellingly, Defendant makes no effort to advance such argument in its reply brief even though Defendant's failure to address Cook's actual theory of relief is highlighted by Cook in opposition to summary judgment.    In addition to Defendant's failure to argue this issue, the Court notes that the evidence viewed in Cook's favor demonstrates that Cook was called a "dumb n**ger" by one Lyon employee as often as two to three times a week, that he was exposed to racist comments and epithets from many other Lyon supervisors (including comments from supervisors stating that African-American employees should all be fired), that the environment at Lyon encouraged African-American employees to keep their mouth shut and deal with the mistreatment if they wanted to keep their job, and that a certain shop foreman maintained a refrigerator and lunch tables that Cook and other African-American employees could not use.    See ECF No. 122-1, at 56-64, 88-96, 103. Cook further asserts that he was falsely promised a permanent "rigging" job at Lyon but was passed over for hire in favor of less experienced white employees, and that Cook was being

significantly underpaid as a "laborer" making only $8 per hour, while <u>often performing the higher-paying duties of a rigger</u>, duties that Lyon's permanent "rigger" employees were paid over $20 an hour to perform.  ECF No. 122-1, at 46-49, 88-89.

Defendant's failure to even address Cook's theory of recovery, coupled with the evidence favoring Cook, counsels strongly against resolving this issue in Defendant's favor without submission to a factfinder to determine whether Cook faced "objectively intolerable" working conditions.  Defendant's summary judgment motion is therefore **DENIED** as to Count Four.

### F. Tavaris Tillery

### 1. Facts

- Tavaris Tillery is an African-American man who began working at Lyon as a temporary worker hired through Tidewater Staffing in 2014, and was hired as a permanent worker at Lyon in April of 2015.  Tillery worked in the inside paint shop under lead man Bobby Hardy (who was Tillery's father), with both Hardy and Tillery, subordinate to foreman Michael Ahart.  Tillery was terminated in January of 2016.

- During his time at Lyon, Tillery was called "boy," or "Ahart's boy," or otherwise referred to as "boy" by white supervisors, including Ahart, on almost a daily basis.  ECF No. 125-1, at 16-17, 24-29.

- Tillery was constantly exposed to racist graffiti in the bathrooms at Lyon (including the n-word scribbled "everywhere" in the bathrooms), saw a noose left on the ground outside the paint shop in a location where he suspects that it was left for him, and worked with a white co-worker (Ahart's son) who used the n-word "all the time" in conversations, although it was not directed at Tillery or other Lyon employees.  Ahart would generally refer to all of his African-American subordinates as his "boys,"

although he did not call most employees "boy" to their face. Ahart also told disgusting stories of sex acts he performed on "his black women" and "what objects he would use on these women." Additionally, Ahart displayed a confederate flag in his office that was immediately visible when you entered and wore a confederate flag necklace. Ahart did not remove these items from the workplace even after Tillery and other employees complained about the items being racist. Id. at 22-23, 49-52, 64-65, 83-88.

- Kerner, the foreman of the outside paint shop referred to Tillery as "Ahart's boy" and made comments about African-American workers being "lazy thugs," also stating that they would work harder if they "had [their] crack pipes." When Tillery complained to Kerner about his racist comments, Kerner would respond by calling Tillery a "thug" for complaining. Kerner also laughed with fellow white supervisor Bobby Holden regarding Holden's joke that an African-American employee should "smile" when he was working inside a dark tank so that the white supervisors could see him. Id. at 37-39, 75, 77-78.

- Tillery was a witness to the 2015 incident between Douglas and Thomas, Sr. and Tillery and Ramell McDonald (another Plaintiff in this case) complained about this event to lead man Bobby Hardy. Tillery contends that Hardy elevated the complaint up the chain to multiple supervisors, including Ahart, but nothing was done. Thomas, Sr. was fired within two weeks of the incident and within approximately two months of the incident, Tillery, Hardy, and McDonald were all terminated from Lyon. The record reveals that Ahart personally participated in identifying the individuals to be terminated as part of the asserted RIF. Id. at 33-36, 79-81; ECF No. 125-3.

- Both Ahart and Kerner routinely assigned Tillery and other African-American employees the "dirtiest of the dirtiest work," including working inside tanks (a dirty and undesirable job) while white employees were not assigned such tasks. Tillery acknowledges that such work was necessary and within his job description, but claims that during his time at Lyon, such work was exclusively assigned to black workers and that white workers were never required to perform such dirty and undesirable work. No. 125-1, at 39-41, 77-78.

## 2. Hostile Work Environment - Tillery

### a. Severe or Pervasive

Defendant's summary judgment motion challenging Tillery's hostile work environment claim presents a close question. Tillery does not assert that he was directly called the n-word at work or that he heard other employees being addressed with such grossly offensive epithet. Although Tillery fails to point to facts suggesting that he experienced any episodes of racial harassment that were sufficiently "severe" to constitute a hostile work environment, the Court finds that the evidence highlighted by Tillery in his brief in opposition, some of which is reproduced above, is sufficient to create a jury question as to whether the ongoing racist harassment was sufficiently "pervasive" to constitute a hostile work environment. Specifically, the collective consideration of white-supervisors' repeated use of the word "boy," to include the consistent moniker "Ahart's boy" used by other managers who did not know Tillery's name, the noose Tillery found, the racist graffiti he was exposed to on a daily basis (which did include the n-word), a manager's continued display of the confederate flag after he was informed how it made his subordinate African-American employees feel, and the overall tone taken by white managers, including not only racist comments and jokes, but consistent assignment of the dirtiest and least desirable work assignments to Tillery and other African-American

71

workers, is sufficient for a reasonable juror to conclude that Tillery was subjected to a long-term objectively hostile work environment that was also subjectively perceived by Tillery as offensive.[26]  See Guessous, 828 F.3d at 227 (finding that the district court erred by "failing to address numerous comments that were open to a racially motivated interpretation" and by failing to consider evidence that the "intimidating and intrusive management" of the plaintiff was based on her race); see also Hoyle v. Freightliner, LLC, 650 F.3d 321, 333 (4th Cir. 2011) (explaining that the "totality of the circumstances" inquiry applicable to the third prong of a hostile work environment claim "includes conduct directed not at the plaintiff" because it turns on "the nature of the workplace environment," as contrasted with the "individual dynamic" between the plaintiff and an individual harasser) (quotation marks and citations omitted).

The repeated and consistent actions of Ahart, Kerner, and other supervisors during Tillery's entire term of temporary and permanent employment at Lyon, when coupled with other instances of racist conduct or symbols broadly documented in the record, are sufficient for a reasonable juror to conclude that the "net effect . . . was an abusive environment likely to 'detract from employees'

---

[26] Tilery's complaints to Ahart and lead-man Bobby Hardy, as well as the statements contained within his deposition regarding how the harassment made him feel, are sufficient to create a jury question as to whether Tilery subjectively viewed the environment as racially hostile.

job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.'" Strothers, 895 F.3d at 331 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)); see Brown v. Nucor Corp., 576 F.3d 149, 157–58 (4th Cir. 2009), as amended (Oct. 8, 2009) (explaining that Supreme Court precedent permits a plaintiff to prevail on a hostile work environment claim based on evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (quoting Harris, 510 U.S. at 21)); see also Reid v. Dalco Nonwovens, LLC, 154 F. Supp. 3d 273, 291 (W.D.N.C. 2016) (determining that the term "boy," when used in a certain context, is a term that "a reasonable jury could conclude to be a racially-charged slur"); Jones v. Dole Food Co., 827 F. Supp. 2d 532, 552 (W.D.N.C. 2011) (explaining that if the term "boy" was used "in a racially derogatory context, rather than in reference to a young person in general," the court believed that "jurors would equate the use of the term . . . as the use of a racial pejorative, which are never acceptable and which any reasonable, civil person would find objectionable and offensive").[27]

---

[27] A review of Tillery's deposition appears to leave open the question of whether Tillery was called "boy" to his face by Ahart on a near daily basis, or whether Tillery overheard Ahart on a near daily basis referring to Tillery as "boy" when he was talking to other people. Because all reasonable inferences must be made in Tillery's favor at the summary judgment stage,

Both the objective and subjective effects of some the harassment suffered by Tillery are effectively portrayed by the following excerpt from Tillery's deposition:

> Every day.  I mean, I walked in the office, I seen a Confederate flag every day.  I seen the Confederate flag around my boss' neck every day.  I've been called boy just about every day.  So every day. . . .  Yes I find it offensive.  He can't call me by my actual name?  You know, the word boy, a white man calling a grown black man that.  I got a name.  I'm not a kid, so.

ECF No. 125-1, at 65-66; see Boyer-Liberto, 786 F.3d at 280 ("[A] reasonable jury could find that [the plaintiff's supervisor's] two uses of the "porch monkey" epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment.").  To the extent that Ahart and other managers consistently referred to Tillery and other African-American subordinates, who were grown men, as "boy" for some reason other than to "humiliate, ridicule, or intimidate," the jury will have to make such finding.  E.E.O.C. v. Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (citation omitted); see White v. BFI Waste Servs., LLC, 375 F.3d

---

the Court interprets the record as reasonably supporting the conclusion that Ahart, and at least two other managers, directly called Tillery "boy," or "Ahart's boy," in the workplace rather than using his name.  The Court also considers the testimony that Ahart and the other managers did not refer to any white employees as "boy." ECF No. 125-1, at 76.  See Woods v. Salem Elec. Co., No. 1:15CV525, 2017 WL 74271, at *3 (M.D.N.C. Jan. 6, 2017) ("While offensive utterances, without more, generally do not rise to the level of an actionable claim, courts have upheld claims of hostile work environment based on the use of "racially abusive language" that was 'repeated,' 'continuous,' and 'prolonged.'") (citation omitted).

288, 297 (4th Cir. 2004) (placing emphasis on the fact that the plaintiff "specifically testified that supervisors used the term 'boy' on a daily basis to refer only to black employees, and not to white ones"); Lee v. Norfolk S. Ry. Co., 912 F. Supp. 2d 375, 382 (W.D.N.C. 2012) (noting that while certain incidents at issue "standing alone may seem innocent," when considered in totality, the placing of a noose on the plaintiff's locker, coupled with the regular use of the word "boy," which is a "racial insult" and a co-worker calling the plaintiff the n-word on two occasions, along with other accusations, are sufficient to create a jury question on the severe or pervasive element).

### b. Imputable to Lyon

Defendant's alternative contention that any racist conduct is not imputable to Lyon based on the Ellerth/Faragher affirmative defense is rejected for the same reasons as explained in the analysis of several co-Plaintiff's claims, including that: (1) such defense is not applicable to the racist conduct committed anonymously or by co-workers (noose, graffiti, Ahart's son); and (2) even if the defense is available, Defendant fails to carry its burden to demonstrate that it implemented an effective policy aimed at preventing and/or curtailing harassment—to the contrary, Lyon failed to distribute its policy to its temporary workers (including Tillery), and failure to effectively limit, investigate, or correct pervasive racial discrimination (especially during the

period that Lyon had only a "personnel manager" who did not realize that the confederate flag could be offensive to African-American workers and who believed that the use of the n-word was not a violation of Lyon's anti-discrimination policy). Cf. Passananti v. Cook Cty., 689 F.3d 655, 673-74 (7th Cir. 2012) (explaining that it "is not enough that an anti-harassment policy appears reasonably effective on paper," a company is not shielded from liability if it ignores its obligation to actively prevent harassment and respond appropriately to complaints; stated differently, the policy "also must be reasonably effective in practice") (citation omitted).  For these reasons, Defendant's motion is **DENIED** as to Count One.

### 3. Disparate Treatment: Work Assignments - Tillery

Defendant seeks summary judgment as to Count Two, disparate treatment, arguing that Tillery fails to demonstrate that he suffered disparate treatment amounting to an "adverse employment action." Although Tillery argues in response that "dangerous" job assignments can constitute an adverse employment action, his dangerousness argument is entirely conceptual/conclusory as he fails to point to any evidence suggesting that he was ever required to work in a "dangerous" environment.  Defendant's motion to dismiss Tillery's disparate treatment claim is therefore **GRANTED**.

## 4. Retaliation - Tillery

Defendant challenges Tillery's retaliation claim, arguing that Tillery fails to state a prima facie retaliation claim by failing to adduce evidence suggesting that he engaged in "protected activity" and/or that such activity was the "but-for" cause of his termination. Defendant alternatively argues that even if Tillery can establish a prima facie case of retaliation, Lyon has identified a racially neutral justification for his termination (the RIF), and that Tillery fails to demonstrate that such justification is pretextual. Tillery responds by highlighting that: (1) he complained to lead man Bobby Hardy on multiple occasions regarding racist conduct in the workplace, including after the incident between Douglas and Thomas, Sr., and that after Hardy raised such complaints up the managerial chain, Hardy, Tillery, and McDonald were all fired on the same day; (2) Ahart, who participated in identifying Tillery and McDonald for termination, had previously received a complaint from Hardy, Tillery, and McDonald about his display of confederate flags in the workplace; and (3) the RIF was pretexual. ECF No. 125, at 29-30.

Although the Court agrees with Tillery that the record demonstrates that he engaged in protected activity, the Court agrees with Defendant that Tillery fails to demonstrate that the RIF, or Tillery's inclusion in it, was pretext for discrimination.

77

Tillery therefore fails, as a matter of law, to point to facts sufficient to carry his ultimate burden of demonstrating a "but-for" causal connection between his protected activity and subsequent termination.

First, Tillery's evidence relies almost exclusively on the "suspicious" timing of his discharge, and there appears to be an absence of direct or circumstantial evidence (beyond timing) tying his discharge to his protected activity. Temporally, Tillery's best evidence linking his protected activity to his termination is the complaint he and McDonald made to Tillery's father (Hardy) about Donna Douglas' behavior approximately two months before Hardy, Tillery and McDonald were terminated. Although it appears undisputed that Hardy complained about Douglas to Ahart and several other foremen, Tillery points to no record evidence on which a reasonable juror could conclude that Ahart was aware that the genesis of such complaint originated with Tillery or McDonald. Stated another way, Tillery relies on pure speculation that Hardy told Ahart, or any other foreman, that he was relaying a "joint complaint" rather than sharing his own personal view about the incident between Douglas and Thomas, Sr. See ECF No. 125-1, at 79-80. Similarly, the fact that Hardy, Tillery, and McDonald were all terminated on the same day offers little to suggest "suspicious" timing as four other employees were also terminated as part of the RIF during the first two weeks of January, 2016,

including three white employees (two of which appear to have been painters in the "outside paint shop"). ECF No. 125-5; see Milligan-Grimstad v. Stanley, 877 F.3d at 711 ("[S]uspicious timing alone is rarely enough to survive summary judgment particularly when there are reasonable, non-suspicious explanations for the timing of the termination.") (internal quotation marks and citation omitted).

As to Tillery's other "protected activity," Tillery, McDonald, and Hardy had previously complained to Ahart about his display of the confederate flag; however, Tillery places no timeline on such event across his term of employment with Lyon. Additionally, Tillery fails to present evidence suggesting that anything beyond a "conversation" occurred when Ahart explained that he had non-racist reasons for displaying the flag (he was a "true southerner" and "it was on one of [his] favorite cars on a TV show"). ECF No. 125-1, at 20-22. Tillery did not press the issue further with Ahart, and Tillery does not contend that: (1) the discussion with Ahart was heated or confrontational; (2) Tillery complained to senior management or H.R. about Ahart; or (3) Ahart was required to remove his confederate items—to the contrary, according to Tillery, Ahart kept displaying them the entire time that Tillery was employed. In light of these limited facts supporting his claim, Tillery is forced to rely primarily on speculation to link his termination to his "protected activity,"

79

and such speculation is insufficient as a matter of law to demonstrate a "causal link" between the activity protected under the law and his termination.  See Mercer v. Arc of Prince Georges Cty., Inc., 532 F. App'x 392, 397 (4th Cir. 2013) (noting that the timing of an employer's action is a "relevant factor," but that "it will rarely be independently sufficient to create a triable issue of fact") (citation omitted).

Even assuming that Tillery's evidence is sufficient to state a prima facie retaliation claim, Defendant has presented a racially neutral reason for reducing the size of the labor force in the inside paint shop (the RIF) and has proffered a racially neutral reason for selecting Tillery and McDonald for termination (recently hired, less experience).  Lyon's records support its contention that it underwent a substantial workforce reduction as a result of the RIF, and further indicate that Lyon suffered substantial financial losses in both 2015 and 2016.[28]  See ECF Nos. 92-5; 92-6 (documenting significant operating losses as well as the over 90% reduction in the size of the temporary workforce at Lyon and the release of twenty-two permanent employees); see White v. Dalton, 225 F.3d 656 (4th Cir. 2000) (unpublished table opinion) (identifying a "reduction-in-force necessitated by declining profits," as a "legitimate, nondiscriminatory reason" for

---

[28] Tillery's evidence comparing Lyon's year-to-year gross revenues offers little support for his contention that the RIF itself was pretexual.

eliminating the plaintiff's job position). Lyon's business records also support Ahart's proffered race-neutral reasons for identifying Tillery and McDonald for termination-they were more recently hired than the two workers Ahart ultimately retained in the "inside paint shop." ECF No. 125-5. Both Tillery and McDonald had been working as permanent employees for less than nine months when they were terminated, while the two retained employees had been permanent employees for approximately 1 ½ years and 7 ½ years respectively.[29] Id. Moreover, the positions eliminated in the inside paint shop in January of 2016 (Tillery, McDonald, and Hardy's positions), have not been filled/replaced with either a temporary or permanent worker. ECF No. 92-6 ¶ 15.

Tillery's brief in opposition attempts, but fails, to demonstrate that Lyon's proffered reason for its decision is "pretext" for discrimination. First, Tillery argues that Lyon never explains why he was terminated; however, Ahart explained during his deposition that he made the decision to retain Robert Ash and Thomas Lee in the inside paint shop (over Tillery,

---

[29] Ahart recites other related factors, such as the fact that Tillery and McDonald had less experience, and Tillery offers no evidence to rebut the accuracy of such statements. Although plainly not dispositive as to Tillery's retaliation claim, both of the workers that Ahart ultimately retained were African-American. Additionally, of the seven workers terminated in early January of 2016, which included Hardy, Tillery, and McDonald, four were African-American and three were Caucasian, including two white "painter/blasters" assigned to the outside paint shop who had been permanent Lyon employees for far longer than Tillery and McDonald. ECF No. 92-6 ¶ 13; ECF No. 125-5.

McDonald, and Davell Artis, who was terminated in May of 2016) based on "who was there the longest and who did the better work and who knew more." ECF No. 125-3, at 60. As noted above, hiring records confirm that the two retained workers had worked for Lyon as a permanent employee substantially longer than Tillery, McDonald, and Artis, with all three of the discharged workers having been hired as permanent employees at Lyon during 2015. ECF No. 125-5. Additionally, both retained workers were classified as "painter/blaster" while all three discharged employees were classified as "utility" workers in the inside paint shop. ECF No. 125-5. "Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." Russell v. Harlow, 771 F. App'x 206, 207 (4th Cir. 2019) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996)); see also Evans, 80 F.3d at 960-61 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (internal quotation marks and citation omitted).

Second, Tillery's assertion that Lyon "hired people into the paint shop at the same time" that the RIF was occurring does not appear to be supported by Tillery's proffered evidence. ECF No. 125, at 30. While Tillery does identify six new hires during the relevant timeframe, there appears to be no evidence suggesting

that any of such hires were in the inside or outside paint shops rather than some other division/shop at Lyon. ECF No. 125-5.

Third, Tillery's efforts to manufacture a "conflict" between Dunkley's broad statement about the factors that were considered when reducing the workforce ("tenure, experience, ability to advance to the next step, flexibility . . . managerial input, attendance, as well as each employee's safety/quality record) and the explanation given by Ahart (tenure, knowledge, ability to perform) fails to identify any material conflict and/or shifting justifications. ECF No. 92-6; ECF No. 125-3. In sum, Tillery relies on speculation and an incomplete summary of the evidence in an effort to rebut Lyon's race-neutral justifications for its actions; thus on this record, no reasonable juror could conclude that Defendant's explanation was pretextual, or that Tillery carries his ultimate burden to demonstrate a "but-for" causal connection between his termination and his earlier-in-time complaint to Ahart. Defendant's motion is therefore **GRANTED** as to Tillery's retaliation claim.

## 5. Wrongful Discharge — Tillery

Defendant seeks summary judgment as to Tillery's wrongful discharge claim, arguing only that such claim fails because the RIF constitutes a legitimate non-discriminatory reason for the discharge. Tillery argues both that: (1) he need only show that his race was a "motivating factor" in the termination decision;

(2) there is direct evidence of discrimination, thus eliminating the need to rely on the burden shifting framework, because Ahart had previously stated that he was "going to get rid of you-all n\*\*gers" and get himself a new crew; and (3) that Tillery has illustrated a material factual dispute as to whether the RIF (or Tillery's selection for the RIF) was pretextual.

While Tillery is correct that he need only show that race was a "motivating factor" in his discharge, he fails to clear such hurdle (either directly or through the burden shifting framework). Furthermore, even if a prima facie case is assumed, Defendant has offered a race-neutral justification for its actions and Tillery's evidence falls far short of that necessary for a reasonable juror to conclude that the proffered justification was pretextual.

First, although Tillery and McDonald were terminated on the same day based on the decision made by Ahart, their allegedly racist white supervisor, the two permanent employees that Ahart elected to retain in the inside paint shop were, like the discharged employees, African-American. Second, of the five other individuals terminated during the same ten day period that Tillery and McDonald were terminated, three were Caucasian and two were African-American, and two of the three Caucasian employees were both a "painter/blaster" that appear to have been assigned to Lyon's outside paint shop. Third, notwithstanding Tillery's claimed "direct" evidence of discrimination, Ahart did not get rid

84

of his whole African-American crew, nor did he replace a single
member of his "crew" with a white worker after Tillery and McDonald
were terminated, but rather, he selected three of his five African-
American non-supervisory crew members for termination due to the
RIF and the positions were never filled/replaced.     Fourth, for
reasons similar to those discussed in the preceding section,
Tillery clearly fails to demonstrate that the RIF, or his inclusion
in the RIF, was pretext for race-based discrimination.     Summary
judgment is therefore **GRANTED** as to Tillery's wrongful discharge
claim.

### G. Bobby Hardy

### 1. Facts

- Bobby Hardy is an African-American man who worked in Lyon's
  paint shop from 2008 through January 2016, beginning as a
  contractor supervised by foreman David Kerner.  He became
  a full time employee in 2010 and worked for several years
  in the inside paint shop as a "lead person" under foreman
  Michael Ahart.

- Hardy testified that David Kerner was "tougher on blacks
  than he was on whites," and always used black employees
  for "the grunt work."  Hardy tried to get along with all
  his supervisors, but did so because they were his boss,
  not because he liked them.   In Hardy's view, several of
  his supervisors, including Kerner, Ahart, and Tommy Hill,
  were racists.   Kerner used racial slurs and made racial
  innuendos; Henry Miller pulled his pants down and told
  people to "kiss his white ass;" Douglas put her hand down
  her pants and then put her hand in Thomas, Sr.'s face and
  told him to "kiss . . . her white ass;" Tommy Hill put
  Hardy on the night shift in retaliation for Hardy's
  earlier-in-time comments challenging his racist jokes;
  Ahart wore a confederate flag necklace and scarf and
  refused to stop wearing them after African-American
  employees told him that they were offended; and Kerner and

Miller called each other the n-word for a period of time
until Hardy had a heated argument with them and ended the
practice. Hardy complained to "personnel" about Henry
Miller pulling down his pants and "telling people to kiss
his white ass" but "[n]othing was done." ECF No. 123-1,
at 20, 23-27, 40, 52-53, 59-60, 73-74.

- Lonnie Jones, who was the Production Manager for at least
  part of the time that Hardy was at Lyon, told Hardy on at
  least ten occasions that Jones' father bought him a black
  person "to play with" when he was young. Jones also called
  Thomas, Sr. "Big Ni**ger" on a daily basis, called another
  African-American employee "Blue" in reference to his very
  dark skin, and called the other African-American employees
  "boy" pretty much whenever "he was talking to someday of
  color." When Hardy confronted Jones about his racist
  comments/jokes, Jones said "Oh, f*ck that." Id. at 77-80,
  102.

- Hardy was also exposed to other racist conduct and comments
  in the workplace, including two hanging nooses, confederate
  flags on gang boxes, and racist graffiti in the bathroom,
  which included the n-word. Hardy also explains that while
  he stood up for himself and confronted issues he could
  handle, there were still broader racist issues he couldn't
  fix like the graffiti, Lonnie Jones, confederate flags,
  etc.[30] Id. at 75-77, 104-05, 112.

- Following the incident between Thomas, Sr. and Douglas, to
  include what Hardy perceived as both unprofessional and
  racially motivated conduct, Hardy complained about the
  incident to multiple foremen, including Ahart, Kerner, and
  Miller, thinking that they would "raise up a stink" and
  "make more noise" than Hardy could. While all of these
  foremen stated to Hardy that Douglas was dead wrong, "no
  one went to bat" for Thomas, Sr. or did anything else other
  than acknowledge to Hardy that they felt Douglas acted
  inappropriately. Thomas, Sr. was terminated shortly after
  the incident, and Hardy was terminated several weeks later.
  Hardy never saw the termination coming, believing that he
  was fired in retaliation for "being so vocal about the

---

[30] As discussed herein, as a "lead-man," Hardy was well aware of the racist
conduct that foremen directed to his subordinate African-American employees,
and he encouraged multiple individuals to find a way to "put up" with such
repugnant conduct in order to keep their high-paying jobs.

racial" discrimination, especially "the Donna Douglas incident." Id. 39-50.

- The record fails to indicate that Hardy was provided a copy of Lyon's anti-discrimination policy prior to May of 2013 (when he presumably received the 2013 policy). Hardy acknowledged receipt of the 2015 policy on November 23, 2015, approximately six weeks before he was terminated. ECF No. 80-5.

### 2. Hostile Work Environment - Hardy

#### a. Severe or Pervasive

Unlike several other Plaintiffs in this case, it does not appear that Hardy, who was a supervisory "lead man," was personally called the n-word, although he did hear another African-American employee (Thomas, Sr.) being referred to by that grossly offensive epithet by a manager far more senior than Hardy. Additionally, Hardy saw two nooses hanging in the workplace, as well as the n-word and other racially offensive graffiti in the bathrooms. He was also  routinely exposed to African-American employees being mistreated based on their race and called racist names, including "boy" and "blue." Lonnie Jones also made racist comments about owning a black person as a toy when he was younger. The Court, however, does not need to determine whether a reasonable juror could conclude that any one of these events (most notably, the two hanging nooses and Lonnie Jones' comments) were sufficiently "severe" to constitute a hostile work environment, because the facts highlighted by Hardy are sufficient to create a jury question as to whether the combination of events, including countless

incidents in which African-American employees were intentionally degraded or otherwise openly treated as inferior by numerous managers at Lyon, were sufficiently pervasive to constitute a hostile work environment. See Hoyle, 650 F.3d at 333 (explaining that the "totality of the circumstances" inquiry includes workplace conduct directed at others).

The racist statements and actions of Ahart, Kerner, Jones, Miller, Douglas and others, to include retaliatory actions (placing Hardy on the night shift) and consistent assignment of the worst jobs to African-American employees, if credited by the jury, are sufficient for a reasonable juror to conclude that the "net effect" created an "abusive environment likely to detract from employees' job performance [and] discourage employees from remaining on the job." Strothers, 895 F.3d at 332 (internal quotation marks and citation omitted); see Nucor Corp., 576 F.3d at 157-58 (explaining that a hostile work environment claim can be based on evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult," sufficiently severe "to alter the conditions of the victim's employment and create an abusive working environment") (citation omitted). When considering the totality of the environment Hardy faced on a daily basis over the course of several years, a reasonable juror could surely conclude that the racism faced by Hardy and the African-American workers he supervised "permeated" the workplace and

88

created an abusive working environment.  See Woods v. Salem Elec.
Co., No. 1:15cv525, 2017 WL 74271, at *4 (M.D.N.C. Jan. 6, 2017)
("'[R]epeated  conduct'  is  a  hallmark  of  'viable  hostile  work
environment claims.'" (quoting Boyer-Liberto, 786 F.3d at 277)).

       To  the  extent  Defendant  focuses  a  portion  of  its  summary
judgment argument on the fact that Hardy admittedly "got along"
with his "racist" supervisors, such argument fails to demonstrate
that Hardy did not subjectively perceive the environment as hostile
and abusive.  Notably, the evidence viewed in Hardy's favor reveals
that, as a "lead man," Hardy was always looking out for his own
job as well as the jobs of his African-American subordinates (to
include  Tillery,  McDonald,  and  Artis)  who  were  earning  more  at
Lyon  than  they  could  elsewhere.   As  Hardy  explained  during  his
deposition when he was asked if he was afraid of his supervisors:

       I wasn't afraid of my supervisors, no. . . .   But it
       was the mental anguish, you know.  It was the fact when
       you go in this yard, you know, you had to deal with the
       racial people, racial innuendos, racial writing in the
       bathroom, rebel flags all on the gang boxes.  It was the
       atmosphere that mentally beat you opposed to you being
       fearful  for  yourself  physically,  you  know  what  I'm
       saying, you know?  So . . . It was, it was, it was just
       dreadful.

       . . .

       Most of the black people at Lyon Shipyard, we couldn't
       make that kind of money anywhere else, so we accepted,
       and I'm not saying that it's right, we accepted a lot of
       this stuff so that we were able to take care of our
       families the way that we thought that they should be
       taken  care  of,  you  know.    It's  kind  of  hard  for  a
       convicted felon to go out here and make $25 an hour, you

> know, $22, $23. So a lot of this stuff you had to weigh
> your options, quit/feed the family, you know what I mean?
> And it ain't a hard choice. So you subdue yourself to a
> lot of mental anguish in order to provide for your
> family.

ECF No. 123-1, at 62-63. The evidence in the record demonstrates
that Hardy, in looking out for the best interests of his
subordinates, warned them to find a way to deal with the racist
behavior if they wanted to keep their jobs, which offers context
for Hardy's ability and desire to remain at Lyon for several years,
notwithstanding the harassment.[31]   See Boyer-Liberto, 786 F.3d at
280 (noting that "harassment perpetrated by a supervisor against
her subordinate" typically has a "particular threatening
character"). Defendant's argument on this point is therefore
rejected at the summary judgment stage.

### b. Imputable to Lyon

Defendant's alternative contention that any racist conduct is
not imputable to Lyon based on the Ellerth/Faragher affirmative
defense is rejected for the same reasons previously discussed
herein, including that: (1) such defense is not applicable to
anonymous racist conduct; (2) such defense is not available at the
summary judgment stage based on Hardy's evidence that his race

---

[31] Hardy also testified that, at the time, his criminal record prevented him
from getting a "RAPIDGate" clearance that would allow him to work at some
other local shipyards, and that after he was terminated, he did find a new
job but he lost $8 an hour in pay. ECF No. 123-1, at 29-30, 107-08. Such
facts further bolster Hardy's contention that he endured the pervasive
racist harassment out of necessity.

played a factor in his termination; and (3) even if the affirmative defense is available, Hardy has identified genuine factual disputes regarding whether Lyon's policies in place during the relevant timeframe were effective and/or effectively implemented (particularly before the Lyon H.R. department was created), thus requiring the jury to determine whether Lyon exercised "reasonable care" to prevent/correct harassing behavior (the first prong of the Ellerth/Faragher affirmative defense).[32] See Thompson, 117 F. Supp. 2d at 529 (explaining that summary judgment is "rarely appropriate" when the applicable standard governing an affirmative defense turns on whether the defendant exercised "reasonable care," as such defense "places a premium on fact-intensive determinations of reasonableness of the conduct of the parties").

In addition to the above, Hardy's evidence documenting the long-term and pervasive mistreatment of African-American employees at Lyon, mistreatment that was often witnessed by managerial employees that "should have" ended the conduct or reported it to

---

[32] Contrary to Defendant's suggestion, the record includes evidence indicating that Hardy made reports to both H.R. and management about workplace misconduct by Miller and Douglas, but nothing ever came from them. See ECF No. 123-1, at 27-28 (discussing a complaint Hardy made to personnel about Henry Miller, the fact that "it became a joke" going to personnel when Holly Nowak was in charge, and that although Nicole Dunkley tried to "clean[] up the yard" after she was hired in 2015, she was unable to fix all of the problems before Hardy was terminated). Additionally, to the extent Lyon suggests that Douglas received a "stern punishment" for her racist conduct, the record reveals both that Douglas was suspended for profane and aggressive conduct and that Lyon's head of H.R. falsely rejected reports that Douglas made a race-based statement, thereby undercutting any suggestion that Lyon reacted strongly to race-based conduct.

H.R., is sufficient to create a jury question as to whether knowledge of this pervasive racist conduct can be imputed to Lyon. Importantly, imputing knowledge to the employer is proper when "a reasonable person, intent on complying with [antidiscrimination laws] would have known about the harassment." Ocheltree, 335 F.3d at 334. For these reasons, Defendant's motion is **DENIED** as to Count One.

### 3. Disparate Treatment: Work Assignments - Hardy

Defendant seeks summary judgment as to Count Two, disparate treatment, arguing that Hardy fails to demonstrate that he suffered disparate treatment amounting to an "adverse employment action." Hardy responds by arguing that job assignments can rise to the level of an adverse employment action if they are sufficiently "dangerous." Hardy, however, fails to point to any evidence indicating that he was personally required to perform dangerous work. Because there is no evidence supporting relief, Defendant's summary judgment motion is **GRANTED**, although the record of race-based work assignments is one of many considerations that factor into the hostile work environment calculus.

### 4. Wrongful Discharge - Hardy

Defendant seeks summary judgment as to Hardy's wrongful discharge claim, appearing to concede the "prima facie" case for the purposes of summary judgment, but arguing that the RIF constitutes a legitimate non-discriminatory reason for the

92

discharge and that Hardy fails to demonstrate pretext.   Hardy responds by arguing that a reasonable juror could conclude that Defendant's proffered explanation for the termination was pretextual.

Considering the record in a light most favorable to Hardy, the Court finds that a reasonable juror could conclude that Hardy's race was a "motivating factor" in the termination decision and that Lyon's proffered justification is pretextual.   Although Hardy and other Plaintiffs have not identified any material evidence that undercuts the apparent legitimacy of the RIF itself, the driving factor of the wrongful termination calculus in this case is not the legitimacy of the RIF itself, but rather, whether Hardy was selected for RIF termination at least in part due to his race. Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998) (explaining that in "reduction in force cases," a plaintiff can establish an inference of discrimination supporting a prima facie case "by introducing other probative evidence that indicates the employer did not treat . . . race neutrally when making its decision").

As reflected in the record, Lyon's RIF decision came down to deciding between terminating Ahart, a white foreman, and Hardy, who was identified as an "assistant foreman" by Johnny Gaskins, the individual that made the termination decision.   Hardy has presented evidence, beyond his mere self-serving testimony, on which a reasonable juror could conclude that Hardy was an

established long-term employee at Lyon that was skilled in his painting trade and had impressive managerial abilities, as verified by his performance evaluations. Hardy also has presented evidence indicating that he held three separate painting certifications important to his position, whereas, according to Hardy, Ahart held none of these important certifications. ECF No. 123-1, at 66-67.[33] The record as a whole also supports the inference that Lyon's workplace had been an atmosphere favorable to white employees for over a decade, and that Gaskins and/or other members of senior management knew or should have known by late 2015 that Ahart had an established history of mistreating African-American employees and using racist language in the workplace, a fact that clearly impacts his qualifications to act as a supervising "foreman" of a shop.

The decision-maker that selected Hardy for termination (Gaskins) did not purport to rely on the different titles that Ahart and Hardy held (foreman vs. assistant foreman) to justify his decision, instead asserting that Ahart was more "reliable and flexible," and that Hardy may have complained about certain work assignments, or "dragged his feet" with some work, and that Hardy was less willing to do work outside his painting trade. ECF No. 123-7. However, because there is well-documented evidence that

---

[33] Defendant does not offer any evidence in response suggesting that Ahart held any of the painting certifications held by Hardy.

Hardy and other African-American employees were frequently singled out at Lyon to perform undesirable/difficult work assignments, a juror could reasonably draw the inference that Hardy's purported lack of flexibility regarding work assignments was <u>intertwined with the racially unequal assignments</u> he was asked to perform.

Considering the two candidates requisite qualifications, a reasonable juror could place substantial weight on the fact that Gaskins <u>could not even recall</u> whether Ahart had the same painting certifications that Hardy had, as the record supports the inference that such certifications were a substantial asset to a painting supervisor at Lyon (particularly if Lyon was significantly reducing the labor force of subordinates that would otherwise be painting at Lyon). The evidence suggests both that Lyon paid to send Hardy to school to obtain the certifications and promoted him after he received the certifications. ECF No. 123-1, at 65-72. Further supporting Hardy's claim of pretext is his allegation that Gaskins had previously denied Hardy a promotion based solely on a (false) safety violation reported by a white "machine shop" employee that Gaskins purportedly believed over Hardy's word without any corroborating evidence. ECF No. 123-1, at 70-72. Additionally, notwithstanding his (former) status as a supervisory employee with an established record of high performance, Hardy asserts that after he learned of his termination, he tried to discuss a possible job in the "outside paint shop" with Gaskins

95

and he received "an emphatic no" with no further explanation. Id. at 37. Gaskins contemporaneous refusal to even engage in a conversation with Hardy, a long-term valued member of Lyon's supervisory staff, adds some degree of further gloss to the pretext calculus. Cf. ECF No. 123-11 (one of Hardy's performance reviews from 2015 documenting not only Hardy's exceptional work but his leadership skills and initiative). Additionally, in evaluating the broader situation, a reasonable juror could take into consideration the circumstantial fact that the first four employees that Lyon elected to discharge (Thomas, Sr., Hardy, Tillery, and McDonald) were all African-American, two of whom were African-American supervisors, as well as the absence of any evidence highlighted by Defendant suggesting that Caucasian supervisors were also terminated as part of the RIF.

While a close question on this record, the Court concludes that ruling in Defendant's favor at the summary judgment stage would improperly usurp the role of the factfinder. Notwithstanding the fact that Hardy's wrongful termination claim does not appear particularly strong, the Court finds that there is sufficient evidence to allow a reasonable factfinder to conclude that Hardy's race was one of several "motivating factors" in Lyon's decision to select him, rather than Ahart, for termination, and that Lyon's explanation as to why Ahart was retained over Hardy is

pretextual. Defendant's summary judgment motion is therefore
**DENIED** as to Count Four.

### 5. Retaliation - Hardy

Defendant does not challenge Hardy's retaliation claim in a
dedicated subsection of its summary judgment brief, but does
include a paragraph at the conclusion of its wrongful termination
argument expressly asserting that Lyon has advanced a legitimate
non-retaliatory reason for discharging Hardy (the RIF and the
decision to retain Ahart), further asserting that Hardy's
"retaliation claim fails as a matter of law" because he fails to
put forth facts demonstrating that he would not have been
discharged "but for" his protected activity. ECF No. 80, at 13-
14. The conclusion of Lyon's brief further states that Lyon seeks
summary judgment as to "all of Hardy's claims." Id. at 14. Hardy
responds, albeit briefly, arguing that Lyon does not seek summary
judgment on this claim, but even if it did, that the proximity of
Hardy's discharge to his complaint about Douglas (less than two
months) contributes to a finding of pretext. ECF No. 123, at 27
n.9.

Having considered both parties' limited arguments, the Court
finds that: (1) Lyon has moved for summary judgment on this claim
even though there is not a dedicated "section" of its brief
challenging Count III; and (2) Hardy fails to establish a prima
facie case of retaliation and/or that Lyon's justification for his

97

termination was pretext for <u>its retaliatory animus</u>.  <u>Cf.</u> <u>Jacobs v.</u> <u>N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 568 (4th Cir. 2015) (explaining that although the plaintiff provided "some indirect evidence from which a factfinder might infer animus, she has produced no direct evidence of <u>retaliatory</u> (as opposed to discriminatory) animus").

Notwithstanding the parties' suggestions that the retaliation claim and wrongful discharge claim rise and fall together, the retaliation claim ultimately requires that Hardy demonstrate that his complaints to several managers were a "but-for" cause of his termination.  Hardy, however, fails to point to any evidence suggesting that the decision maker (Gaskins) or the head of H.R. who participated in the RIF decisions (Dunkley) were even aware of his informal verbal complaints.  Rather, Hardy relies on speculation that he was retaliated against for "being so vocal" about the Douglas incident, acknowledging "[t]hat's what I believe. Is it true or not, I don't know."  ECF No. 123-1, at 50. Hardy, however, does not assert that he made a formal complaint to H.R., or even that he voiced any informal complaint to Dunkley or Gaskins, instead explaining that he "had conversations about the Donnna Douglas incident" with "Robert Midget, Michael Ahart, David Kerner, Henry Miller, Eddy Gayle and pretty much foremans that I complained to, because I actually thought that they would raise up a stink and they would make more noise than I could."  <u>Id.</u> at 41-

42.   Hardy further states both that he "went to those people in hopes that they would go to Johnny Gaskins" or George Lyon, to tell them how wrong Douglas was, but that to his knowledge, "they never went to bat for Big Tony or said anything else about the situation, no more than letting me know that they felt that it was inappropriate."   Id. at 43 (emphasis added).

On these facts, no reasonable juror could conclude that Gaskins and/or Dunkley relied on Hardy's informal verbal complaints to various foremen as "a" reason for selecting Hardy for the RIF.   Hardy's claim is admittedly grounded on speculation and timing, and not only is the timing of Hardy's termination consistent with the RIF and the termination of multiple other employees, but to the extent timing is one "relevant factor" that arguably favors Hardy, it is independently insufficient to "create a triable issue of fact."   Mercer, 532 F. App'x at 397.   Moreover, even if the Court assumes that the timing alone did create a "causal link" sufficient to proceed past the prima facie stage, Hardy clearly fails to demonstrate that the reasons Lyon proffered for his termination were a pretext for retaliation, as there is no evidence suggesting that the decision-makers were even aware of his protected activity.   Hardy's evidence therefore falls far short of establishing that he would not have been terminated "but for" his informal complaints.   Defendant's motion to dismiss the retaliation claim is therefore **GRANTED**.

### H. Davell Artis

#### 1. Facts

- Artis is an African-American man who worked as a temporary employee at Lyon in 2008 and 2009, and returned to Lyon as a temporary employee through Tidewater Staffing in early 2015. Artis was hired by Lyon as a permanent employee in September of 2015 and worked in the inside paint shop under Ahart until June of 2016.

- Consistent with the allegations above, Artis' evidence includes allegations that Ahart and other supervisors at Lyon subjected Artis to racially offensive treatment, including: using the n-word to disparage African-American employees (Ahart), displaying the confederate flag in the workplace (Ahart), calling Artis "boy" (Miller), responding to a complaint from Artis about being called "boy" by saying "I can't stand those f**king n**gers" (Miller), supervisors telling racist jokes, the production manager saying that he had no problem with black people because his rich father bought him "one of you-all to play with" when he was a baby, preferential treatment of white employees (Ahart), and refusing to give Artis work hours and otherwise treating him unfairly <u>after</u> Artis complained to H.R. about Ahart's confederate flag necklace. ECF No. 121-1, at 26-33, 46-48, 50-54, 101-05, 135, 143-45.

- Additionally, there was racist conduct in the form of being called the n-word by "the safety guy" (Doug Boss), being unduly targeted by Boss after Artis objected to his use of the n-word, being exposed to racist graffiti including "I hate n**gers" and "F*ck blacks," and nooses hanging on two separate occasions during Artis' 2015 to 2016 term of employment. <u>Id.</u> at 46-49, 125-35.

#### 2. Hostile Work Environment - Artis

##### a. Severe or Pervasive

Defendant first challenges whether Artis can establish that the harassment he was subjected to at Lyon constituted "severe or pervasive" harassment. As outlined above, the record evidence, when viewed in Artis' favor, appears sufficient to permit a

100

reasonable juror to conclude that Artis was subjected to "severe" harassment based on his race in light of the use of the n-word by multiple supervisors, to include use of such word directed at Artis and the use of such word in conjunction with a supervisor referencing terminating his subordinate African-American employees. Artis also saw nooses hanging on two separate occasions.

Alternatively, even if Artis was not subjected to "severe" harassment, a reasonable juror could plainly conclude that the ongoing, repetitive, and widespread racial harassment, including the use of the n-word by Miller and others, racist jokes, graffiti, and confederal flags, nooses, the use of other racial epithets including "boy," and the racially unfair work assignments and overall mistreatment of Artis and other African-American employees, to include the fact Ahart cut Artis' work hours as retaliation for Artis' formal complaint about Ahart's confederate flag necklace, are collectively sufficient to create a jury question as to whether the claimed hostile work environment was sufficiently "pervasive" to violate § 1981. Guessous, 828 F.3d at 221, 227 (defining the applicable test as whether the conduct was "severe or pervasive," noting that such determination is "'quintessentially a question of fact,'" and faulting the district court for failing to consider evidence of "intimidating and intrusive management" singling out an employee based on her race

101

(emphasis added) (quoting <u>Walker v. Mod-U-Kraf Homes, LLC</u>, 775
F.3d 202, 208 (4th Cir. 2014))).

In reaching this conclusion, the Court has considered "all of
the circumstances," including "the frequency of the discriminatory
conduct," namely the consistent verbal remarks and pervasive
graffiti, the severity of such conduct, as punctuated by the use
of the word recognized to be "pure anathema to African-Americans,"
the linking of such overtly offensive word to threats of
termination, and the fact that the "status" of the harasser was
most frequently that of a supervisor/superior, which "impacts the
work environment far more severely" than harassment by "co-
equals." <u>Boyer-Liberto</u>, 786 F.3d at 277-78, 280 (citations
omitted); <u>Spriggs</u>, 242 F.3d at 185 (citation omitted). The Court
rejects Defendant's invitation to weigh the evidence and/or to
make inferences that do not favor Artis when considering whether
he found the environment "threatening" or "humiliating."[34] To the
contrary, his evidence is sufficient to illustrate, both
subjectively and objectively, a pervasively humiliating
environment.

---

[34] Defendant's challenge to whether Artis was <u>subjectively</u> offended fails at
the summary judgment stage, as Artis' testimony not only includes his
description of his subjective mental state, but documents multiple
confrontations that Artis had with Lyon employees after they used a racist
slur, in addition to Artis' complaints to lead man Bobby Hardy, H.R., and
even Gaskins.

### b. Imputable to Lyon

Defendant next challenges whether Artis' hostile work environment claim is imputable to Lyon, arguing that the record establishes as a matter of law that Lyon exercised reasonable care to prevent and correct workplace harassment and that Artis failed to take advantage of "complaint procedures" established by Lyon and/or Tidewater staffing.   For reasons consistent with those previously explained herein, Lyon fails to carry its burden to establish the applicability of the Ellerth/Faragher affirmative defense.   First, Lyon fails to advance facts demonstrating that all of the actionable harassment came from "Vance supervisors," and even if some of it did, there was still egregious race-based harassment from the safety inspector (Boss) as well as anonymous harassment in the form of graffiti and nooses.   Second, factual disputes exist as to whether Ahart's racism culminated in Ahart making a false complaint to H.R. that resulted in Artis' termination-a tangible employment action.   Third, even accepting Defendant's premise that the affirmative defense is "available," Artis has pointed to genuine factual disputes regarding whether Lyon's relevant policies were effective and/or effectively implemented, thus requiring the jury to determine whether Lyon exercised "reasonable care" to prevent/correct harassing behavior (the first prong of the Ellerth/Faragher affirmative defense). See Thompson, 117 F. Supp. 2d at 529.

Lyon's plaintiff-specific arguments only further reveal that summary judgment is not appropriate, as Lyon relies on the 2015 employee handbook, yet fails to establish that such handbook was received by Artis prior to December 17, 2015, or that Artis received a copy of <u>any</u> anti-discrimination policy while he was a temporary worker. Additionally, the 2015 policy does not appear to require that a complaint be made to H.R., but instead permits an employee to address the issue with the harasser and to report it to his immediate supervisor. Artis has presented evidence suggesting that he satisfied both of these standards through his direct confrontations with harassers and his complaints to lead-man Bobby Hardy, as well as complaints he made to H.R. and Gaskins. ECF No. 121-1, at 29, 33, 86-94, 101.[35] Defendant's summary judgment motion is therefore **DENIED** as to Count One.

### 3. Disparate Treatment: Work Assignments - Artis

Defendant argues that Artis fails to demonstrate that he suffered disparate treatment amounting to an "adverse employment action" because unfavorable job assignments are insufficient to

---

[35] To the extent that consideration of the entire case record suggests that Artis received the 2013 handbook on September 17, 2015, such handbook, even if advanced by Lyon in support of summary judgment, is only relevant to a two month period of Artis' employment. Although Artis did receive a business card from Tidewater Staffing with a phone number that could be used to voice an "H.R. concern," discrimination is not referenced on such card. ECF No. 72-7. Additionally, a comparison of ECF No. 72-4 and ECF No. 72-8, both Tidewater Staffing "post offer" employment documents signed by Artis, reveals that sometime after 2006, Tidewater Staffing changed its form from expressly requiring that race discrimination <u>be reported to both the client (Lyon) and to Tidewater Staffing</u>, to not even mentioning race discrimination on the "post offer" employment practices sheet.

state a claim, and that there is "no allegation, let alone proof, that the alleged discrimination affected Artis' pay, benefits or position." ECF No. 72, at 14-15. Artis responds with a cursory citation to cases indicating that being assigned materially more dangerous tasks can amount to an actionable claim, but fails to point to any record <u>evidence</u> suggesting that Artis was assigned to more dangerous tasks. In light of Artis' failure to point to evidence that could support his claim for relief, Defendant's summary judgment motion is **GRANTED** as to Count Two.

### I. Ramell McDonald

### 1. Facts

- Ramell McDonald is an African-American woman who worked as a temporary employee at Lyon from June 2014 to April 2015 through Tidewater Staffing, first on the "fire watch" and then in the paint shop. She was hired by Lyon as a permanent inside paint shop employee in April of 2015, and was terminated in January of 2016.

- McDonald's evidence includes allegations that Ahart and other supervisors at Lyon, as well as safety inspector Doug Boss, subjected her to racially offensive treatment, including using the n-word to disparage McDonald and other African-American employees. McDonald reported racist conduct to lead man Bobby Hardy and to her foreman Ahart (reports that comply with both the 2013 and/or 2015 anti-discrimination policies). McDonald testified that Ahart did nothing, and instead told her to get back to work or she could "leave." ECF No. 86-1, at 29-30, 34-35, 41-42, 51-52. The facts specific to McDonald are not set forth in greater detail in light of Lyon's decision not to challenge the fact that McDonald was subjected to "severe or pervasive" harassment.

### 2. Hostile Work Environment - McDonald

#### a. Severe or Pervasive

Lyon first seeks summary judgment as to McDonald's hostile work environment claim, but it does not, at least at this time, challenge whether the claimed harassment was "severe or pervasive," instead challenging only whether such conduct is imputable to Lyon.

#### b. Imputable to Lyon

Lyon seeks summary judgment based on the application of the Ellerth/Faragher affirmative defense. For reasons similar to those explained above in the analysis as to several other Plaintiffs, Defendant fails to carry its burden to establish the applicability of the Ellerth/Faragher affirmative defense (failure to establish that harassment came from Vance supervisors, disputed facts as to whether Lyon's anti-discrimination policy was effective as written and/or effective as applied in practice). Notably, like other temporary workers, McDonald did not receive a copy of Lyon's antidiscrimination policy during her time working at Lyon through Tidewater Staffing.[36] Moreover, McDonald's evidence documents her direct report to shop foreman Ahart about

---

[36] Defendant appears to argue that McDonald's signature on Tidewater Staffing's "post-offer" employment document required McDonald to follow Lyon's anti-discrimination reporting requirements, yet there is no evidence that McDonald was provided a copy of Lyon's policy while she was a temporary worker. Moreover, the Tidewater Staffing documents on which Lyon relies were executed by McDonald in 2016 and 2017, after she no longer worked for Lyon. ECF No. 86-7.

another employee's use of the n-word, and rather than investigate such matter or report the issue to H.R., Ahart told her <u>to get back to work or leave</u>. ECF No. 124, at 28-35. Such evidence further undercuts Lyon's ability to prevail on summary judgment on its affirmative defense. See <u>Ocheltree</u>, 335 F.3d at 334-35 (calling into question the efficacy of a discrimination policy that requires the employee to report the harassment twice if a supervisor "does not adequately resolve an employee's complaint"). Defendant's summary judgment motion is therefore **DENIED** as to Count One.

### 3. Disparate Treatment: Assignments/Training - McDonald

Defendant seeks summary judgment as to Count Two, disparate treatment, arguing that McDonald fails to demonstrate that she suffered disparate treatment amounting to an "adverse employment action." McDonald responds by stating that "she was deprived of training" in addition to being assigned "dangerous" job assignments. ECF No. 124, at 31. McDonald's brief offers no further facts, argument, or case law in support of her denial of training claim.

The case law McDonald cites in her brief addresses job assignments with materially increased danger; however, McDonald fails to point to any <u>evidence</u> suggesting that, even on a single occasion, she was required to work in a "dangerous" environment, rendering her claim insufficient as a matter of law. As to

McDonald's training argument, McDonald's deposition includes a reference to Ahart's denial of her request to attend a forklift training course, with  such incident presented as context for McDonald's general working relationship with Ahart.  ECF No. 124-1, at 79-80.  McDonald fails to offer any evidence suggesting that Ahart allowed white employees to attend such course,[37] nor does she demonstrate that driving a forklift had any connection to her painting duties at Lyon or that attending such course would otherwise impact her pay or provide an opportunity for a promotion. See Thompson v. Potomac, 312 F.3d at 649-50 (listing the elements of a failure to train claim, which require a plaintiff to establish that she was "eligible for the  training" and that the denial gave "rise to an inference of discrimination").  As McDonald fails to present sufficient facts on which a reasonable juror could conclude that she was denied training based on her race, Defendant's summary judgment motion is **GRANTED** as to McDonald's disparate treatment claim.

### 4. Retaliation - McDonald

Defendant challenges McDonald's retaliation claim first by arguing that McDonald fails to demonstrate "but-for causation," ECF No. 86, at 9, and then by alternatively arguing that, even if

---

[37] McDonald's statement of undisputed facts asserts that Ahart allowed a white employee to attend the forklift course, but the evidence relied on to support such fact states only that a white employee was teaching the course. Compare ECF No. 124, at 14 ¶ 46, with ECF No. 124-1, at 79-80.

a prima facie case of retaliation has been made, Lyon has offered a legitimate non-retaliatory reason for McDonald's discharge. Id. at 9-10. McDonald responds by arguing that the facts before the Court are sufficient to allow a reasonable juror to conclude that a "protected" complaint McDonald made to Ahart formed the basis for her selection for termination, and that the Defendant's proffered reason for her termination, the RIF, was pretextual. ECF No. 124, at 27-28.

After carefully considering all of the evidence highlighted by McDonald, the Court finds that even when the facts and reasonable inferences are drawn in her favor, no reasonable juror could conclude that McDonald has demonstrated that the RIF, or McDonald's inclusion in it, was pretext for discrimination. McDonald has thus failed, as a matter of law, to point to facts sufficient to carry her ultimate burden of demonstrating a "but-for" causal connection between her protected activity and subsequent termination.

First, similar to co-Plaintiff Tillery's retaliation claim, McDonald relies heavily on the purported timing of her termination following a complaint that she made about racial discrimination. McDonald points to evidence indicating that she complained to Ahart, on a single occasion, about an incident when Donna Douglas

called McDonald, and others, "lazy n**gers."[38] ECF No. 124-1, 34-35. When McDonald told Ahart about it, he told her to "get back on the boat" or she could leave. Id. Although McDonald's brief in opposition to summary judgment states that such event occurred "very shortly" before McDonald was terminated and seeks to use such timing to link the complaint to her termination, McDonald cites no evidence that establishes the timeframe of such event. A careful review of the record suggests that the only indication as to when such event occurred stems from McDonald's assertion that "[i]t was hot that day or during that time it was hot." Id. at 36. McDonald later states: "I experienced Donna. I don't – I can't recall the time frame. I'm just telling you when it happened – I mean it happened." Id. at 39 (emphasis added). Based on such evidence, no reasonable juror could conclude that it is more likely than not that McDonald's termination, which occurred during the winter, was "very close" in time to her complaint to Ahart.

Second, McDonald's attack on the RIF itself fails for the same reasons previously discussed herein. As to McDonald's attack

---

[38] McDonald, along with three or four others, had also complained to Ahart about Doug Boss using the n-word after an incident where Boss was angry about several African-American painters' failure to ventilate an area where they were painting (prompting Boss to complain to Ahart). Nothing came of the workers' complaint to Ahart; that is, Boss did not get in trouble for calling the painters "stupid n**gers." ECF No. 124-1, at 51-53. The cited evidence fails to indicate when this incident occurred. Unlike Tillery, McDonald does not argue that she ever complained to Ahart about his behavior. Additionally, she failed to offer any evidence suggesting that she complained to management or H.R. about Ahart's behavior, and thus, there is an absence of evidence suggesting that Ahart had a personal retaliatory motive to terminate her.

on Ahart's personal motive for selecting her for the RIF, she fails

to advance sufficient evidence to suggest any "causal link" between

her prior protected activity and her termination, and further fails

to demonstrate pretext.   McDonald's own testimony suggests that

she was relatively new to the painting trade and that she had a

short tenure as a full-time employee in the paint shop at Lyon,

which as discussed in detail with respect to Tillery's similar

claim, were the race-neutral factors that Ahart asserted formed

the basis for his decision to terminate her.   The fact that some

new employees were hired by Lyon into departments other than the

painting department (to include welders and machinists) between

November of 2015 and February of 2016 similarly fails to rise to

the level necessary to suggest pretext.

Third, it appears undisputed that McDonald had previously

received a disciplinary write-up from Lyon's H.R. department based

on her inappropriate comments to a male co-worker (McDonald asserts

that her comments were in response to her co-workers inappropriate

sexual advances).   ECF No. 124-1, at 42-45.   McDonald attempts to

use the existence of such write-up to demonstrate a "diverging

explanation" for her termination because Nicole Dunkley of H.R.

states in her affidavit that McDonald's prior disciplinary issue

at Lyon played a "part" in the RIF decision, yet such explanation

was not parroted by Ahart or included in McDonald's termination

paperwork (her paperwork only references "separation of employment

due to Reduction in Force"). ECF No. 86-5. Common sense suggests that it is unremarkable that the H.R. director participating in identifying employees for a RIF would factor in a negative mark in that employee's personnel file, while the employee's supervisor would focus on the employee's work skills, experience, and tenure in his shop. While McDonald does point to a "technical" discrepancy in explanation, such highlighted fact at best suggests that was an additional reason in McDonnel's H.R. file to favor McDonald as one of the employees that needed to be terminated as part of the RIF, beyond the facially sufficient tenure/performance explanation offered by the shop foreman. Accordingly, even when inferences are drawn in McDonald's favor, the purported "shifting justification" is insufficient to provide a reasonable juror a basis to conclude that there was an inference of discrimination and/or pretext.[39]

Adopting herein the relevant parts of this Court's prior analysis addressing Tillery's speculative efforts to demonstrate that his protected activity was a "but-for" cause for his

---

[39] McDonald's brief appears to misreport the relevant facts regarding the prior disciplinary issue, as she asserts in her brief that she was "never told" that she was on "final warning status" after she received the disciplinary write-up from H.R., ECF No. 124, at 29, a fact that, if true, makes it more likely that Lyon is engaging in pretextual post-hoc reliance on such event. However, the cited portion of McDonald's deposition testimony only reflects that she thought that it was unfair that the first complaint against her resulted in a "final warning" because she had never received a "first warning," and "right there" she was put on the "get-out list because it's my final warning." ECF No. 124-1, at 44-45.

termination, or that Lyon's race-neutral justification was
pretextual and sought to cover-up a retaliatory motive,[40] the Court
finds that McDonald's claim is similarly speculative, and the Court
therefore **GRANTS** summary judgment in Defendant's favor.

### 5. Wrongful Discharge - McDonald

Defendant seeks summary judgment as to McDonald's wrongful
discharge claim, arguing that such claim fails because the RIF
constitutes a legitimate non-discriminatory reason for the
discharge. McDonald counters that: (1) she need only show that
her race "played a role" in the termination decision; (2) she has
demonstrated that the RIF is pretextual for the same reasons argued
in support of her retaliation claim; and (3) that Ahart's comments
about getting "rid of you-all n\*\*gers" so that he could "get a new
crew" raise an inference of discrimination. ECF No. 124, at 30.

While McDonald correctly asserts that she need only show that
race was a "motivating factor" in her discharge, she fails to clear
such hurdle (either directly, or through the burden shifting
framework). Moreover, even if a prima facie case is assumed, Lyon
has offered a race-neutral justification for its actions, and

---

[40] McDonald contends that Ahart's statement that she could "get back on the boat or [she] can leave," made after McDonald complained about Douglas, is direct evidence of retaliation. ECF No. 124, at 28. While such evidence reveals Ahart's failure to adequately investigate a race-based complaint, and plainly supports McDonald's hostile work environment claim, it appears to require a leap in logic to contend that such statement provides "direct evidence" of <u>retaliation</u>. <u>See</u> <u>Jacobs</u>, 780 F.3d at 568 (distinguishing between retaliatory and discriminatory animus).

McDonald's speculation is facially insufficient to reasonably suggest that Lyon's proffered justification was pretextual.

Consistent with the analysis of Tillery's claim: (1) although McDonald and Tillery were terminated on the same day based on a decision made by Ahart (portrayed as a "racist" supervisor), the two permanent employees that Ahart elected to retain in the inside paint shop were, like the discharged employees, African-American employees, and Ahart had no subordinate Caucasian employees at the time of his challenged actions; (2) there was roughly an equal mix of Caucasian and African-American employees terminated by Lyon during the first two weeks of January of 2016; (3) notwithstanding McDonald's claimed "direct" evidence of discrimination, Ahart kept several members of his all African-American employee crew and never replaced a single terminated African-American employee with an employee of a different race; and (4) for reasons previously discussed, McDonald fails to call into question the legitimacy of the RIF itself, and fails to demonstrate evidence on which a reasonable juror could conclude that the proffered reasons for her inclusion in the RIF (experience and tenure) were pretext for race-based discrimination.  The fact that six new employees were hired into departments/shops other than the inside or outside paint shop between October of 2015 and February of 2016 is likewise uncompelling, particularly because half of the six new hires were

African-American employees.  Summary judgment is therefore **GRANTED**

as to McDonald's wrongful discharge claim.

### J. Alfredo Lebron-Diaz

#### 1. Facts

- Alfredo Lebron-Diaz ("A.L.D.")[41] is a Hispanic man who worked at Lyon's workplace through a staffing agency between 2007 and 2009, and performed additional work there in the years that followed.  In January of 2013, A.L.D. returned to Lyon to work the night shift as a temporary worker through Tidewater Staffing.  A.L.D. worked for Lyon through Tidewater Staffing until August of 2016, although for part of this time, his position with Lyon was his "second job" (he also worked at another local shipyard).

- Consistent with the testimony of several other Plaintiffs, A.L.D. repeatedly experienced/witnessed racism at Lyon, including racially motivated job assignments.  White workers at Lyon were free to choose their assignments and could turn down work assignments that they did not like, leaving "the crappy jobs for people who are either black or Hispanics."  If a Hispanic or black temporary employee complained about a job assignment, they were threatened with termination.  A.L.D. both heard these threats and saw Hispanic and African-American workers sent home (without pay) after they complained.  ECF No. 118-1, at 22-24, 28.

- A.L.D. also heard racist epithets being used in the workplace against African-American employees and Hispanics, to include the n-word.  This conduct occurred dating back to 2009, and it continued through 2015, with a specific incident "around 2015" involving a "memo" posted at Lyon barring the use of racial slurs, to which a "lead man" reacted: "can't say n**ger anymore."  Id. at 54-56, 62-63.

- The graffiti described by others (the n-word, hanging black figures, swastikas, "Mexican Shuttle" pointing at the toilet, etc.) was similarly described by A.L.D., and he was exposed to it in "any bathroom" at Lyon.  A.L.D. also saw a noose hanging on a tugboat and saw the confederate

---

[41] The Court uses Plaintiff's initials as an abbreviation because his brother, who shares the same surname, is also a Plaintiff in this case.

flag in various places, with the flag "proudly" displayed by supervisor Ahart. ECF No. 29, 42-43, 53, 58-59.

- A.L.D. was himself called various racial slurs by co-workers, but not by his managers. He at times confronted these co-workers, he reported such behavior to his Lyon supervisor Harold Crispen, and he complained to his contacts at two different staffing companies. A.L.D. experienced such racial treatment "the entire time" he was working at Lyon. Id. at 29-35. In addition to the n-word, the slurs A.L.D. heard at Lyon included "spic" and "wetback." When asked how often he heard racial slurs directed toward workers at Lyon, A.L.D. responded "constantly." Id. at 53-54.

### 2. Hostile Work Environment - A.L.D.

Defendant argues that A.L.D. fails to allege facts on which a reasonable juror could conclude that the harassment he experienced was sufficiently "severe [or] pervasive." Defendant correctly highlights that A.L.D. was not called racial slurs by his supervisors, that he could not identify the names of individual co-workers that directed slurs at him, and that he voluntarily returned to Lyon in 2013 even after experiencing harassment prior to such date. Defendant likewise correctly notes that none of the allegations appear to document a "severe" event involving racial harassment.

A.L.D., however, correctly highlights the fact that the Court is required to consider the totality of the circumstances in addressing the fact-based inquiry of whether he suffered "pervasive" race-based harassment, and here such circumstances include evidence of race-based work assignments supported by the

116

sworn testimony of this Plaintiff and many other Plaintiffs,
threats to send African-American and Hispanic workers, including
A.L.D., home if they didn't complete the unfavorable race-based
work assignments, use of the n-word, "spic," and "wetback" by white
co-workers, incidents in which white co-workers verbally
complained about "overgrown Mexicans," or "f*cking Puerto Ricans,"
or "damn spics" in reference to them taking white people's jobs
away or not speaking English at work (all incidents that A.L.D.
personally experienced). ECF No. 118-1, at 37.[42] A.L.D. also
described in detail the ever-present racist graffiti in all of the
bathrooms at Lyon's workplace. Unlike some of the other
Plaintiffs, A.L.D. asserts that he did complain to both his manager
at Lyon and his contacts at the relevant staffing company, but
such complaints did not stop the racist conduct at Lyon.

In addition, the proper inquiry to be made by the Court, and
ultimately the factfinder, considers A.L.D.'s personal experiences
within the context of the overall culture at Lyon, to include the
lack of adequate training for managers/employees and the fact that
the "personnel" department did little to manage race-based conduct
prior to sometime in 2015 (when it appears that "personnel" first
realized that using the racial epithet "n**ger" was a violation of

---

[42] A.L.D. asserts that one co-worker <u>threatened to get him fired</u> when he was
speaking Spanish at work, because the co-worker thought that A.L.D. was
talking about him, and he told A.L.D. that he was "in America" and "better
speak English." ECF No. 118-1, at 33.

company policy). Moreover, the "totality" evidence suggests that the initial efforts to change the "culture" at Lyon when Dunkley was hired in 2015 may not have been immediately successful.

Notably absent from such evidence is the allegation that managers/supervisors directed race-based epithets at A.L.D., although he does allege that managers unfairly assigned him work and would threaten his livelihood, or the livelihood of other minority temporary employees, if complaints were raised about the job assignments. When all of the evidence is considered collectively, it is frankly difficult to determine whether A.L.D. has presented enough facts to demonstrate sufficiently "pervasive" race-based harassment. That said, the race-based work assignments and overall treatment of A.L.D. as a second class employee is documented by A.L.D.'s evidence, and bolstered by evidence from numerous other persons who worked for Lyon during this timeframe. Cf. Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 653-54 (5th Cir. 2012) (acknowledging that "cross-category discrimination," against workers of a different race than the plaintiff "could be relevant when there is a sufficient correlation between the kind of discrimination claimed by a plaintiff and that directed at others," but holding that if the evidence of discrimination against the plaintiff's race is lacking, "evidence of hostility towards a different racial group is not much support for the plaintiff's claim"). Additionally, A.L.D. is able to provide multiple concrete

118

examples of specific slurs directed at him, and he provides details of not just epithets, but the context in which such words were used during specific conversations and/or confrontations.  This is also not a case predicated solely on the self-serving testimony of a single plaintiff, rather, numerous other Lyon employees support A.L.D.'s contention that white co-workers, managers, and senior management engaged in a general practice of treating non-white employees as "second-class" workers at Lyon.   See Savage v. Maryland, 896 F.3d 260, 277 (4th Cir. 2018) (explaining that when racial slurs are used repeatedly to insult African-American "employees and customers," such slurs can create "an unlawful hostile work environment" even if they are "not directed specifically at the complaining employee").  Critically, A.L.D. recounts specifics about how such general practice impacted him.

In seeking to resolve this difficult question, the Court finds itself wading into the waters of "weighing" the evidence in an effort to resolve Lyon's summary judgment motion, a clear sign that whether the disputed harassment "was sufficiently severe or pervasive is . . . a question of fact" that can only be resolved by the factfinder.  Guessous, 828 F.3d at 227 (citation omitted).  In seeking to identify whether material disputed facts preclude summary judgment, the Court considers "evidence about how other employees were treated in that same workplace," as such evidence "can be probative of whether the environment was indeed a

119

[racially] hostile one, even if the plaintiff did not witness [all of] the conduct h[imself]." Ziskie v. Mineta, 547 F.3d 220, 225 (4th Cir. 2008); see Collier v. Ram Partners, Inc., 159 F. Supp. 2d 889, 898 (D. Md. 2001) (finding that "it is clear that a reasonable person could readily find that the incessant use of racial invective in [the] work place was such that [the plaintiff], as a reasonable African-American, was subjected to 'discriminatory intimidation, ridicule, and insult,'" and that the defendant's argument that "racial slurs, insults and epithets targeted at individuals other than [the plaintiff] cannot be considered actionable . . . is contrary to law" (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986))). That said, the Court is careful not to place too much emphasis on conduct that was not witnessed by an individual plaintiff, because the conduct personally experienced by a plaintiff is significantly "more probative of a hostile workplace than is conduct the plaintiff did not h[imself] witness." Ziskie, 547 F.3d at 225.

Here, rather than merely "piggybacking" on the evidence advanced by his co-Plaintiffs, A.L.D. advances specific evidence demonstrating that he personally witnessed the use of the n-word toward African-American employees, as well as the use of the words "wetback" and "spic" made in reference to Hispanic workers, the latter of which has been labeled by another judge of this court as "objectionable in the extreme," Peary v. Goss, 365 F. Supp. 2d

713, 728 (E.D. Va. 2005); see Garcia v. Teledyne Energy Sys., Inc.,
No. 12-CV-1634-JKB, 2012 WL 4127878, at *2 (D. Md. Sept. 19, 2012)
(labeling "spic" as an "offensive and deplorable" slur, but noting
that a race-based comment uttered on a single occasion "is
generally not sufficiently severe or pervasive to alter the
conditions of the victim's employment") (quotation marks and
citation omitted); cf. Cherry v. Menard, Inc., 101 F. Supp. 2d
1160, 1181-82 (N.D. Iowa 2000) (finding that "racial statements,
such as 'spics' and 'gooks,' which were repeatedly used in [the
plaintiff's presence" among other acts, "were so odious and
demeaning that they are sufficiently severe to give rise to an
actionable hostile work environment claim").   A.L.D. likewise
testified that such racial slurs were directed at him by white co-
workers that worked in the yard, although he cannot identify the
names of the co-workers who made such comments.   In describing the
environment, A.L.D. explained that "[t]he problem was because it
didn't fe[el] like it was frowned upon, like it was okay to talk
to people like that and they just say, 'Oh, it's a joke.'"   ECF
No. 118-1, at 33-34. Furthermore, A.L.D. highlights the constant
and offensive racist graffiti that reappeared after it was painted
over, as well as management's failure to address the culture at
Lyon over the course of many years, even after he complained.  The
offensive racist behavior described by A.L.D. was "constant," and
his willingness to deal with this conduct over a lengthy period of

time in order to "make ends meet," ECF No. 118-1, at 24, is not fatal to the subjective component of his claim.  Because resolving this question requires careful line-drawing that can be conducted only after balancing and weighing the evidence, it is too close a call to make as a matter of law, and Lyon's motion is therefore **DENIED** as to this claim.[43]

### 3. Disparate Treatment: Work Assignments - A.L.D.

Defendant seeks summary judgment as to Count Two, arguing that A.L.D. fails to demonstrate that he suffered an "adverse employment action" due to work assignments.  A.L.D. responds by arguing that he was given difficult tasks and made to work in "worse conditions" than white workers, and that job assignments can rise to the level of an adverse employment action if they are sufficiently "dangerous."  A.L.D., however, fails to point to any evidence of even a single incident where he was required to perform materially more dangerous work based on his race.  Consistent with the lack of evidence on this point presented by several co-Plaintiffs, and because there is no evidence supporting relief on Count Two, Defendant's summary judgment motion is **GRANTED.**

---

[43] Defendant does not challenge whether the claimed race-based conduct is properly imputable to Lyon.

122

### K. Wilfredo Lebron-Diaz

### 1. Facts

- Wilfredo Lebron-Diaz ("W.L.D.") is a Hispanic man who worked for Lyon through a staffing agency from 2007 to 2009, and for part of 2010.  He returned to Lyon as a temporary worker through Tidewater Staffing from 2014 to 2016.

- From 2007 to 2009, W.L.D. experienced racism at Lyon through graffiti in the bathroom and overhearing racial slurs, sometimes when the speaker thought that no one was around to overhear it, and sometimes when others were around.  However, W.L.D. did not ever hear a slur directed at him, although he did see graffiti directed at Hispanics. W.L.D. testified that he heard slurs "too often" between 2007 and 2009, although he could not identify the speakers, just "people."  ECF No. 120-1, at 32, 47.

- W.L.D. was upset that white workers were often "cruising" at Lyon's workplace—doing very little real work—and that after he diligently performed his work, he often had to do the unfinished work that he believed should have been performed by white workers.  Id. at 38-39, 42-44.

- W.L.D. returned to Lyon in 2010 through a staffing company, and the graffiti was still there, and the "feeling that we were lesser employees" was still there, the latter being based on the fact that management was not dealing with the graffiti and other "symbols," including nooses and the confederate flag.  W.L.D. cannot remember if he heard any slurs during this eight month period, and his later statements indicate that he never saw a physical noose hanging anywhere, stating that he saw nooses "mostly" in graffiti (without clarification as to where else he might have seen a noose).  Id. at 49, 52-53, 55-56.

- W.L.D. was next at Lyon between 2014 and 2016.  He felt he was the victim of racism during this period based on "symbols, slurs and differential treatment."  The symbols were graffiti and confederate flag stickers, the "differential treatment" was being assigned harder jobs than white employees, and the slurs were not described, although W.L.D. confirmed that none were directed at him. Id. at 55-57.

123

- As for the differential work assignments, W.L.D. explained that between 2014 – 2016, white employees were getting easier work while he was getting complex work. He acknowledged that white employees may also have been assigned complex work at times, and that he never complained about the difficulty of his work assignments. W.L.D. explained that he did not think that he was being overworked at Lyon, and that he liked the challenging jobs and did <u>not</u> like easy jobs. He did think that he should be compensated more if he was always performing a "specialty job." He does not recall seeing any black employees performing "complex work" during 2014 – 2016, but instead explains that it was pretty much him and his brothers who would get "paired off" and sent to do the complex work. W.L.D. further testified that he assumes that his supervisor knew that he was good at the challenging work and would do it well. <u>Id.</u> at 58-62.

- Throughout the time that W.L.D. was at Lyon, he said that there was <u>not</u> a "specific individual" that he believed discriminated against him because he was from Puerto Rico. He does recall hearing racial slurs in the 2014 to 2016 timeframe, but does not describe any of the incidents involving a slur directed at Hispanics. The only specific incident he does describe in his deposition is an incident that he only saw part of, in which a Lyon employee that he could not see (but speculates to be a supervisor) said "damn lazy monkeys" to some African-American workers. Although W.L.D. indicates that most of the slurs he heard at Lyon were made by co-workers around the paint shop that Ahart supervised, he never worked directly with Ahart, or had any direct issues with Ahart, nor does he clarify whether the unidentified slurs were directed at African American employees or Hispanic employees. <u>Id.</u> at 63, 84-85, 95-96.

### 2. Hostile Work Environment - W.L.D.

Defendant argues that W.L.D. fails to allege facts on which a reasonable juror could conclude that the harassment he experienced was sufficiently "severe or pervasive" to sustain a hostile work environment claim. Defendant accurately highlights

124

the absence of a single slur directed at W.L.D. over the course of many years (from supervisors or from co-workers) and that W.L.D.'s allegations regarding slurs against others can only be described as vague. There is also a lack of evidence that W.L.D. heard slurs against anyone on a daily, weekly, or monthly basis, particularly as to the 2014 to 2016 timeframe. Moreover, it appears that much of the specific graffiti and slurs that W.L.D. was exposed to was directed at African-American employees, not Hispanic employees. As to work assignments, W.L.D. does not feel like he was overworked, enjoyed the difficult jobs that he was routinely assigned, and assumes that his supervisor considered his ability to capably perform complex work when assigning him the "tough jobs," noting his belief that he should just have been paid more for such complicated work.

W.L.D.'s response asserts that he was subjected to "regular racial harassment" but points primarily to the offensive statements in bathroom graffiti. He also points to his testimony that he heard racist slurs "too often," but the context of such statement is not only limited to the 2008 to 2009 timeframe, but such vague term ("often") does not effectively reflect the frequency of such statements, as hearing an offensive term such as "spic" on a few occasions over several years could still reasonably be described as "too often." Notably, W.L.D. was never himself the subject of any racial slurs, and he fails to demonstrate the

125

degree to which "slurs" that he did overhear were directed at persons of his race/ethnicity, rather than African-American employees.

The Court acknowledges, and has fully considered in W.L.D.'s favor, the testimony indicating that W.L.D. saw the words "spic" and "wetback" in bathroom graffiti, and that he heard some unidentified racial slurs between 2008 and 2009. ECF No 120-1, at 33. When asked about the 2010 period, W.L.D. said that he could not recall if he heard slurs or what they were if he had heard them. Id. at 52-53. W.L.D. was later asked several follow up questions whereby he appears to indicate that he "heard" the same slurs he had previously seen in written form between 2014 and 2016, although it is unclear from the phrasing of the question and W.L.D.'s limited answer: who purportedly made such slurs; when they were made; how often they were made; the context in which they were used; and/or which slurs were actually spoken (rather than written in the bathrooms). Id. at 95.

The only concrete factual example of a slur that W.L.D. offers from the 2014 to 2016 timeframe is the story referenced above in which an unknown employee, assumed by W.L.D. to be a supervisor, appeared to refer to several African-American workers as "monkeys." Id. at 95-96. Notably, W.L.D. only partially witnessed such event, which was directed at workers of another race, and he is unclear on the details. Id. Accordingly, even

assuming in W.L.D.'s favor that his testimony is sufficient to establish that he did hear the slur "spic" or "wetback" uttered at Lyon at some point between 2014 and 2016, such slur(s) was not directed at W.L.D., no identity or even a description of the speaker has been provided, and no context for the statement is offered—making it unclear whether such slur(s) was even directed at another person during this time.  As a result, there is insufficient evidence to establish that such slur(s) materially contributed to an actionable abusive working environment for this Plaintiff during the last three years of his employment.

This Court agrees with W.L.D. that it is appropriate to consider the totality of the record to determine if there was an objectively hostile work environment, and here, co-Plaintiffs have provided various facts supporting a hostile work environment claim by multiple African-American co-workers and one Hispanic co-worker.  However, as previously discussed herein, because the different Plaintiffs worked in different shops at different times, the "general environment" evidence cannot be given undue emphasis, particularly when the bulk of such evidence appears to single out employees of a different race.  While the "environment" evidence unquestionably remains relevant, an individual plaintiff's personal experience remains the primary driver behind his or her ability to demonstrate a hostile work environment.

Here, even after accepting all of W.L.D.'s facts as true and making reasonable inferences in his favor, the record is not sufficient to demonstrate that this Plaintiff was subjected to an objectively hostile work environment that was abusive, psychologically injurious, threatening, and/or humiliating, or that it was degrading to the point that it interfered with W.L.D.'s work performance. See Reardon v. Herring, 201 F. Supp. 3d 782, 788 n.7 (E.D. Va. 2016) ("[F]ederal labor laws are not intended to create 'a general civility code for the American workplace.'" (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998))). This Court in no way condones the race-based conduct W.L.D. asserts that he viewed or overheard at Lyon. Offensive racial comments directed at people of any race, and graffiti using grossly offensive epithets, no matter whom they target, have no place on any work site, to include a shipyard. That said, W.L.D.'s vague allegations regarding an unknown number of slurs, from unknown co-workers, directed at unknown persons (if even directed at a person), without any details regarding the specific statements, or the context in which they were used, or the frequency of such conduct, falls short of the evidence necessary to support a viable hostile work environment claim. See Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir. 1994) (finding that "general allegations" of differential treatment based on race that are "not substantiated by accounts of specific dates, times or

circumstances . . . do not suffice to establish an actionable claim

of harassment"); Skipper v. Giant Food Inc., 68 F. App'x 393, 399

(4th Cir. 2003) (explaining that "a plaintiff pressing a hostile

work environment claim must substantiate his claim with reasonable

specifics about the alleged incidents that underlie the claim,"

which is not satisfied by a broad complaint that unnamed "white

workers use racial epithets in the warehouse"); cf. Singleton v.

Dep't of Corr. Educ., 115 F. App'x 119, 122 (4th Cir. 2004) ("It

is established that 'simple teasing, offhand comments, and

isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of

employment.'" (quoting Faragher, 524 U.S. at 788)). Similarly,

the graffiti, while offensive and inappropriate, was likewise

directed primarily at people of a different race, and is

insufficient to support a cause of action, even when considered in

conjunction with work assignments that were, at least at times,

"tougher," especially because W.L.D. acknowledges that some of the

tough assignments he received were apparently the result of his

skill and desire to perform challenging work. Defendant's motion

is therefore **GRANTED** as to W.L.D.'s hostile work environment claim.

### 3. Disparate Treatment: Work Assignments - W.L.D.

Defendant seeks summary judgment as to Count Two, arguing

that W.L.D. fails to demonstrate that he suffered an "adverse

employment action." W.L.D. responds by arguing that he was given

difficult tasks and made to work in "worse conditions" than white workers, and that job assignments can rise to the level of an adverse employment action if they are sufficiently "dangerous." W.L.D., however, fails to point to any evidence of even a single incident in which he was required to perform materially more dangerous work based on his race. Consistent with the resolution of the disparate treatment claim advanced by most of the co-Plaintiffs, because there is no evidence supporting relief on Count Two, Defendant's summary judgment motion is **GRANTED.**

### V. Summary and Conclusion

As set forth above, Defendant's summary judgment motion as to Plaintiff Robert Thomas, Jr. is **DENIED.** ECF No. 87. Defendant's summary judgment motion as to Plaintiff Wilfredo Lebron-Diaz is **GRANTED.** ECF No. 83. The summary judgment motions as to the remaining Plaintiffs are **GRANTED in part and DENIED in part.** Specifically: Brandon Campbell – **GRANTED** as to disparate treatment, **DENIED** as to hostile work environment, ECF No. 75; Robert Thomas, Sr. – **GRANTED** as to disparate treatment, **DENIED** as to hostile work environment, retaliation, and wrongful discharge, ECF No. 89; James Williams, **GRANTED** as to disparate treatment, **DENIED** as to retaliation, and wrongful discharge, ECF No. 94; Jerry Cook, **GRANTED** as to retaliation, **DENIED** as to hostile work environment, disparate treatment, and wrongful discharge, ECF No. 77; Tavaris Tillery, **GRANTED** as to disparate treatment,

retaliation, and wrongful discharge, **DENIED** as to hostile work environment, ECF No. 91; Bobby Hardy, **GRANTED** as to disparate treatment and retaliation, **DENIED** as to hostile work environment and wrongful discharge, ECF No. 79; Davell Artis, **GRANTED** as to disparate treatment, **DENIED** as to hostile work environment, ECF No. 71; Ramell McDonald, **GRANTED** as to disparate treatment, retaliation, and wrongful discharge, **DENIED** as to hostile work environment, ECF No. 85; and Alfredo Lebron-Diaz, **GRANTED** as to disparate treatment, **DENIED** as to hostile work environment, ECF No. 81.

With the benefit of such Plaintiff-specific rulings, counsel for both parties are reminded of the benefits of reevaluating the relative strengths and weaknesses of their cases, which clearly vary across Plaintiffs and across the differing types of claims that survive summary judgment. A lengthy jury trial is scheduled to begin later this year, and in light of the obvious risks and rewards of proceeding to trial, the parties are hereby **INSTRUCTED** to return to a settlement conference with a Magistrate Judge of this Court to determine whether the unpredictability of trial can be avoided through a negotiated settlement. Counsel for the parties should jointly contact the scheduling deputy for the Magistrate Judge **within ten (10) days** of the issuance of this Opinion and Order to schedule a settlement conference.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ ~~Mark S. Davis~~

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
September **30**, 2019

132